## UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

SOUTH CAROLINA ASSOCIATION OF
SCHOOL LIBRARIANS; D.R., by and through
his parents, Leah Moore and Charles Rhyne;
H.A.C., by and through her parents Susan
Cridland-Hughes and Jed Cridland-Hughes;
H.M.C., by and through her parents Susan
Cridland-Hughes and Jed Cridland-Hughes;

                    *Plaintiffs*,

         v.

ELLEN WEAVER, in her official capacity as
South Carolina Superintendent of Education;
GREENVILLE COUNTY SCHOOL DISTRICT;

                    *Defendants*.

Case No.    2:25-cv-12857-DCN

**Complaint for Declaratory and
Injunctive Relief**

### PRELIMINARY STATEMENT

1.      Plaintiffs—3 primary school students and a professional association of 750 school librarians from across South Carolina—bring this action to challenge two pillars of Defendant Weaver's statewide censorship regime.

2.      First, Plaintiffs seek relief from the portion of South Carolina Department of Education (SCDE) Regulation 43-170 that bans all classroom, library, and curricular materials that contain "descriptions or visual depictions of 'sexual conduct,'" regardless of whether the material appeals to the prurient interest, is patently offensive, or otherwise has educational, literary, artistic, political, or scientific value. *See* Ex. A (the "Regulation").

3.      The Regulation is no paper tiger. Because of the Regulation's categorical ban on "sexual conduct," South Carolina now leads the nation in statewide book bans: 21 books. Fearing

1

repercussions, librarians across the state have prospectively removed books from their libraries to avoid potential challenges. Many teachers have abolished their classroom libraries.

4.     Across the state, enforcement of the Regulation has been irregular. For example, Berkely County School District cut off its students' access to Discus, an online resource operated by the South Carolina State Library. Fort Mill School District cut its connection to the York County Public Libraries eBook collection, depriving its students of access to thousands of books previously available to them. And Beaufort County School District suddenly requires students to obtain parental permission to access a growing list of canonical, age-appropriate literature.

5.     The Regulation is not just wrong; it is unlawful. The Regulation facially violates the First Amendment because it is a content-based regulation that is substantially overbroad under the Supreme Court's *Ginsberg* standard for obscenity.[1]

6.     The Regulation is also unconstitutionally vague under the Fourteenth Amendment because its text (and Defendants' even more confusing instructions for enforcement) fail to provide librarians and other educators with sufficient certainty about what materials do and do not amount to a "description or depiction" of "sexual conduct."

7.     Second, Plaintiffs challenge Defendant Weaver's unilateral efforts "strangle the free mind at its source," *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 637 (1943), by using her authority as State Superintendent to forcibly curtail students' access to ideas that she politically opposes.

8.     Specifically, Plaintiffs challenge Defendant Weaver's March 2025 Memorandum (Censorship Memo), which calls for the immediate and complete suppression of 14 ideas and

---

[1] Just this year, virtually identical laws have been struck down in Iowa and Florida. *See, e.g.*, *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573-CEM-RMN, 2025 WL 2408178 (M.D. Fla. Aug. 13, 2025) (permanently enjoining a Florida law that bans school materials that "depicts or describes sexual conduct," as overbroad under *Ginsberg*); *Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1029–31 (S.D. Iowa Mar. 25, 2025) (preliminarily enjoining an Iowa law that bans school materials that contain a "description" of a "sex act," as overbroad under *Ginsberg*).

concepts from SCDE materials. *See* Ex. B. In addition to prohibiting a *non-exhaustive* list of concepts—which include firmly rooted ideas like "implicit bias," "restorative justice," and "social-emotional learning"—Defendant Weaver's Censorship Memo also requires state employees to positively indoctrinate students with the political administration's views on sex, gender, race, and American exceptionalism.

9.      Like the Regulation, Defendant's Weaver's Censorship Memo violates the First and Fourteenth Amendments.

10.     By using her authority over South Carolina public-school curricula to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *Barnette*, 319 U.S. at 642, Defendant Weaver is violating students' First Amendment right to receive information. And because the Censorship Memo warns librarians, teachers, and other SCDE personnel to avoid a "not exhaustive" list of vague and undefined concepts, it violates the Fourteenth Amendment due process rights of members of Plaintiff South Carolina Association of School Librarians (SCASL).

11.     Without injunctive relief, Student Plaintiffs and SCASL members face imminent and irreparable harm to their First and Fourteenth Amendment rights.

## PARTIES

12.     **Plaintiff South Carolina Association of School Librarians (SCASL)** is a nonprofit, nonpartisan membership organization in South Carolina. As a professional organization, SCASL's purpose is to improve school library programs and services, including by supporting the right of students to have access to ideas and information. It also aims to foster public understanding of the value of librarianship and library programs in education. The organization is based in Columbia, SC, and it represents over 750 member-librarians from across South Carolina, including at least one member in every school district in the state. Its current president, Tenley Middleton, is a librarian in the Fort Mill School District. Like other SCASL members, her district has ordered her to remove books that *might* violate the Regulation.

3

13.     **Plaintiff D.R.** is 17 years old and brings his claims by and through his parents, Leah Moore and Charles Rhyne. D.R. is a senior at the Academic Magnet High School in the Charleston County School District.

14.     **Plaintiffs H.A.C. and H.M.C.** are 16 and 14 years old respectively and bring their claims through their parents Susan and Jed Cridland-Hughes. H.A.C. is a junior at Greenville High School and H.M.C. is a freshman at Greenville High School in the Greenville County School District.

15.     **Defendant Ellen Weaver** is the South Carolina Superintendent of Education. In her official capacity, Defendant Weaver is responsible for creating and enforcing the policies of the SCDE, including the challenged Regulation and Censorship Memo.

16.     **Defendant Greenville County School District** (Defendant Greenville) serves about 77,000 students, ranging from Pre-K through 12th grade. It is made up of 106 schools in Greenville County, South Carolina. Its board of trustees is responsible for all matters within the district and comprises 12 members.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the United States Constitution and 42 U.S.C. § 1983.

18.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District of South Carolina and because Defendants reside in this District.

19.     Venue is proper in the Charleston division under Local Civil Rule 3.01 because that is where Plaintiff D.R. and members of Plaintiff SCASL reside, and where a substantial portion of the events or omissions giving rise to the claims occurred.

## FACTS

20.     Defendant Weaver is responsible for creating and/or enforcing two policies that constrain the professional judgment and threaten the job security of SCASL members and that

4

censor Student Plaintiffs' access to library, classroom, and curricular materials: Regulation 43-170 and the Censorship Memo. Though related to a common purpose, each creates distinct harms to Student Plaintiffs and SCASL members.

21.    The Regulation mandates the removal of all books that contain a description of sexual conduct from schools. It does not matter whether the school is an elementary or a high school. It does not matter whether a book is pornographic or great literature.

22.    South Carolina classrooms and libraries do not provide children with "obscene" materials. Indeed, under South Carolina law, it is a crime to disseminate obscene materials to a minor. *See* S.C. Code §§ 16-15-345, -305(B) (defining "obscene" according to *Miller v. California*, 413 U.S. 15 (1973)). Thus, the Regulation only applies to materials that are not legally obscene.

23.    The Censorship Memo requires the SCDE to remove a non-exhaustive list of taboo concepts and terms from its materials. While Defendant Weaver's list is not complete, it has a clear theme: Anything that contradicts *her* views regarding race and gender must go.

**I.    Regulation 43-170**

24.    The State Board of Education enacted the Regulation on February 13, 2024, despite opposition from educators and students, and despite warnings that it did not comply with constitutional obscenity standards. It went into effect on June 25, 2024.

25.    In addition to prohibiting all materials with sexual content, the Regulation also provides standardized procedures by which parents can challenge a book. To enable such challenges, the Regulation requires school districts to maintain a complete list of materials available to students in its libraries, including a teacher's classroom library. Ex. A, §§ II & III.

26.    Under the Regulation's enforcement provision, the State Board of Education can penalize school districts and employees for violating the Regulation. After a second violation, the Board may impose "any response that the Board, in its discretion, deems appropriate." Ex. A, § VII.

A.     Complete Ban on Materials Containing "Sexual Conduct"

27.     Regulation 43-170 categorically forbids any materials that "include descriptions or visual depictions of 'sexual conduct'" from being used "in a South Carolina K-12 public school classroom," made available in "a public school library/media center (including through digital platforms)," or included on "a public school's reading list." It also prohibits teachers from "keep[ing]" such materials on "school grounds" or "ma[king them] available to students." Ex A, §§ I & III.

28.     The definition of "sexual conduct," derived from South Carolina's criminal prohibition on obscenity, *see* S.C. Code Ann. § 16-15-305(C)(1), includes "actual or simulated intercourse," actual or simulated "touching" or "caressing," "masturbation," and even "excretory functions."[2]

29.     But unlike Section 16-15-305, the Regulation does not incorporate the three-part constitutional test for obscenity provided in *Miller v. California*, 413 U.S. 15 (1973). Instead, it prohibits all materials containing "sexual conduct," without any consideration of whether the material is "patently offensive," "appeals to the prurient interest," or possesses "serious literary,

---

[2] In full, the definition is: "(a) vaginal, anal, or oral intercourse, whether actual or simulated, normal or perverted, whether between human beings, animals, or a combination thereof; (b) masturbation, excretory functions, or lewd exhibition, actual or simulated, of the genitals, pubic hair, anus, vulva, or female breast nipples including male or female genitals in a state of sexual stimulation or arousal or covered male genitals in a discernably turgid state; (c) an act or condition that depicts actual or simulated bestiality, sado-masochistic abuse, meaning flagellation or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals, or female breast nipples, or the condition of being fettered, bound, or otherwise physically restrained on the part of the one so clothed; (d) an act or condition that depicts actual or simulated touching, caressing, or fondling of, or other similar physical contact with, the covered or exposed genitals, pubic or anal regions, or female breast nipple, whether alone or between humans, animals, or a human and an animal, of the same or opposite sex, in an act of actual or apparent sexual stimulation or gratification; or (e) an act or condition that depicts the insertion of any part of a person's body, other than the male sexual organ, or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure."

6

artistic, political, or scientific value." By omitting the *Miller* test, the Regulation ignores constitutional limits on when the government may lawfully suppress sexual content.

30.     The Regulation does not consider whether the sexual content is important or gratuitous, whether the sexual content is brief or infused throughout the material, or whether the sexual content contains any pedagogical value.

31.     The Regulation also ignores the age or maturity of students. It treats a 16-year-old high school student the same as a five-year-old kindergartener, even though the former can give legal consent in South Carolina. S.C. Code Ann. § 16-3-655.

### B.     How a Book is Banned

32.     Regulation 43-170 creates three pathways for challenging instructional materials.

33.     First, it allows school districts to prospectively review their existing materials to ensure that the materials are age and developmentally appropriate, i.e., do not describe "sexual conduct." Second, it allows parents of students to challenge any specifically identified material. Third, it allows the State Board to review materials on its own initiative. Ex. A, §§ III & IV.

#### i.     Prospective Review

34.     Although 43-170 states that school districts are not required to review their existing materials, it also repeatedly states that each school district "is ultimately responsible for the selection or continued use of all Instructional Materials." Ex. A, § II-B. Regarding new materials, the Regulation mandates that "[a]ny materials that do not satisfy [the requirements] shall not be acquired, retained, or used by a public school district." Ex. A, § III-B.

35.     The Regulation does not provide a procedure for school districts to follow if they opt to review their existing materials. Thus, districts are free to follow whatever procedure they want, so long as they evaluate the materials using the criteria provided by the Regulation: "(1) The material's academic or educational rigor; (2) The material's educational significance; (3) The material's validity, accuracy, objectivity, currency, and appropriateness; (4) The finite

7

availability of library shelf space and whether the space occupied by any particular volume could be filled by a different volume with greater academic rigor, objectivity, or accuracy, literary or educational merit, or quality." Ex. A, § III-C.

36.     The Regulation also prohibits removing material because a district board opposes the viewpoints expressed within. Ex. A, § III-D; *but see* Censorship Memo, *infra* Part II (forbidding concepts like "social justice," "social emotional learning," and "implicit bias").

37.     Neither the 4-factor assessment from § III-C nor the prohibition on viewpoint discrimination in § III-C apply to materials that describe sexual conduct. The Regulation requires removal of those materials regardless of their educational rigor, significance, or any of the Regulation's other criteria.

38.     If a district chooses to vet its existing collection, this burdensome process falls on its librarians. Librarians consistently "weed" their collections based on criteria like book circulation, condition, or outdatedness. But librarians cannot read every book in their libraries. Verifying that every book does not violate the Regulation is, for practical purposes, impossible.

39.     Ordinarily, any prospective review of materials consists of either a district official instructing librarians to remove specific books, or librarians removing books that they believe may be challenged by a parent.

### ii.  Parental Challenges

40.     Parents can challenge material by filling out a form provided by the SCDE and submitting it to their school district board of trustees. Ex. A, § IV-A. On the form, the complainant must specifically identify the challenged material, affirm that the complainant has read the challenged material, and explain why the parent believes the material should be removed. Parents are limited to submitting five challenges per month.

41.     Within 90 days of receiving a complaint, the district board must conduct a public meeting to consider the complaint and decide at that meeting whether to remove or restrict the challenged material within that district. Ex. A, § IV-B.

42.     If the complaining parent disagrees with the board's decision, they may appeal the decision to the State Board of Education. Upon receiving an appeal, the State Board must hold a public meeting at which to consider it.

43.     If the State Board decides that the material violates the Regulation, it issues a statewide order to all public schools to remove the materials. Ex. A, § IV-C.

                    *iii.  Voluntary State Board Review*

44.     Finally, the State Board may opt to review materials of its own volition. In such instances, its determinations bind all public-school districts in South Carolina. Ex. A, § IV-E.

45.     After reviewing materials, a district board may opt to fully remove materials from schools, to restrict access to the materials to students with parental consent, or to retain the materials. Ex. A, § III-C. The State Board has the same power but with statewide impact. Ex. A, § IV-E.

                    C.      The Enforcement Provision

46.     The Regulation authorizes the State Board to punish school districts or employees if they fail to comply with the Regulation. Ex. A, § VII.

47.     For a first violation, the punishment is limited to a written warning.

48.     For a second violation, if the State Board finds that the violator acted "knowing[ly] or intentional[ly] or willful[ly] or recklessly disregarded the district's or the employees actual or constructive knowledge of the" requirements of the Regulation, the district superintendent or the violating employee will be "subject to a hearing conducted by the State Board, and any response that the Board, in its discretion, deems appropriate."

49.     Ordinarily, the State Board's may "deny, revoke, or suspend a [teaching] certificate or issue a public reprimand for . . . willful violations of the rules and regulations of the State Board of Education." S.C. Code Ann. Regs. 43-58.

9

50.    Notably, Regulation 43-170 does not require a willful violation, merely the "reckless disregard" of "actual or constructive knowledge" of the Regulation's requirements. Ex. A, VII-B. Nor does the Regulation impose any restrictions on how the State Board may punish a violator.

51.    In South Carolina, public-school educators, including librarians, must hold an appropriate teaching credential as specified by the Board of Education. S.C. Code Ann. Regs. 43-50. Thus, revocation of a librarian's credentials under 43-170 could effectively end their career.

D.    The Cataloging Requirement

52.    The Regulation requires each school district to "maintain at all times on its website a complete, current list or catalog of all books and other materials that are available to students through any of a district's libraries or media centers." Ex. A, § II-C. This requirement is designed to make it easier for parents to challenge materials.

53.    Schools must catalog all materials "used in or available to a student in any given class, course, or program that is offered, supported, or sponsored by a public school, or that are otherwise made available by any public-school employee to a student on school premises," and to provide that list to a parent or guardian upon request. Ex. A, § II-D. Thus, the Regulation impacts school libraries, classroom libraries, and course materials.

54.    School librarians are responsible for cataloging every book in their libraries and making that catalog available to parents. Most districts, which rely on library cataloging software, simply make these catalogs available online.

55.    Teachers are similarly responsible for cataloging their classroom libraries. But, unlike school librarians, most teachers did not previously keep a catalog of their libraries or have access to library cataloging software. As a result, districts instructed teachers to catalog their libraries and prohibited them from lending books until they were cataloged. Many districts also required teachers to ensure that no books that violate the Regulation were in their libraries. As a result, many teachers stopped keeping classroom libraries.

10

E.     Vagueness Problems

56.     Teachers, librarians, districts, and even the State Board have struggled to interpret and apply the Regulation. Part of the issue is that it is not clear what it means to "describe" or "depict" sexual conduct. For example, the Regulation leaves open whether the description must be explicit, or whether metaphor, innuendo, or other suggestive language counts.

57.     Attempting to clarify the issue, SCDE sent a memorandum to local school officials on February 11, 2025. Ex. C (Regulation 43-170—Final Orders from the State Board of Education). This memorandum provided an unhelpful standard: Something violates the Regulation if it contains enough "explanatory detail" to allow one to "form a mental image" of the sexual conduct.

58.     The new standard left school librarians more confused about the Regulation's application than before. After all, different people require different amounts of "explanatory detail" to imagine sexual conduct. Thus, material might violate the Regulation for one reader but not another.

59.     This contradicts Defendant Weaver's assertion that the Regulation relies on "a very objective criteria."[3] As the memorandum states, the criteria hinge on the mind's eye of the evaluator; this is as subjective as subjective gets.

60.     The Regulation's vagueness has resulted in inconsistent application.

61.     For example, the Board opted to review George Orwell's *1984* on its own initiative. Despite *1984* describing the very sexual acts the Regulation seeks to suppress, the Board opted to retain the book.

62.     In the same February 11 memorandum, the Department explained that *1984* does not violate the Regulation because its passages "referencing sexual conduct . . . are brief and lack

---

[3] South Carolina Legislature, August 27, 2025 meeting of the Government Efficiency and Legislative Oversight Committee – Education and Cultural Affairs Subcommittee, scstatehouse.gov (last visited Oct. 7, 2025), https://tinyurl.com/53xvmu2p.

11

the necessary explanatory detail to qualify as a description." But, as anyone who has read the book knows, *1984* explicitly describes a sexual affair between two characters. In one scene, Orwell writes: "[h]e could feel her breasts, ripe yet firm, through her overalls."

63.     The Board's decision to retain *1984* is impossible to square with the Regulation, which requires removal of any book that describes "physical contact with the covered or exposed … female breast." Ex. A, § (I)(C) (citing S.C. Code Ann. § 16-15-305(C)(1)(d)).[4] The passage's brevity is irrelevant to the Regulation. By retaining the book, the Board further confounded the work of teachers, librarians, and administrators whose jobs rely on appropriately enforcing the Regulation.

64.     Also on its own initiative, the Board reviewed and removed multiple books by Sarah Maas, including four books from the series *A Court of Thorns and Roses*. Presumably unaware that the series has a fifth book, the Board neither considered nor removed it. Similarly, the Board reviewed and removed two books from Maas's *Throne of Glass* series but did not consider the six other books in that series. Librarians across South Carolina remain uncertain about whether to take the rest of these series off the shelves.

65.     The Regulation's vagueness has also led to disparate enforcement across South Carolina. For example, Beaufort County has been subjected to dozens of book challenges (by a single parent) and has imposed parental-consent barriers on nine books that aren't restricted in other districts. Other districts, like Berkeley County School District, have removed access to critical educational resources to avoid potentially violating the Regulation, despite having received no challenges to any of its instructional materials. Others have been reluctant to get involved, preferring to punt book reviews to the State Board rather than ban books themselves.

---

[4] Plaintiffs do not mean to suggest that *1984* should be banned. Rather, the Board's unconvincing mental gymnastics underscore that the Regulation's prohibition on sexual conduct is an unworkably blunt instrument that, if faithfully applied, will rob students of invaluable curricular and literary materials.

12

F.     Statewide Book Removals

66.     Since the Regulation's implementation, the Board has banned 21 books from all public-school libraries The Board banned each of these books because they contain descriptions of sexual conduct. They are: *A Court of Frost and Starlight* by Sarah Maas, *A Court of Mist and Fury* by Sarah Maas, *A Court of Thorns and Roses* by Sarah Maas, *A Court of Wings and Ruin* by Sarah Maas, *All Boys Aren't Blue* by George Johnson, *Flamer* by Mike Curato, *Half of a Yellow Sun* by Chimamanda Ngozi Adichie, *Hopeless* by Colleen Hoover, *Kingdom of Ash* by Sarah Maas, *Last Night at the Telegraph Club* by Malinda Lo, *Living Dead Girl* by Elizabeth Scott, *Lucky* by Alice Sebold, *Normal People* by Sally Rooney, *Perks of Being a Wallflower* by Stephen Chbosky, *Push* by Sapphire, *Tricks* by Ellen Hopkins, *Identical* by Ellen Hopkins, *Ugly Love* by Colleen Hoover, *Collateral* by Ellen Hopkins, *Damsel* by Elana Arnold, and *Empire of Storms* by Sarah Maas.

67.     The Board has also restricted access to *Crank* by Ellen Hopkins, which now requires students to obtain parental consent before accessing the book. While the Board found that the references to sexual assault in *Crank* did not amount to "descriptions" of sexual conduct, the Board found that these references justified restricting access to the book.

68.     Many of these books received much literary acclaim and offer much pedagogical value. For example, *Perks of Being a Wallflower* made the American Library Association's list of Best Books for Young Adults in 2000. *Half of a Yellow Sun* received the Women's Prize for Fiction in 2007 and appeared on the AP Literature and Composition Exam as recently as 2023. *Last Night at the Telegraph Club* won the National Book Foundation's Book Award for Young People's Literature in 2021 and the Young Adult Library Services Association placed the novel on its Top Ten Best Fiction list in 2022.

69.     Fourteen of these books banned by the Board of Education were challenged by the same parent in Beaufort County.

G.     District-level Enforcement Differences

70.     Interpretation of the Regulation has varied wildly by district.

*i.   Book Restrictions by Beaufort County School District*

71.     On August 22, 2025, Beaufort County restricted access to nine more books: *The Bluest Eye* by Toni Morrison, *Sold* by Patricia McCormick, *The Freedom Writers Diary* by Erin Gruwell, *The Kite Runner* by Khaled Hosseini, *The Lovely Bones* by Alice Sebold, *Thirteen Reasons Why* by Jay Asher, *The Art of Racing in the Rain* by Garth Stein, *Tilt* by Ellen Hopkins, and *The Duff* by Jody Keplinger. While these books have not been removed from Beaufort County's school libraries, students now need parental permission to access them.

*ii.   Termination of Discus by Berkeley County School District*

72.     Discus is a free online resource operated by the South Carolina State Library. It contains a vast collection of education and research resources, including encyclopedias, reference books, newspapers, eBooks, government reports, and historic documents.

73.     In February 2025, Berkeley County School District completely blocked access to Discus. In an email to the State Library's Agency Director, Berkeley County School District's legal counsel defended Berkeley's authority to cut access to Discus under the Regulation and asserted that Berkeley had the obligation to do so.

74.     South Carolina students rely heavily on Discus as a reliable source of information for research assignments. Berkeley County School District's decision left its students without this important educational tool. In lieu of Discus, Berkeley officials suggested using Google Scholar, Wikipedia, and SweetSearch.com. According to the State Library Director, "[n]one of these 'resources' are remotely comparable to Discus, an academic research database." As she pointed out, "[t]he only losers in his situation are the students who do not have access to accurate information and resources."

75.     In the wake of Berkeley's decision to remove Discus access, several other school districts contacted the State Library to determine whether Discus complied with the Regulation,

14

including Beaufort County School District, Dorchester 2 School District, and Charleston County School District.

76.    In July 2025, the State Library Director exchanged a series of emails with SCDE official, Dr. Mark Herring. In those emails, the Director asked Dr. Herring if SCDE could issue a statement that Discus complied with the Regulation. Dr. Herring responded that SCDE wanted an "airtight" promise that Discus complied with the Regulation. To date, SCDE has not issued such a statement.

77.    Although the Regulation's prohibition on "sexual conduct" applies equally to students of every age, Berkeley County School District restored Discus access to high schoolers in August 2025, while continuing to block access for younger students.

78.    Elementary and middle school students remain unable to access Discus resources, even those specifically meant for their level.

### iii. Termination of Sora Connection by Fort Mill School District

79.    Sora is an application through which school libraries can purchase eBooks and audiobooks, which students can borrow using their personal electronic devices.

80.    Many county libraries also use Sora to provide their patrons with access to a wealth of eBooks and audiobooks. County libraries typically have larger Sora collections than school libraries.

81.    School libraries can connect their Sora accounts with their local county libraries' accounts, providing their students access to their county libraries' Sora collection. This connection provides students with access to thousands more books, at no cost to schools or students.

82.    Afraid of violating the Regulation, some school districts—like Fort Mill School District—have severed students' Sora link to their local libraries rather than risk the possibility that students might gain access to materials that "describe" "sexual conduct." As a result, students can no longer access *thousands* of titles.

## II.    The Censorship Memo

83.    On March 14, 2025, Defendant Weaver sent out a memorandum that purports to create "clarity and consistency in how [SCDE] implement[s] federal and state policies." Ex. B.

84.    It orders South Carolina educators to comply with three of President Trump's Executive Orders and one associated "Dear Colleague" letter from the U.S. Department of Education. Notably, courts across the country have preliminarily enjoined those orders, finding that they likely violate the First and Fifth Amendments.

85.    The Censorship Memo mandates the following viewpoints:

86.    **Sex Ideology.** The Censorship Memo mandates that South Carolina educators "promote" that "sexes are not changeable and are grounded in fundamental and incontrovertible reality." It correspondingly prohibits "gender ideology" and, along with it, the view that "it is possible for a person to be born in the wrong sexed body." This not only suppresses one side of a critical public debate, but it also requires that South Carolina students be taught an ideology that the Fourth Circuit has ruled discriminatory. *See, e.g.*, *Grimm v. Gloucester County School Board*. 972 F.3d 586 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878 (2021); *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025).

87.    **Race Ideology.** The Censorship Memo requires South Carolina educators to follow the Trump Administration's directive to "instill a patriotic admiration for our incredible Nation"[5] by avoiding any suggestion that the United States is, or has ever been, "racist, sexist, or otherwise discriminatory." Ex. B. Besides suppressing one side of a critical public debate, this prohibition is impossible to follow in topics like U.S. History and American Literature. S*ee, e.g.*, U.S. Constitution, art. I § 2 (3/5ths compromise); U.S. Constitution amend. XIX (finally granting women right to vote in 1920); *To Kill a Mockingbird*.

---

[5] Executive Order 14190, "Ending Radical Indoctrination in K-12 Schooling."

16

88. Besides mandating the promotion of Defendant Weaver's own views related to race and gender, the Censorship Memo orders educators not to "promote" ideologies that are inconsistent with the mandated viewpoints. Nowhere in the Memo does Defendant Weaver explain what it means to "promote" an ideology, leaving educators to guess whether it means active advocacy, mere mention, neutral explanation, or something else entirely.

89. Compounding the issue, the Censorship Memo prohibits the use of a *non-exhaustive* set of "buzzwords, concepts, and practices." This list includes:

- Action Civics
- Antiracism
- Cisgender, Heteronormative, and other Gender Binary/Spectrum-related terms
- Collective Guilt/Responsibility
- Critical Pedagogy/Consciousness
- Critical Theory (Postcolonial, Queer, Race, or any other kind of Postmodern Theory)
- Culturally Responsive/Relevant Teaching
- Disparate Impact Theory
- Diversity, Equity, and Inclusion
- Implicit/Unconscious Bias
- Intersectionality
- Restorative Justice/Practices
- Social Justice
- Social-Emotional Learning (SEL)

90. Although addressed only to SCDE employees, the memorandum's effects extend much further. It sharply constrains the curricular and material-selection decisions of teachers and librarians that are no less bound by the command of Defendant Weaver, thereby depriving

17

Plaintiff Students of their access to a broad range of pedagogically appropriate lessons and materials.

### III.     Effects on Plaintiffs

    A.    <u>Defendants' censorship harms students' access to information in the classroom and library.</u>

91.     Plaintiff D.R. is 17 years old and is a senior at the Academic Magnet High School in the Charleston County School District.

92.     He is a member of the Charleston chapter of the Diversity Awareness Youth Literacy Organization (DAYLO). DAYLO is a diversity-themed book club that reads several books per year. In addition to its book-club operations, DAYLO also participates in anti-censorship and intellectual freedom advocacy.

93.     D.R. has opposed Regulation 43-170 since its inception. On February 6, 2024, he spoke during the public comment period at the State Board of Education's meeting. Noting that the age of consent in South Carolina is 16 years, he argued that a total ban on sexual content in schools was not in students' best interests. In particular, he noted that the Regulation would require the removal of any books that have examples of healthy sexual relationships, or that help students identify abusive relationships.

94.     Before its enactment, D.R. would borrow books from his teacher's classroom libraries. When the Regulation went into effect, he was no longer able to do so, because it required teachers to catalog all books in their classroom. Many teachers stopped providing classroom libraries. To help, D.R. and other DAYLO members helped teachers catalog their classroom libraries. But it remains the case that many of his teachers stopped providing classroom libraries.

95.     D.R.'s school, Academic Magnet High School, complied with the Regulation by removing books banned statewide from its shelves. This amounted to 11 books: *Damsel*, *The Perks of Being a Wallflower*, *Flamer*, *All Boys Aren't Blue*, *A Court of Mist and Fury*, *A Court of*

*Thorns and Roses*, *A Court of Wings and Ruin*, *Normal People*, *Empire of Storms*, *Kingdom of Ash*, and *Last Night at the Telegraph Club*. *Crank* is only accessible with parental permission. Its library did not have any of the other proscribed books.

96.     Due to the Regulation, staff at Academic Magnet High School advised the Charleston DAYLO chapter to avoid books prohibited by the Regulation. The Charleston DAYLO chapter works closely with school staff and wants to avoid actions that could harm staff members or its relationship with the school administration.

97.     D.R. wants his DAYLO chapter to read *Last Night at the Telegraph Club* but is prohibited from doing so because of the Regulation's enforcement.

98.     H.A.C. is 16 years old and is a junior at Greenville High School, which is part of the Greenville County School District. She founded the Greenville DAYLO chapter and is currently its president. H.M.C. is 14 years old and is a freshman at Greenville High School. H.M.C. joined DAYLO at the start of her freshman year. The Greenville DAYLO chapter meets on campus.

99.     At the beginning of the 2025 school year, the Greenville DAYLO chapter expressed interest in reading *The Perks of Being a Wallflower*. School officials informed DAYLO that it was not permitted to read *The Perks of Being a Wallflower* because it was one of the 21 books banned under Regulation 43-170.

100.    The Greenville DAYLO chapter does not rely on Greenville High School to provide its books. Ordinarily, its members purchase their own copies or rely on the public library. In some circumstances, the larger DAYLO organization will provide the books.

101.    Even though Greenville High School would not provide DAYLO's reading material, it still forbade DAYLO from reading any of the books banned by Regulation 43-170.

102.    After starting high school, H.M.C. attempted to locate and check out *The Perks of Being a Wallflower* by Stephen Chbosky, *Identical* by Ellen Hopkins, and *Kingdom of Ash* by

19

Sarah Maas from Greenville High School's library. None of the books were in the library, although other books from the same series by Sarah Maas were present.

103.     Shortly after the Regulation went into effect, both H.A.C. and H.M.C. (who was then in middle school) asked their English teachers if they could borrow a book from their classroom libraries. Both of their teachers told them that they could not borrow a book because the teachers still needed to catalog their classroom libraries.

104.     Since the Regulation went into effect, H.A.C. has noticed that most of their teachers at Greenville High School have stopped maintaining in-classroom libraries.

105.     By mandating the removal of all materials that describe sexual conduct from the classroom and the library, the Regulation undermines the Plaintiffs education.

106.     South Carolina's College- and Career-Ready English Language Arts Standards (SC CCR ELA Standards) require high school graduates to have engaged with a wide variety of "rich and challenging texts." But many such texts include descriptions of sexual conduct. The Regulation denies Plaintiffs the opportunity to learn from such texts.

107.     Many such texts also appear on the Advanced Placement Literature and Composition Exam. By not permitting Plaintiffs access to such texts, the Regulation undermines the Plaintiffs ability to prepare for this exam, through which they could achieve college credit and bolster their college applications.

        B.     <u>Defendants' censorship fails to adequately notify SCASL members about how to comply with the law.</u>

108.     Since passing the Regulation, librarians and educators have complained about the Regulation's vagueness, stating that it has made it more difficult to do their job.[6] Even some

---

[6] Abraham Kenmore, *SC teachers say new 'age-appropriate' rule is causing confusion. They're seeking clear guidance*, S.C. Daily Gazette (Sept. 9, 2024, 10:46 AM), https://tinyurl.com/yedymktx.

State Board of Education members have complained about its vagueness.[7] Indeed, illustrative of this vagueness are frequent disagreements among school districts and the Board about whether a book violates the Regulation. Indeed, each of the books the Board reviewed and banned after a parental appeal demonstrates such a disagreement.

109.    SCDE has represented that the Regulation "creates neither new processes nor new penalties related to educator misconduct," but that squarely contradicts the Regulation's enforcement provision, which gives the State Board the power to punish school employees, including SCASL members. Ex. A, § VII. Understandably, SCASL members are unconvinced, continuing to fear that SCDE will penalize them if they violate the Regulation.

110.    This fear is further justified by Defendant Weaver's history of retaliation against librarians. For example, Defendant Weaver cut SCDE's ties with SCASL in 2023 because SCASL advocated against censorship in school libraries. In doing so, Defendant Weaver escalated tensions while simultaneously accusing SCASL of creating a "hostile environment."

111.    SCASL's members, school librarians in South Carolina, do not understand how to interpret the Regulation. Before the State Board's retention of *1984*, librarians were unsure what constituted a "description" of sexual conduct. Since the State Board retained *1984,* school librarians' confusion has increased. Despite their uncertainty regarding the Regulation's scope, school librarians believed that *1984*'s explicit sexual content clearly violated it.

112.    The State Board's explanation for retaining *1984*,[8] that it lacked enough "explanatory detail" to "form a mental image of the conduct occurring," caused more confusion. This standard is highly subjective, and librarians do not know how to apply it. Different people require different amounts of detail to form a mental image, and librarians do not know whose perspective matters. Even under this revised standard, librarians do not know how the State

---

[7] Skylar Laird, *No vote on removing books from schools as SC education board questions own rule*, S.C. Daily Gazette (April 1, 2025, 4:57 PM), https://tinyurl.com/y4sv4ems.
[8] Memorandum from SCDE to District Superintendents, dated 2/11/2025.

21

Board concluded that *1984* lacked sufficient explanatory detail to allow readers to form mental images of sexual conduct. This has led librarians to believe that the State Board will interpret the Regulation to reach whatever conclusions it wants.

113. The differing interpretations by different school districts further evidence the Regulation's ambiguity. For example, Berkeley County School District found that Discus violated the Regulation because it contained sexual content, but other districts have not. Indeed, Berkeley County later determined that, although Discus contained descriptions of sexual conduct, it was acceptable to return access to high school students.

114. Due to the Regulation's enforcement provision, SCASL members are not only afraid of losing their jobs, but about being stripped of their ability to continue in their profession. To avoid such consequences, some school librarians have become overly cautious about purchasing new books. Some have stopped purchasing fiction altogether.

115. School librarians have changed the way they acquire new books. Before the regulation, librarians relied on professional reviews and age-appropriate ratings provided by publishers. Now, many librarians rely on the "tags" provided by Follett, the company that manufactures the library cataloging software used by South Carolina school libraries. If Follett tags a book as "mature" or related to "sex and dating," many librarians will not purchase it.

116. Instead of relying on professional reviews, many librarians have begun relying on crowd-sourced reviews, like those previously available on BookLooks.org. Since BookLooks shut down, librarians have relied on reviews on sites like Goodreads and ScreenItFirst to determine whether parents are likely to challenge books before purchasing them.

117. Worse still, SCASL members who fear repercussions have *preemptively* removed books they thought might be challenged. In some cases, they used their library software to find any books in their collection tagged as "mature" or involving "sex and dating," and removed them from their shelves. Books can be designated as mature or related to sex and dating for many reasons besides containing descriptions of sexual conduct.

118.    Many SCASL members have been engaged in onerous record-keeping activities to protect themselves in case one of their purchases is challenged. These activities include downloading Follett Catalogs whenever they make a new purchase, so that they can prove the books they purchased did not have "mature" or "sex and dating" tags at the time of purchase. Other activities include recording the justification for every book purchase or attempting to read every book before shelving it.

119.    SCASL members fear running afoul of Defendant Weaver's Censorship Memo, and its non-exhaustive list of taboo terms and concepts related to "discriminatory equity" or "gender" ideologies. SCASL members cannot know what library-sponsored activities are implicated by the Censorship Memo.

120.    Many librarians are pressured—even directed—by their districts to remove potentially controversial texts from their shelves, especially those related to sexuality and social justice issues. For example, many school libraries regularly put up themed book displays. These displays have included themes related to banned books, Black history, and the LGBTQ+ community. Some districts have ordered their librarians to take down displays related to these subjects. But SCASL members do not know where to draw the line. As a result, many have simply stopped creating themed displays or providing programming that Defendant Weaver might disagree with, regardless of whether it is on her non-exhaustive list.

121.    Tenley Middleton is the current president of SCASL. She has been a school librarian for over a decade. She currently works as a school librarian in Fort Mill School District. Ms. Middleton finds the Regulation difficult to interpret and she feels that the State Board has applied it inconsistently.

122.    Since the Regulation's implementation, she has been asked by her district to remove books that have not been challenged, including *Me, Earl, and the Dying Girl* by Jesse Andrews. District officials have repeatedly told Ms. Middleton that the district wants to avoid being in the news, which has encouraged her not to buy books that she otherwise would. District

officials were also upset with her for putting up a Ramadan themed display in the library because members of the community complained. As a result of these pressures, she has stopped purchasing books that Follet labels as "mature," which has resulted in her not purchasing *hundreds* of books.

123.     The Regulation and the Censorship Memo have inspired a culture of fear among school librarians.

**CLAIMS FOR RELIEF**

**Count One**

**Regulation 43-170 Violates the First Amendment**
**42 U.S.C. § 1983**
(Student Plaintiffs)

124.     The allegations in all previous paragraphs are incorporated here.

125.     The Regulation's prohibition on all library and classroom materials that describe or depict "sexual conduct" is overbroad and violates the First Amendment rights of students to receive information. The State exercises significant discretion over the content of its school libraries, but there are limits. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) (plurality opinion).

126.     Through the Regulation, Defendant Weaver requires removal of all books that describe or depict sexual conduct, regardless of their value. There are no exceptions. There is no consideration of a book's literary, artistic, scientific, or political value. Nor is there consideration for the age and maturity of the audience; banned books are forbidden to kindergarteners and high school seniors alike. The ban covers literary classics like *Catch-22* and *Brave New World*, and it covers books on puberty that discuss safe sex and consent.

127.     The Regulation is overbroad in both the library and classroom contexts. Regulations on speech are unconstitutionally overbroad "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up).

24

128.    The Regulation's categorical ban on materials with "sexual conduct" in school libraries is overbroad because none of the covered materials are obscene for minors. For something to be obscene for minors, it must lack literary, political, artistic, or scientific value as to minors. *Ginsberg v. New York*, 390 U.S. 629 (1968). But every book in every school library is there *because* a librarian found that it had such value. There are no obscene books in South Carolina's schools. Each time the State Board or a school district used the Regulation to remove a non-obscene book that contained "sexual conduct," it violated the Constitution.

129.    Physical books are not the only materials that the Regulation has removed. It has also caused school districts to restrict access to online resources such as Discus and Sora because they might contain materials that describe sex. As a result, students have lost access to thousands of educational resources, including dictionaries, encyclopedias, audiobooks, and eBooks, even though most do not mention sex.

130.    The Regulation is overbroad in the classroom context too, where the State may regulate curriculum only if its decision bears a reasonable relation to a legitimate pedagogical interest. *Hazlewood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). But there is no legitimate pedagogical interest behind the Regulation's ban on materials that depict or describe "sexual conduct."

131.    To the contrary, the Regulation cripples the education of South Carolina students. Beginning in seventh grade, students should be "reading critically from a variety of rich and challenging texts." SC CCR ELA Standards, August 2025. By removing all materials that contain descriptions of sexual conduct, the Regulation deprives students of access to many such texts. One court noted that much of the "world's finest literature" contains descriptions of sexual acts, including:

25

> *Candide* by Voltaire; *Brave New World* by Aldous Huxley; *All the Pretty Horses* by Cormac McCarthy; *Droll Stories* by Honoré de Balzac; *Howl and Other Poems* by Allen Ginsburg; *[The] Naked Lunch* by William S. Burroughs; *Tropic of Cancer* by Henry Miller; *Slaughterhouse Five* by Kurt Vonnegut; *Sophie's Choice* by William Styron, *Myra Breckenridge* by Gore Vidal; *One Hundred Years of Solitude* by Gabriel Garcia Marquez; *For Whom the Bell Tolls* by Ernest Hemingway; *A Farewell to Arms* by Ernest Hemingway; *Women in Love* by D.H. Lawrence; *As I Lay Dying* by William Faulkner; *The Handmaid's Tale* by Margaret Atwood; *Leaves of Grass* and *Song of Myself* by Walt Whitman, *I Know Why The Caged Bird Sings* by Maya Angelou, *Go Tell It On The Mountain* by James Baldwin, *Their Eyes Were Watching God* by Zora Neale Hurston, *Lolita* by Vladimir Nabokov, *Oedipus Rex* by Sophocles, *The Color Purple* by Alice Walker, *Tristessa* by Jack Kerouac, *Ulysses* by James Joyce, and the Bible.[9]

By requiring the removal of the books listed above, and many more, the Regulation deprives students of the opportunity to learn from libraries' worth of great literature.

132.    Moreover, the Regulation reaches many books—including several listed above—that frequently appear on the Advanced Placement Literature and Composition Exam. By banning such books from the classroom, the Regulation undermines students' ability to succeed on that exam and to use their scores to bolster their college applications.

133.    Beyond reading and analyzing great literature, South Carolina students are expected to develop "refined research skills." SC CCR ELA Standards, August 2025. These skills should enable students to "evaluate and critique the validity and credibility of a variety of print and multimedia texts." *Id.* When Berkeley County School District removed access to Discus, it cut off access to students' best research tool. As a substitute, Berkeley County School District suggested students use sweetsearch.com, Google Scholar, and Wikipedia. As the Director of the South Carolina State Library explained, "[n]one of their resources are remotely comparable to the quality of resources provided by and through Discus."[10]

---

[9] *Couch v. Jabe*, 737 F. Supp. 2d 561, 568 (W.D. Va. 2010).

[10] Brandon Roperts, *Groups demand restoration of student access to Discus in Berkeley County*, Post and Courier (Aug. 4, 2025), https://tinyurl.com/ynu3f6nr.

134.    In short, the Regulation undermines the goals of South Carolina's public-school system. It slashes the number of permissible "rich and challenging texts" that can be taught. And it reduces the availability of high-quality sources that students can use for research.

135.    The Regulation's prohibition on materials that depict or describe "sexual conduct" is overbroad in both libraries and classrooms. It mandates the removal of books that are not obscene and degrades the quality of course material. It violates the First Amendment and must be enjoined.

**Count Two**

**Regulation 43-170 Violates the Fourteenth Amendment:**
**42 U.S.C. § 1983**
(SCASL)

136.    The allegations in all previous paragraphs are incorporated here.

137.    A regulation is "void for vagueness if its prohibitions are not clearly defined" and it fails to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Regulations are unconstitutional when ordinary people "must necessarily guess at [their] meaning and differ as to its application." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967) (*quoting Bagget v. Bullet*, 377 U.S. 360, 367 (1964)). They are also void for vagueness if they "authorize . . . arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

138.    Since its enactment, SCASL members have struggled to apply the Regulation. The Regulation orders the removal of any book that "describes" sexual conduct but does not explain what it means to describe such conduct. Defendant Weaver's attempted clarification, that something must provide enough detail to form the image of the act in the reader's mind, is hopelessly subjective.

139.    Nor is the risk of arbitrary enforcement theoretical. The State Board has arbitrarily retained some books that violate the Regulation and rejected others. *1984* is one example.

Another is the choice to ban the first four books from the *Court of Thorns and Roses* series but not the fifth.

140.    The Regulation's imprecision burdens SCASL members with the impossible task of discerning which material "describes" sexual conduct, and which do not. The result has been a chilling effect in South Carolina schools, as librarians take a better-safe-than-sorry approach to avoid punishment.

141.    SCASL members throughout the state, including member Tenley Middleton, must comply with the Regulation when they catalog, sort, purge, or add materials to their school libraries. Failing to do otherwise risks punishment, including the loss of their SCDE-provided credentials. Because the Regulation fails to provide adequate notice of what counts as "describing" sexual conduct, the Regulation is unconstitutionally vague.

### Count Three

**The Censorship Memo Violates the First Amendment**
**42 U.S.C. § 1983**
(Student Plaintiffs)

142.    The allegations in all previous paragraphs are incorporated here.

143.    The Censorship Memo violates the First Amendment rights of D.R., H.A.C., and H.M.C. to access materials that express viewpoints on matters of sex and race with which Defendant Weaver disagrees.

144.    The Censorship Memo requires educators to proclaim that there are only two genders, male and female, and prohibits discussion of any ideology that disagrees with Defendant Weaver's views on gender. It further prohibits educators from discussing public debates surrounding race, including any suggestion that the United States is or ever has been "racist, sexist, or otherwise discriminatory."

145.    The Censorship Memo further demands that educators categorically avoid a non-exhaustive list of concepts and terms, including: action civics; antiracism; cisgender, heteronormative, and other gender binary/spectrum-related terms; collective guilt/responsibility;

28

critical pedagogy/consciousness; critical theory; culturally responsive/relevant teaching; disparate impact theory; diversity, equity, and inclusion; implicit/unconscious bias; intersectionality; restorative justice/practices; social justice; and social emotional learning.

146. Although the State has authority to regulate activities that "bear the imprimatur of the school," including school curriculum, its decisions to remove material must have a reasonable relation to a legitimate pedagogical interest. *Hazlewood*, 484 U.S. at 271. "[I]mposition of 'ideological discipline'" is not a legitimate pedagogical interest and is "not a proper undertaking for school authorities." *Pico*, 457 U.S. at 877 (Blackmon, J., concurring) (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 511 (1969)).

147. The Censorship Memo's only purpose is to impose ideological discipline. It is to ensure that South Carolina schools do not discuss "discriminatory equity ideology" or acknowledge the existence of the LGBTQ+ community. There is no legitimate pedagogical purpose to the Censorship Memo—only Defendant Weaver's will to suppress views with which she disagrees.

148. Defendants may not agree with these ideas, but the proper response is to address them, not delete them. Instead, Defendants are attempting to ensure conformity with their viewpoints by suppressing the other side.

**Count Four**

**The Censorship Memo Violates the Fourteenth Amendment**
**42 U.S.C. § 1983**
(SCASL)

149. The allegations in all previous paragraphs are incorporated here.

150. The Censorship Memo violates the Fourteenth Amendment rights of SCASL members by banning a non-exhaustive list of subjects—leaving SCASL members to guess at what is forbidden. It also invites discriminatory enforcement—Defendant Weaver can add something to her inexhaustive list whenever and for whatever reason she wants.

151.    Even the terms listed in the Censorship Memo are ill defined. For example, SCASL members must guess at the scope of "social justice." Ex. B. It could apply to anything that argues that one version of society is more just, including Plato's *Republic*, John Locke's social contract theory, and John Rawls's veil of ignorance theory—all of which are discussed in the Encyclopedia Britannica's online page on "social justice."[11] It could also include the women's suffrage movement and the Civil Rights Movement of the 1960s, in which American citizens worked to bring about a more just society.

152.    The non-exhaustive list of banned terms and concepts, combined with the undefined scope of the listed terms, creates a zone of ambiguity that invites arbitrary enforcement. Under these standards, Defendant Weaver, the Board of Education, or local school districts retain unfettered discretion to punish educators for materials based on subjective disagreement with content addressing sex or race.

### RELIEF REQUESTED

a.  Declare that Regulation 43-170's prohibition of materials that describe sexual conduct and the Censorship Memo violate the First and Fourteenth Amendments.

b.  Preliminarily and permanently enjoin any enforcement of Regulation 43-170's sexual conduct prohibition and the Censorship Memo;

c.  Enter judgment for Plaintiffs and against Defendants;

d.  Award such costs and reasonable attorneys' fees as available by law, including under 42 U.S.C. § 1988; and

e.  Award such other relief as the Court may deem just and appropriate.

---

[11] Brian Duignan, *social justice*, Brittanica (Sep. 29, 2025), https://www.britannica.com/topic/social-justice.

Dated: October 7, 2025
Respectfully submitted,

*/s/ Allen Chaney*

Allen Chaney
Fed. Id. No. 13181
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(843) 372-6881
achaney@aclusc.org
*Attorney for Plaintiff*