UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **SOUTH CAROLINA ASSOCIATION OF SCHOOL LIBRARIANS**; **D.R.**, by and through his parents, Leah Moore and Charles Rhyne; **H.A.C.**, by and through her parents Susan Cridland-Hughes and Jed Cridland-Hughes; **H.M.C.**, by and through her parents Susan Cridland-Hughes and Jed Cridland-Hughes;<br><br>*Plaintiffs*,<br><br>v.<br><br>**ELLEN WEAVER**, in her official capacity as South Carolina Superintendent of Education; **GREENVILLE COUNTY SCHOOL DISTRICT**;<br><br>*Defendants*. | Case No. 2:25-cv-12857-DCN |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT GREENVILLE COUNTY SCHOOL DISTRICT'S MOTION TO DISMISS**

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................1

ARGUMENT .........................................................................................................................5

I. The Court has subject-matter jurisdiction over Plaintiffs' claims against the District..........................................................................................................5

    A. SCASL, H.M.C., and H.A.C. each have standing to assert claims against the District. ......................................................................................6

    B. Plaintiffs' injuries are ongoing and their claims are ripe. ..........................13

    C. Greenville County School District is not an arm of the State and is not protected by sovereign immunity. ........................................................15

II. Plaintiffs assert plausible claims for relief against the District..............................16

    A. H.M.C. and H.A.C. assert plausible First Amendment claims against the District's removal of classroom, library, and curricular materials..................................................................................................17

    B. SCASL asserts a plausible vagueness claim against the District..............22

III. The District's remaining arguments do not warrant dismissal. ............................24

    A. The District's *Pullman* abstention argument is wrong. ............................24

    B. Venue is proper in Charleston because a substantial part of the events giving rise to the suit occurred in Charleston County. ...................27

    C. Plaintiffs are happy to add the State Board as a Defendant......................28

CONCLUSION.....................................................................................................................28

## INTRODUCTION

South Carolina, like Iowa and Florida, enacted a statewide ban on classroom and library materials that describe or depict sexual conduct. *See Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001 (S.D. Iowa 2025); *Penguin Random House LLC v. Gibson*, 796 F. Supp. 3d 1052 (M.D. Fla. 2025). Like the students, teachers, and publishers who successfully sued in *Robbins* and *Gibson*, Plaintiffs here have been injured by Regulation 43-170 and have stated plausible claims for relief under the First and Fourteenth Amendments. *See Robbins*, 774 F. Supp. 3d at 1037 (preliminarily enjoining Iowa SB 496); *Gibson*, 796 F. Supp. 3d at 1081 (permanently enjoining Fla. Stat. § 1006.28). Thus, Defendant Greenville County School District's ("District") motion to dismiss—which conspicuously ignores both *Robbins* and *Gibson*—should be denied in full. [1]

## STATEMENT OF FACTS

Plaintiff South Carolina Association of School Librarians ("SCASL") is a professional organization representing over 750 school librarians. ECF 1, ¶ 12. It has members in every county in South Carolina. *Id.* SCASL's mission includes improving school libraries, supporting students' rights to access information, and fostering understanding of the value of librarianship and library programs in education. *Id.*

Plaintiffs H.A.C. and H.M.C. are students at Greenville High School, which is part of the Defendant Greenville County School District (the "District"). ECF 1, ¶ 14. Plaintiff D.R. is a student at the Academic Magnet High School in the Charleston County School District. ECF 1, ¶ 13.

On February 13, 2024, the South Carolina State Board of Education ("State Board") enacted Regulation 43-170 (the "Regulation"). ECF 1, ¶ 24. The Regulation bans from public

---

[1] The District also makes a litany of other arguments that—even if persuasive—don't require dismissal. Those arguments are addressed separately in Arg. III, *infra*.

1

schools all materials that depict or describe 'sexual conduct', as defined by South Carolina Code § 16-15-305(C)(1). The Regulation applies to any materials containing such a description, regardless of whether the work is legally obscene as to minors. ECF 1, ¶¶ 29–30.

The Regulation purges sexual content in three ways. First, school districts vet their existing materials and remove anything that violates the Regulation. ECF 1, ¶¶ 34–39. Second, parents can challenge materials by submitting a form to their school district's board of trustees. ECF 1, ¶ 40. The district's board of trustees will decide whether the material violates the Regulation; if the challenging parent disagrees with the determination, they can appeal the decision to the State Board. ECF 1, ¶¶ 41–42. And third, the State Board can voluntarily review materials. ECF 1, ¶¶ 44–45. The State Board's decisions—both in appeals and voluntary reviews—bind all public-school districts in South Carolina. ECF 1, ¶¶ 43, 45.

The Regulation does not mandate that school districts prospectively review their existing materials, but it nonetheless encourages review by emphasizing that school districts are "ultimately responsible for the selection or continued use of all Instructional Materials." ECF 1, ¶¶ 34–35; *id.* Ex. A, § II.V. Under the Regulation, school districts may review books however they choose, so long as they account for the material's educational rigor, significance, validity, accuracy, objectivity, currency, appropriateness, and the availability of library shelf space. ECF 1, ¶ 35. The Regulation also prohibits removing material based on the district's opposition to the viewpoints expressed in the material. ECF 1, ¶ 36.

When a parent challenges material in their district, the district's board of trustees must conduct a public meeting to consider the challenge and decide whether to remove or restrict the material. ECF 1, ¶ 41. If the complaining parent disagrees with their district's determination, they may appeal it to the State Board. ECF 1, ¶ 42. Notably, the Regulation only permits the complaining parent to appeal a decision. ECF 1, Ex. A, § IV.D. It provides no avenue for parents who disagree with a removal to appeal the decision.

The Regulation also requires each school district to "maintain at all times on its website a complete, current list or catalog of all books and other materials that are available to students through any of a district's libraries or media centers." ECF 1, Ex. A, § II.C. As a result, librarians—including SCASL members—are responsible for cataloging every book in their library. ECF 1, ¶ 54. The Regulation further requires school districts to catalog all materials "used in or available to a student in any given class, course, or program that is offered, supported, or sponsored by a public school, or that are otherwise made available by any public-school employee to a student on school premises." ECF 1, Ex. A, § II.D. Thus, teachers are responsible for cataloging their classroom libraries and course materials. ECF 1, ¶ 54. Many school districts also ordered their teachers to ensure that no books that violate the Regulation were in their classroom libraries. ECF 1, ¶ 55.

Under the Regulation, the State Board may punish school districts or school employees for failing to comply with the Regulation. ECF 1, ¶ 46. For a first violation, the penalty is a written warning. ECF 1, ¶ 47. For a second violation, the State Board may conduct a hearing and subject the violator to any penalty that it finds appropriate if it finds that the violator intentionally, knowingly, or recklessly disregarded the Regulation. ECF 1, ¶ 48. South Carolina requires its teachers to be credentialed by the State Board. ECF 1, ¶ 51. Thus, if the State Board chose to strip an educator of their credentials under the Regulation, it could effectively end the educator's career.

The Regulation does not prevent school districts from punishing its employees for violating the Regulation. ECF 1, Ex. A. On the contrary, the Regulation explicitly states that districts are "ultimately responsible . . . for ensuring compliance with the requirements of this regulation." ECF 1, Ex. A, § III.E. Accordingly, school districts that do not sanction employees for perceived violations risk the State Board imputing a district employee's violation to the district. By independently "ensuring compliance," districts reduce the risk that they will be held accountable for their employees' violations.

But many educators—including SCASL members—do not know *how* to comply. ECF 1, ¶ 108. The Regulation bans "descriptions" of sexual conduct but provides no guidance on what counts as a description. ECF 1, ¶ 56. Recognizing that problem, the Department of Education issued guidance on February 11, 2025, stating that "descriptions require enough 'explanatory detail' to form a mental image of the conduct occurring." ECF 1, ¶ 57; ECF 1, Ex. C. But this so-called "clarification" only created more confusion. After all, different people require differing amounts of detail to form a mental image. ECF 1, ¶¶ 57–58. In other words, different people could reasonably reach different conclusions about whether something describes sexual conduct.

The Department of Education's guidance has done little to alleviate educators' concerns. Fearful of violating the Regulation, SCASL members have altered their professional practices in significant ways. ECF 1, ¶¶ 115–118. Some librarians have stopped purchasing—or have removed—books designated "mature" by their library management software, even though such designations often reflect factors unrelated to sexual conduct. ECF 1, ¶¶ 115, 117. Others consult crowdsourced reviews to predict which books parents might challenge before making purchase decisions. ECF 1, ¶ 116. And many librarians now maintain extensive records of their selection decisions to defend themselves if challenged. ECF 1, ¶ 118.

Teachers are also wary of violating the Regulation. Many have stopped maintaining classroom libraries because they fear punishment. ECF 1, ¶ 55. This includes many teachers for the Defendant District, including teachers at Greenville High School. ECF 1, ¶ 103–104. As a result, Plaintiffs H.A.C. and H.M.C. have both been denied access to materials that were previously available to them in their classrooms. ECF 1, ¶ 103. Moreover, because the plain text of the Regulation forbids teachers from using materials that describe sexual conduct in their classes, many works of classic fiction—including books on the Advanced Placement English Exam—are suddenly unavailable to Plaintiffs. ECF 1, ¶ 107.

4

Since enacting the Regulation, the State Board has banned 21 books from all public-school libraries and classrooms. ECF 1, ¶ 66. The District has played its role in enforcing the Regulation by removing each of those books. ECF 1, ¶¶ 102–104; ECF 11-2. Plaintiffs H.A.C. and H.M.C., who attend Greenville High School, have been unable to check out specific books from their school library, including *The Perks of Being a Wallflower* by Stephen Chbosky, *Identical* by Ellen Hopkins, and *Kingdom of Ash* by Sarah Maas. ECF 1, ¶ 102. H.A.C. and H.M.C. are also both members of the Greenville DAYLO chapter. ECF 1, ¶ 98. When the Greenville DAYLO chapter expressed interest in reading *The Perks of Being a Wallflower*, school officials told them that they could not because it would violate the Regulation.[2] ECF 1, ¶¶ 99–100.

By enforcing the Regulation, the District deprives H.A.C. and H.M.C. of their right to access information under the First Amendment. ECF 1, ¶ 106. It not only impedes their right of access in their school library, it denies the opportunity to engage with such materials under the guidance of teachers who can provide context, guide classroom discussions, and connect works to broader literary and historical understanding.

## ARGUMENT

### I.     The Court has subject-matter jurisdiction over Plaintiffs' claims against the District.

Defendants may challenge subject-matter jurisdiction under Rule 12(b)(1) in two ways: facially or factually. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial

---

[2] Counsel for the District says that District officials acted under a mistaken but good faith belief that the Regulation forbade the students from reading books the State Board had banned. *See* ECF 11-1 at *4. But "the statements of lawyers are not evidence," *Couch v. Jabe*, 679 F.3d 197 (4th Cir. 2012) (refusing to consider, on summary judgment, a lawyer's factual representation about a prison security concern), and the District's claim—even if it were substantiated by a witness declaration—would have no bearing on the District's arguments under Rule 12, which require the Court treat Plaintiffs' well-pleaded allegations as true. *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017); *see also Kerns*, 585 F.3d at 192 (factual disputes that are "intertwined with the merits" should not be resolved at the pleading stage)

challenge, defendants contend that the complaint fails to allege sufficient facts upon which to base subject-matter jurisdiction. *Id.* In this instance, the court applies the same standard as in a 12(b)(6) motion to dismiss for failure to state a claim, taking all facts alleged in the complaint as true. *Id.* Thus, the court may dismiss the case only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (citations omitted). The District's standing and ripeness arguments fall into this category.

In contrast, when a defendant makes a factual challenge, they contend that the jurisdictional allegations in the complaint are not true. *Kerns*, 585 F.3d at 192. In this case, the court "may consider evidence outside the pleadings without converting the proceeding into one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). But if the challenged "jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery." *Kerns*, 585 F.3d at 193.

    A.    <u>SCASL, H.M.C., and H.A.C. each have standing to assert claims against the District.</u>

To have standing, a plaintiff must demonstrate that (1) they have suffered injury in fact, (2) a causal connection between the harm alleged and the action of the defendant, and (3) that their harms are redressable by a decision of the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Requirements for standing are "relaxed" in First Amendment cases. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)).

6

1.     *H.M.C. and H.A.C. have standing to sue the District.*

i.     <u>H.M.C. and H.A.C. have plausibly alleged injuries to their First Amendment right to receive information.</u>

H.A.C. and H.M.C., the Student Plaintiffs at Greenville High, have suffered many injuries in fact. They cannot access any of the books banned under the Regulation in their school library or classrooms, including *The Perks of Being a Wallflower*, *Identical*, and *Kingdom of Ash*, because they were removed by the District. ECF 1, ¶¶ 102. On top of that, their English teachers have stopped maintaining classroom libraries and denied them access to the books in their classrooms. ECF 1, ¶¶ 103–104. Finally, school officials prohibited H.A.C. and Greenville High School's DAYLO Chapter from reading and discussing *The Perks of Being a Wallflower*.

Unlike litigation that focuses on the removal of specific books, the Student Plaintiffs' injuries extend beyond the missing named titles. H.A.C. and H.M.C.'s injuries also include the loss of classroom libraries, the elimination of literature from school curriculum, and the materials taken off the shelves by librarians who fear violating the Regulation. ECF 1, ¶¶ 99–107, 117. The books that the State Board has expressly banned statewide are the most obvious examples of harm, but they are not the total harm. As a result of the District's compliance with the Regulation, H.A.C. and H.M.C. have lost access to new ideas and viewpoints, stunting their academic growth.

In *Robbins*, the Southern District of Iowa considered a law identical with the challenged portion of the Regulation. 774 F. Supp. 3d 1001. The *Robbins* court found that the student plaintiff had standing because the law "directly limit[ed] the books and materials she [could] obtain from the school library" and blocked her access to new ideas, viewpoints, and information about history, politics and science. *Id.* at *1014. So too here.

The District mistakenly likens this case to *Pickens County Branch of the NAACP v. School District of Pickens County*, No. 8:23-CV-01736-JDA, 2025 WL 2844248 (D.S.C. Oct. 7, 2025). ECF 11-1, at *9–10. *Pickens County* involved the removal of a single, identified book—

7

a context in which it may be reasonable to ask whether plaintiffs tried or intended to access that particular title. [3] *Id.* But the Regulation operates systemically, sweeping an unknown number of books from library shelves. As other federal courts have explained, students cannot be expected to demonstrate a prior intent to access specific titles when the universe of affected materials is neither fixed nor disclosed. *See, e.g.*, *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, No. 1:25-CV-637 (PTG/IDD), 2025 WL 2969560 (E.D. Va. Oct. 20, 2025) (finding standing where scope of book removals was uncertain, and the removal process was "iterative" and "dynamic"). Were the standard in *Pickens County* imposed here, students would be required to "know []*in advance*" what materials were removed before they could challenge the Regulation. *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 550 (N.D. Tex. 2000) (emphasis in original), abrogated by *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (en banc). But students cannot walk into a library and see what has been removed.

But even under the District's preferred framework, Plaintiffs have unmistakably suffered injuries in fact. Both H.M.C. and H.A.C. "took concrete steps to access the restricted material[s] in the past and/or articulated a concrete plan or desire to access the restricted material in the future." *Pickens Cnty.*, 2025 WL 2844248 at *8. H.M.C. tried to check out *The Perks of Being a Wallflower*, *Identical*, and *Kingdom of Ash* from Greenville High School's library but could not because the District had removed them. ECF 1, ¶ 102. H.M.C. and H.A.C. were both denied access to books in their English teachers' libraries because of the Regulation. ECF 1, ¶ 103.

---

[3] While the *Pickens* court described the use of its test as routine, caselaw shows that courts are split. Other courts have found that plaintiffs met standing requirements simply by showing their access to books was impeded such that they could not spontaneously "review a passage" by "walk[ing] into the library and do[ing] so." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003). In another case, a court found that plaintiffs had standing because a public library had moved certain children's books away from where "children and their parents would expect to find them." *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2023 WL 5944154, *3 (W.D. Ark. Sept. 12, 2023).

Finally, H.M.C. was denied permission to read *The Perks of Being a Wallflower* as part of her DAYLO student group. ECF 1, ¶¶ 99–101.

H.A.C. and H.M.C.'s injuries are indistinguishable from those held sufficient to confer standing in *Gibson*. There, the Middle District of Florida held that parent-plaintiffs had standing to challenge Florida's (virtually identical) statewide ban on materials that describe or depict sexual conduct because their minor children "have tried to access books that were removed from their school libraries." *Gibson*, 796 F. Supp. 3d at 1063–64. As the court recognized, such injuries have long been sufficient to invoke federal jurisdiction. *See, e.g.*, *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) ("The Board's decision to remove the book from the school district's libraries injured Balzli by taking away that right."). The District does not discuss—much less distinguish—the straightforward reasoning of *Gibson*.

Finally, the District argues that H.M.C. was not injured because she (unlike H.A.C.) began high school after the books were removed.[4] ECF 11-1, at *9-10. In support of its position, the District relies on *Case v. Unified School District No. 233*, 908 F. Supp. 864 (D. Kan. 1995). But respectfully, *Case* got it wrong. H.M.C. is in high school now, and without Defendants' unconstitutional removal decision, she would have access to *The Perks of Being a Wallflower*, *Identical*, and *Kingdom of Ash*. That is all that must be alleged to establish an injury to her First Amendment right of access. The mere fact that her claim did not *accrue* until she reached high school does not mean she lacks standing now.

Other courts have rightly rejected the standing analysis from *Case*. In *Crookshanks as next friend of C.C. v. Elizabeth School District*, parents sued on behalf of their children because of book removals in a middle school. 775 F. Supp. 3d 1160, 1185–86 (D. Colo. 2025). The

___

[4] Of course, "[s]o long as one Plaintiff has demonstrated standing . . . the court need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." *Middleton v. Andino*, 488 F. Supp. 3d 261, 279 (D.S.C. 2020) (cleaned up) (citing *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[A] case is justiciable if some, but not necessarily all, of the plaintiffs have standing as to a particular defendant.")).

District of Colorado held that parents had standing even though *none* had children at the school (yet). *Id.* Indeed, one of the parents had standing because she intended to send her children— then in preschool—to the middle school when they were old enough. *Id.* at 1186. Unlike the preschoolers in *Crookshanks*, H.M.C. attends Greenville High School and is being injured by the District's removal of materials right now.

    ii.   <u>H.M.C. and H.A.C.'s injuries are traceable to and redressable against the District.</u>

The District tries to put liability exclusively on Defendant Weaver and the State Board, but the facts alleged in the Complaint—buttressed by recent federal precedent—show that H.A.C.'s and H.M.C.'s injuries are also traceable to the District and redressable by an injunction against it.

As discussed above, *Gibson* involved student plaintiffs who challenged book removals under a state law that, like the Regulation, prohibited materials that contain descriptions of sexual conduct. 796 F. Supp. 3d at 1061. There, just like here, the students sued both state officials and their local county school board. *Id.* Instructively, the *Gibson* court concluded that "both sets of Defendants caused Plaintiffs' injuries." *Id.* It reasoned that although the state defendants were responsible for enacting the law, the school board defendants were nonetheless liable because they "remove[d] the books on the local level." *Id.* at 1064. The same is true here. Not only is the District responsible for removing all materials banned by the State Board, it also has authority—and has *exercised* authority—to enforce the Regulation beyond the explicit commands of the State Board. The denial of H.M.C. and H.A.C.'s access to their classroom libraries and ability to read and discuss *Perks of Being a Wallflower* as part of DAYLO are directly traceable to the District. ECF 1, ¶¶ 99–104.

With respect to redressability, the *Gibson* court found that a judgment against the school board would redress some of the plaintiffs' injuries because it would require the school board to reshelve removed books or continue to violate the Constitution. *Id.* The same is true here. The

10

*Gibson* court also found that the defendant school board had the power to interpret the law at issue. *Id*. As a result, a judgment against the school board could require it to interpret the law in a way that is Constitutional. *Id.* Like in *Gibson*, the District has the power to interpret the Regulation and apply it. ECF 1, ¶¶ 34–35. Thus, while the District disclaims any "direct enforcement authority" under the Regulation, ECF 11-1, at *17, that is not accurate. At the very least, the Court could order the District to cease any prospective review and to restore materials it removed under the Regulation.

H.M.C. and H.A.C. have both suffered injuries in fact that are traceable to the District's removal of materials. Because a judgment against the District would alleviate these injuries, they have standing.

        2.      *SCASL has standing to sue the District.*

SCASL represents over 750 school librarians, including librarians in the District who face adverse employment consequences if they fail to accurately enforce the Regulation's vague proscription on materials that "describe" sexual conduct. *See* ECF 1, ¶ 12. It has standing to assert Fourteenth Amendment vagueness claims against the District because (1) its members have standing to sue; (2) it seeks to protect interests germane to the organization's purpose; and (3) the suit does not require participation of its individual members.[5] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

The District disputes that any of SCASL's members have been injured, arguing that "SCASL has made no showing that the protected First Amendment activities of any school librarian in the District has been chilled or infringed." ECF 11-1, at *11. But SCASL asserts

---

[5] The District wisely does not dispute the second or third prong of associational standing. The suit is germane to SCASL's purpose, which includes supporting the right of students to have access to ideas and information. ECF 1, ¶ 12. And there is no need for individual SCASL members to participate because the case seeks only prospective relief. *See, e.g.*, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 783 (D. Md. 2025) (holding that "individual participation is ordinarily not necessary" when plaintiffs only seek declaratory and injunctive relief).

vagueness claims under the Fourteenth Amendment's Due Process Clause, not speech claims under the First Amendment.[6] ECF 1, ¶¶ 136–141. Just like the educator and librarian plaintiffs in *Robbins*, SCASL's members in the District have "been required to remove books from their respective libraries and are subject to sanctions in the form of termination and/or revocation of licensure." *Robbins*, 774 F. Supp. 3d at 1013; ECF 1, ¶¶ 137–141; *see also GLBT Youth v. Reynolds*, 709 F. Supp. 3d 664, 682–83 (S.D. Iowa 2023) ("*GLBT Youth I*"), *rev'd on other grounds by GLBT Youth v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) ("*GLBT Youth II*"). Because of the Regulation, SCASL's members in the District—who face the risk of professional liability on one hand and violating students' First Amendment right of access on the other—are stuck guessing at what counts as a "description" of sexual conduct. That is a textbook vagueness problem, and one that SCASL's members have standing to challenge. *See GLBT Youth I*, 709 F. Supp. 3d 683–84, 702 (holding that because SB 496 "places . . . Educator Plaintiffs in the untenable position of having to decide whether to remove [a book] from the school library— thereby interfering with the First Amendment rights of students—or leaving it on the shelves and facing potential discipline, up to and including termination," it "likely violates the due process clause").

SCASL has standing even though its members haven't (yet) been punished. To show a credible threat of prosecution, plaintiffs need only show that the threat is not "imaginary or wholly speculative." *Kenny*, 885 F.3d at 288. Risks are generally sufficient to confer standing "when defendants have not 'disavowed enforcement.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)). In its motion, the District does not disavow enforcement. ECF 11-1. Given the District's refusal to disavow future enforcement, the threat of enforcement can hardly be called speculative. As such, SCASL has standing to sue on behalf of its members in

---

[6] The District's misread of SCASL's claims also explains their inapposite reliance on *Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir. 1998), a case about the First Amendment rights of teachers.

the District. *See GLBT Youth*, 709 F. Supp. 3d at 677, 682–84 (holding that educators had standing to raise vagueness challenge where they alleged confusion over "age-appropriate" standard and a credible "fear of being penalized").

B.     Plaintiffs' injuries are ongoing and their claims are ripe.

"To determine whether the case is ripe, [courts] balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration. A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quotation marks and citations omitted). A claim should only be dismissed as unripe "if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Wild Virginia v. Counc. on Env't Qual.*, 56 F.4th 281, 294 (4th Cir. 2022). Such circumstances arise "[w]here an injury is contingent upon a decision to be made by a third party that has not yet acted." *Id.* (quoting *Doe v. Va. Dep't of St. Police*, 713 F.3d 745, 758 (4th Cir. 2013)). As with standing, ripeness requirements are "relaxed" in First Amendment cases. *Cooksey*, 721 F.3d at 240.

Here, Plaintiffs' injuries all flow from the District's concrete and ongoing enforcement of Regulation 43-170. The specter of future modification of the regulation by the State Board does not make their *current* injuries speculative, nor does it undermine the Court's ability to order relief. Thus, all of Plaintiffs' claims against the District are ripe for judicial resolution.

1.     *H.M.C. and H.A.C.'s First Amendment claims are ripe.*

As to H.M.C. and H.A.C.'s First Amendment claims, the District's ripeness argument is meritless. Plaintiffs plausibly allege that, *because of the Regulation*, the District removed at least three library books, restricted access to classroom libraries, and prohibited DAYLO from reading and discussing *Perks of Being a Wallflower*. ECF 1, ¶¶ 98–104. Far from relying on a "speculative and contingent chain of possible future events," ECF 11-1, at *8, Plaintiffs' claims

13

rest on concrete and continuing harms to their First Amendment right to access information. *See infra* Part II.A; *Cooksey*, 721 F.3d at 240 ("First Amendment rights are particularly apt to be found ripe for immediate protection because of the fear of irretrievable loss"). The District's confusing and incriminating factual insinuation (*i.e.*, that it perhaps inflicted some of the First Amendment deprivations for reasons other than compliance the Regulation, ECF 11-1 at *8) can be raised later, but it is no obstacle the Court's jurisdiction under Article III. This is hardly the first book-banning case, and conspicuously, no court has yet denied review for lack of ripeness. *Cf., e.g.*, *Robbins*, 774 F. Supp. 3d 1001; *Gibson*, 796 F. Supp. 3d 1052. The District offers no basis for this Court to be the first.

2.     *SCASL's vagueness claim is ripe.*

Similarly, SCASL's due process claim is fit for judicial resolution because it is purely legal. *See Miller*, 462 F.3d at 319. The operative issue is whether the Regulation's prohibition on books that contain "descriptions" of sexual conduct is vague, i.e., whether persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984) (*quoting Connally v. Gen. Const. Co.*, 269 U.S. 385 (1926)). As other courts have demonstrated, deciding this issue does not depend on how the Regulation has been applied, but on how it could be applied. *GLBT Youth*, 709 F. Supp. 3d 664. Indeed, "that there is even a 'credible threat' of enforcement of vague rules . . . militates in favor of hearing the challenge." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010) (holding that facial challenge to vague statute was ripe). Here, the threat of enforcement is credible, current, and ongoing because the District has refused to disavow it. *Kenny*, 885 F.3d at 288; *see generally* ECF 11-1.

Furthermore, the hardship to plaintiffs "who would be compelled to act under threat of enforcement of the challenged law," weighs in favor of review. *Miller*, 462 F.3d at 319. Here, that burden is substantial. Because of the Regulation, SCASL members have preemptively removed content that their library management software designates as "mature," even though

14

content can be designated "mature" for reasons unrelated to sex. ECF 1, ¶¶ 115, 117. Librarians have started using crowdsourced reviews to decide whether parents are likely to challenge books before purchasing them. ECF 1, ¶ 116. And they have engaged in onerous record-keeping activities to protect themselves in case one of their purchases is challenged. ECF 1, ¶ 118.

Both the Student Plaintiffs' and SCASL's claims allege that the Regulation is unconstitutional on its face. Delaying resolution will not aid the Court in deciding the issues, it will only compound the harm that Plaintiffs experience. Because the issues are purely legal and the burden on the Plaintiffs is substantial, this case is ripe for decision.

C.     <u>Greenville County School District is not an arm of the State and is not protected by sovereign immunity.</u>

The District's cursory invocation of sovereign immunity must be rejected. As the party asserting sovereign immunity, the District bears the burden of persuasion. *Hutto v. S.C. Ret. Sys.*, 899 F. Supp. 2d 457, 466 (D.S.C. 2012), *aff'd on other grounds,* 773 F.3d 536 (4th Cir. 2014). But rather than presenting any evidence or substantive arguments demonstrating that the District is an arm of the state, the District merely trumpets Judge Floyd's decision in *Smith*. *See* ECF 11-1 at *12–13. Thus, the District has "not overcome [its] burden by a long shot." *Anderson v. Dorchester Cnty.*, Case No. 2:20-cv-2084-DCN-MGB, 2021 WL 1186637, *9 (D.S.C. Mar. 30, 2021) (rejecting sovereign immunity where the Defendant "d[id] little more than regurgitate excerpts of Judge Duffy's opinion in *Eldeco*").

Turning to the merits, the District's rote reliance on *Smith* is misplaced. ECF 11-1 at *12 (citing *Smith v. Sch. Dist. of Greenville Cnty.*, 324 F. Supp. 2d 786 (D.S.C. 2001)). Many subsequent cases have correctly held that school districts are *not* entitled to sovereign immunity. *See, e.g.*, *S.H. v. Bd. of Trustees of Colleton Cnty. Sch. Dist.*, No. 2:22-CV-243-RMG, 2022 WL 2276575, at *4 (D.S.C. June 22, 2022); *Anderson*, 2021 WL 1186637, at *9; *Grady v. Spartanburg Sch. Dist. 7*, No. 7:13-CV-02020-GRA, 2014 WL 1159406, *4–9 (D.S.C. Mar. 21, 2014). That is because sovereign immunity requires a "case-by-case" analysis of whether the

15

district established that it "is an arm of the state" under the four factors announced in *Cash v. Granville County Board of Education*, 242 F.3d 219, 223 (4th Cir. 2001). *Grady*, 2014 WL 1159406 at *2–4. The four factors are:

1.  The impact a judgment against the entity would have on the State treasury;
2.  The degree of control that the state exercises over the entity;
3.  Whether the entity deals with local or statewide concerns; and
4.  How State law treats the entity.

*Id.*; *Maryland Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir. 2005). Here, each factor weighs against finding that the District is an arm of the State.

To start, the District has made no showing that a judgment against it would impact the State's treasury. As Judge Gergel held in *S.H.*, that alone "counsels against a finding of immunity." 2022 WL 2276575 at *3. Presumably directed at the other three factors, the District simply argues that "43-170 . . . exemplif[ies] the state's pervasive control over the District through the State Board's imposition of specific criteria and procedures relating to . . . instructional materials." ECF 11-1 at *12–13. But the District's own arguments and policies show that it exercises plenty of autonomy. ECF 1 at ¶¶ 99–100, 102–104; *see also* ECF 11-1 at *8 ("[T]he District, of course, can add or remove books from its libraries[.]"); IFA Rule re Instructional Materials (available at: https://greenville-sc.community.highbond.com/home/policies/policydoc/f8358e8b-3d05-407c-a346-5feb56b10681) (outlining the District's *own* material selection criteria).

In short, the District is not entitled to sovereign immunity. Not only has the District failed to meet its burden of persuasion, but every factor weighs against finding it an arm of the state.

## II.    Plaintiffs assert plausible claims for relief against the District.

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts must accept as true all material allegations of the complaint, draw all reasonable inferences from those facts in the plaintiff's favor, and construe them in the light most favorable

16

to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court may dismiss the case only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Martin*, 858 F.3d at 248 (citations omitted). If a complaint contains facts sufficient to state a claim for relief that is plausible on its face, the court must deny the motion. *Iqbal*, 556 U.S. at 678.

A.    H.M.C. and H.A.C. assert plausible First Amendment claims against the District's removal of classroom, library, and curricular materials.

"Generally speaking, a First Amendment challenge proceeds in three steps." *Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 197–98 (D. Me. 2014). First, plaintiffs bear an initial burden to "demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 n.5 (1984). Second, the court must consider the nature and circumstances of the claim and "determine[] the applicable level of scrutiny." *Billups v. Cty. of Charleston, S.C.*, 961 F.3d 673, 684 (4th Cir. 2020). Third, the court must determine "whether the government's justifications for restricting the conduct or speech satisfy the applicable standard or standards." *Pollack*, 12 F. Supp. 3d at 198; *see Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) ("After the plaintiff makes his initial showing, the burden then falls on the government to prove the constitutionality of the speech restriction.").

1.    *The District's enforcement of the Regulation burdens Plaintiffs' First Amendment rights.*

The Constitution protects the right to receive information. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). And students do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The Constitution protects students' right to receive information in both libraries and classrooms. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) (libraries); *Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015) (classrooms). Courts generally agree that classroom

17

and library restrictions implicate the First Amendment, but they have not yet coalesced around the appropriate standard of scrutiny. [7] *Compare Robbins*, 774 F. Supp. 3d at 1021 ("The state must establish a substantial and reasonable governmental interest that justifies the school library restrictions.") *with Gibson*, 796 F. Supp. 3d at 1073–74 (M.D. Fla. 2025) (discussing *Tinker* but then applying nonpublic forum analysis and holding that the state "must not unreasonably restrict the [school] library's purpose of providing students information on a broad range of subjects and viewpoints."); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013) (explaining that *Tinker*'s substantial-disruption test applies by default to all school censorship claims, except those discussed in *Fraser*, *Kuhlmeier*, and *Morse*).

Here, Plaintiffs H.A.C. and H.M.C. have each been denied access to library and curricular materials by the District's enforcement of Regulation 43-170. *See supra* Part I.A. They have therefore carried their initial burden to show that the First Amendment applies.

> 2.      *The Regulation is substantially overbroad.*

To resolve a facial overbreadth challenge like Plaintiffs', *see* ECF 1, ¶ 135, "a court must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other. The first step in determining whether a law is overbroad is to assess the law's scope." *Moody v. NetChoice, LLC*, 603 U.S. 707, 71824 (2024). Once the scope

---

[7] Contrary to the District's assertion, no court has *held* that library curation constitutes government speech. *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667– 68 (8th Cir. 2024) (rejecting notion that "placement and removal of books in school libraries" is government speech); *Crookshanks*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) (same); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (same); *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2023 WL 5944154, *5 (W.D. Ark. Sept. 12, 2023) (same); *Fayetteville Pub. Lib. v. Crawford Cnty., Ark.*, 760 F. Supp. 3d 811, 834 (W.D. Ark. 2024) (same). In *Little v. Llano*, upon which the District relies, only a plurality of Fifth Circuit judges found that library curation constitutes government speech. 138 F.4th 834 (5th Cir. 2025). The District also cites *Parnell v. School Board of Escambia County, Florida*, 802 F. Supp. 3d 1361 (N.D. Fla. 2025), *judgment entered,* No. 4:23-CV-414-AW-MAF, 2025 WL 2959779 (N.D. Fla. Sept. 30, 2025), but the *Parnell* court expressly *declined* to rule on the issue. *Id.* at 1368 ("I need not decide the difficult government-speech issue to resolve the case").

is determined, the next step is "to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id*. at 725. If "a substantial number of the law's unconstitutional applications are substantial compared to its constitutional ones," the law is unconstitutionally facially overbroad. *Id*. at 718. Under any standard of scrutiny, Regulation 43-170 is substantially overbroad.

    i.   <u>The Regulation's scope is vast.</u>

The Regulation does not make a particularized inquiry into the pedagogical value or age appropriateness of any specific library or curricular material. Rather, it categorically requires the removal of all "materials used in a South Carolina K-12 public school classroom, made available in a public school library/media center, or included on a public school's reading list . . . [that] include[] descriptions or visual depictions of 'sexual conduct,' as that term is defined by Section 16-15-305(C)(1)." S.C. Code Ann. Regs. 43-170; S.C. Code Ann. § 16-15-305(C)(1). So far, the Regulation has prompted the statewide removal of 21 books, ECF 1, ¶ 66, the wholesale removal of classroom libraries, *id.* ¶¶ 3, 55, 94, & 103, and the termination of online research resources, *id.*, ¶¶ 70–82.

    ii.   <u>The Regulation has no constitutional applications.</u>

When the state infringes on the First Amendment, it carries the burden of demonstrating that its conduct satisfies constitutional scrutiny. *Reynolds*, 779 F.3d at 226. Here, Defendants cannot justify *any* book removals under Regulation 43-170.

As federal courts in Iowa and Florida concluded, the best framework for assessing laws like the Regulation stems from the Supreme Court's obscenity jurisprudence. *See Robbins*, 774 F. Supp. 3d at 1010 (enjoining law that prohibited schools from containing "material with descriptions or visual depictions of a sex act"); *Gibson*, 796 F. Supp. 3d at 1061 (enjoining law that allowed parents to challenge material that "[d]epicts or describes sexual conduct"). The obscenity standard for minors was established in *Ginsberg v. State of New York*, 390 U.S. 629

19

(1968), where the Supreme Court held that the State may only restrict minors from accessing material that:

1. Taken as a whole, and under contemporary community standards, appeal to the prurient interest of minors;

2. Depict or describe specifically defined conduct in a way that is patently offensive for minors; and

3. Taken as a whole, lack serious literary, artistic, political, or scientific value for minors.

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025). Instructively, both the *Robbins* and *Gibson* courts found this standard to be the best fit for dealing with laws like the Regulation. As the *Robbins* court put it, this standard, which applies to laws "with sweeping implications on the ability of minors to access books or other materials," fits because the law at issue was "just such a law." 774 F. Supp. 3d at 1024. For the same reason, this Court should apply the *Ginsberg* standard here. Like the law at issue in *Robbins*, the Regulation "imposes across-the-board, statewide restrictions" on the content that students may access. *Id.* And, applying the *Ginsberg* standard to the Regulation's applications is straightforward.

Applying *Ginsberg*, it is easy to see that there are no constitutional applications of the Regulation. Every removed book was in a school because an educational professional determined that it had literary, artistic, political, or scientific value for minors. ECF 1, ¶ 128. In fact, before enacting the Regulation, South Carolina had already criminalized the distribution of obscene materials to minors under the *Ginsberg* standard. S.C. Code Ann. § 16-15-305. In other words, there were never any obscene materials in schools for the Regulation to target. Thus, as in *Robbins* and *Gibson*, the Regulation has no constitutionally permissible applications and is facially overbroad.

But the Regulation does not only fail the *Ginsberg* standard, it fails *every* potential standard.

20

*Tinker*. Fourth Circuit precedent directs that *Tinker*'s "substantial-disruption test" should apply to all school-based First Amendment claims except for those carved out by the Supreme Court in *Fraser* (prohibiting students from using "vulgar and offensive terms"), *Hazlewood* (restricting student speech that "bear[s] the imprimatur of the school"), or *Morse* (student speech promoting illegal drug use). *Hardwick*, 711 F.3d at 435; *see also Gibson*, 796 F. Supp. 3d at 1073–1074 (applying non-public forum analysis but agreeing that "the *Tinker* standard might be warranted."). A book that is not obscene under *Ginberg* might nonetheless be subject to removal if there is evidence that its availability or usage has caused (or reasonably will cause) a substantial disruption. But here, the District has offered no such evidence. Thus, all the book removals violate *Tinker*.

Non-public forum. Even applying the more deferential nonpublic forum standard, Defendants lose. Under that standard, "the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). The reasonableness of the restriction is judged "in light of the purpose served by the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

The school library is the "principal locus" of students' freedom "to inquire, to study, and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868. Its purpose is "to provide information on a broad range of subjects and viewpoints." *E.K. v. Dep't of Def. Educ. Activity*, 2025 WL 2969560, at *12 (quoting *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024)). Given that, it is unreasonable to remove all books that contain descriptions of sexual conduct. "[V]ast swaths of literature" contain such content. *Gibson*, 796 F. Supp. 3d at 1074; *Couch v. Jabe*, 737 F. Supp. 2d 561, 567–69 & n.4–14 (W.D. Va. 2010) (listing "dozens of the highly regarded works of literature which include an explicit description of a sexual act or intercourse"); *Cline v. Fox*, 319 F. Supp. 2d 685, 692–93

21

(N.D. W. Va. 2004) (observing that *1984*, *The Canterbury Tales*, *Ulysses*, and the Bible all contain sexual explicit passages). Indeed, the *Robbins* court took judicial notice of that fact in route to striking down an identical law in Iowa. 774 F. Supp. 3d at 1027.

Defendants have claimed no defensible interest in banning every book that describes sexual content. Nor is any such interest obvious, given that many such titles frequently appear on the AP Literature and Composition Exam. ECF 1, ¶ 132. Because the Regulation *undermines* the purpose of the school library, Defendant cannot satisfy scrutiny under the non-public forum analysis.

B.     <u>SCASL asserts a plausible vagueness claim against the District.</u>

A statute is void for vagueness if ordinary individuals "must necessarily guess at its meaning and differ as to its application." *Jaycees*, 468 U.S. at 629. The problem with such laws is two-fold. First, they fail to provide actual notice to citizens, and second, they permit arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). The Regulation triggers both concerns.

The Regulation does not say what it means to "describe" sexual conduct. SCASL members, school boards, and even the State Board have struggled to apply it. The *Robbins* court found an identical law vague for exactly this reason. *GLBT Youth*, 709 F. Supp. 3d 664. As that court explained:

> According to Merriam-Webster, the word "description" means "an act of describing," "discourse intended to give a mental image of something experienced," or "a statement or account giving the characteristics of someone or something: a descriptive statement or account." Description, Merriam-Webster Online Dictionary. In the context of Senate File 496, this definition is elastic enough to leave considerable uncertainty about what crosses the line. In the Court's view, for example, a statement that two characters "made passionate love," "had sex on the bed," or even just "had sex" is a "description" of a "sex act," albeit not a terribly detailed one. Accordingly, reasonable school districts could decide to remove books with such language. Reasonable school districts also could decide not to do so, however, concluding that such language does not contain sufficient visual imagery to constitute a "description."

22

*Id.* In other words, individuals must guess at its meaning and differ in its application. The facts alleged in the Complaint bear this out. ECF 1, ¶¶ 56–65, 70–82, 108–121. Berkeley County School District banned students from using DISCUS—a powerful online resource operated by the State Library. ECF 1, ¶¶ 72–78. No other school district has done so. Fort Mills School District has cut off its students' ability to access the county library's eBook collection. ECF 1, ¶¶ 79–82. Other districts have not.

Moreover, the State Board has arbitrarily enforced the Regulation. The text of the Regulation requires removal of any material that contains a description of sexual conduct, as that term is defined by Section 16-15-305(C)(1) of the South Carolina State Code. This includes depictions of "simulated touching, caressing, or fondling of . . . the covered or exposed genitals, pubic or anal regions, or female breast nipple . . . in an act of actual or apparent sexual stimulation or gratification." S.C. Code Ann. § 16-15-305(C)(1)(d). And yet, the State Board voted to retain *1984*, which contains the following description of the main character feeling the breast of his lover:

> "Don't you like *this*?" She twisted herself round and pressed her bosom against him. He could feel her breasts, ripe yet firm, through her overalls. Her body seemed to be pouring some of its youth and vigor into his. "Yes, I like that," he said.

George Orwell, *1984* 215 (2003). According to the State Board, this passage is "brief and lack[s] the necessary explanatory detail to qualify as a description." ECF 1, ¶ 62. Yet school districts in Iowa, applying the *same rule*, did remove *1984*. *GLBT Youth*, 709 F. Supp. 3d at 700.

Plaintiffs are glad that the Board did not ban *1984*. Nonetheless, they are puzzled at how this passage could be anything other than a description of a man experiencing sexual gratification from his lover pushing her breasts into him. Regardless, it illustrates the issue. Anyone applying the Regulation can stretch it to cover—or not cover—whatever they want.

The Regulation's vagueness poses serious problems for SCASL members. If librarians apply the Regulation too broadly, they risk violating students' First Amendment rights, *supra* Arg. II.A; but if they apply it too narrowly, they risk losing their credentials or facing other professional consequences. ECF 1, ¶¶ 51, 114. And because districts are "ultimately responsible . . . for ensuring compliance with the requirements of this regulation," SCASL members rightly fear being punished by the school districts that employ them. ECF 1, Ex. A, § III.E.

The Due Process Clause protects SCASL members from this unfair guessing game. The Regulation is unconstitutionally vague, and SCASL has stated a plausible claim for relief against the District. *See GLBT Youth I*, 709 F. Supp. 3d 683–84, 702.

**III.     The District's remaining arguments do not warrant dismissal.**

Three of the District's arguments—about (1) *Pullman* abstention, (2) the proper division of the District of South Carolina, and (3) the necessity of joining the South Carolina Board of Education—do not, even if correct, warrant dismissal. That said, Plaintiffs will address each argument in turn.

A.       The District's *Pullman* abstention argument is wrong.

Federal courts have a "virtually unflagging" obligation to hear cases which fall in their jurisdiction. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989) ("Congress, and not the Judiciary, defines the scope of federal jurisdiction."). As a result, there is a presumption against abstention, which "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976) (emphasis added). Abstention is only appropriate with the "clearest of justifications," *Colo. River*, 424 U.S. at 819, and federal courts are "particularly reluctant to abstain in cases involving facial challenges based on the First Amendment." *W. Va. Parents for Religious Freedom v. Christiansen*, 124 F.4th 304, 310 (4th Cir. 2024) (quoting *City of Houston, Tex. v. Hill*, 482 U.S. 451, 467 (1987).

24

The party seeking abstention "bears the burden of meeting each prong." *Briseno v. Bonta*, 621 F. Supp. 3d 1065, 1071 (C.D. Cal. 2022).

Under *Pullman*, abstention is only appropriate "where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question." *Meredith v. Talbot County*, Md., 828 F.2d 228, 231 (4th Cir. 1987). "The central question is whether a state court decision interpreting the relevant law is likely to negate any federal constitutional issue." *NC RSOL v. Boone*, 402 F. Supp. 3d 240, 257 (M.D.N.C. 2019). As courts of this District have observed, "*Pullman* abstention is disfavored in the First Amendment context, where the chilling associated with an unconstitutional abridgment of speech creates further constitutional violations." *Auto Money N. LLC v. Walters*, 737 F. Supp. 3d 330, 350 n.20 (D.S.C. 2024) (citing *NC RSOL*, 402 F. Supp. 3d at 257).

     *1.*     *There is no reason to abstain under Pullman.*

Here, the District's abstention argument lacks any merit. Plaintiffs' claims rest on the plain text and uneven enforcement of the Regulation, not on "unsettled questions of state law." *Meredith*, 828 F.2d at 231; see ECF 1, ¶¶ 125–135 (asserting that the text of the Regulation is facially overbroad). Fatally, the District makes no attempt to explain how the availability of "state administrative and judicial procedures" or the unrealistic possibility that state officials might "clarify the criteria and review standards respecting affected instructional materials under R 43-170," [8] ECF 11-1, at *14, are likely to "negate [the] federal constitutional issue[s]" raised by Plaintiffs' Complaint, *see NC RSOL*, 402 F. Supp. 3d at 257. South Carolina courts have no authority to rewrite the law, and no amount of judicial surgery can salvage the facial

---

[8] As a factual matter, it is unreasonable to think that Defendant Weaver or the State Board will make any further attempt to clarify the Regulation. In response to this very lawsuit, the S.C. Department of Education publicly stated that it "will vigorously defend" the Regulation, "which set[s] clear and legally sound standards." Marley Bassett, *S.C. Department of Education sued over book-banning regulation*, WRDW (Oct. 7, 2025) (available at: https://www.wrdw.com/2025/10/07/sc-department-education-sued-over-book-banning-regulation/).

overbreadth of the Regulation. [9] And although some accusation of uncertainty is inherent in Plaintiffs' vagueness challenge, "not every vagueness challenge to an uninterpreted state statute or regulation constitutes a proper case for abstention." *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 149–50 (3d Cir. 2000) (refusing to abstain from vagueness challenge) (quoting *Procunier v. Martinez*, 416 U.S. 396, 401 (1974), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989)). To the contrary, federal courts routinely (and rightly) resolve such claims without abstaining. *See, e.g., Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783 (M.D. Tenn. May 2, 2024) (refusing to abstain from teachers' vagueness challenge to state curricular limits); *NC RSOL*, 402 F. Supp. 3d at 257 (refusing to abstain from overbreadth and vagueness claims).

Put simply, the Regulation is "not obviously susceptible to a limiting construction" that would "obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claims." *Farmer*, 220 F.3d at 149–50. Thus, abstention is inappropriate.

> *2.      In any event,* Pullman *abstention cannot justify dismissal.*

"Dismissal [is] inappropriate following *Pullman* abstention." *Courtney v. Goltz*, 736 F.3d 1152, 1164 (9th Cir. 2013). Rather, as this Court explained in *NAACP v. Wilson*, "[i]f a district court determines that the [*Pullman*] doctrine applies, it 'should retain jurisdiction over the case, but stay the proceedings so that state courts can rule on the state law question.'" Case No. 2:23-cv-01121-DCN, 2023 WL 5207978, *6 (D.S.C. Aug. 14, 2023) (quoting *Nivens v. Gilchrist*, 444 F.3d 237, 245–46 (4th Cir. 2006)). Supreme Court precedent is in accord. *England v. La. St. Bd. of Med. Exam'rs*, 375 U.S. 411, 469 (1964) (Douglas, J., concurring) (explaining that if a

---

[9] Several federal courts have resolved legal challenges to laws that, just like Regulation 43-170, limit the availability of materials that contain or describe "sexual conduct." *See, e.g.*, *Gibson*, 796 F. Supp. 3d 1052, 1077–78 (M.D. Fla. 2025) (enjoining Florida law prohibiting materials that describe sexual conduct); *Robbins*, 774 F. Supp. 3d 1001 (S.D. Iowa 2025) (enjoining Iowa law prohibiting materials that contain a "description" of a "sex act"); *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) (enjoining Texas law requiring content labels for "sexually relevant" materials). No court has yet abstained.

court decides to abstain under *Pullman*, "it does not dismiss the complaint; it retains jurisdiction while the parties go to a state tribunal"); *Bellotti v. Baird*, 428 U.S. 132, 147, 151 (1976) (collecting cases and holding that the district court should have certified an unclear question of state law to the state supreme court). Thus, even if the Court is somehow convinced to abstain, the proper result is a stay—not dismissal.

B. <u>Venue is proper in Charleston because a substantial part of the events giving rise to the suit occurred in Charleston County.</u>

Under Local Civ. R. 3.01, venue is proper in any division where "a[] natural defendant resides, where a substantial part of the events or omissions giving rise to the claim occurred, or where any corporate/other organization does business relating to the events or omissions alleged." Local Civ. R. 3.01 (A)(1). As with the venue statute, 28 U.S.C.A. § 1391, the Rule makes it possible for venue to be proper in more than one judicial division. *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). When venue is proper in multiple divisions or districts, "a plaintiff's choice of venue is entitled to substantial weight." *Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015).

Here, venue is proper in Charleston because that is where SCASL and Defendant Weaver "do[] business relating to the events or omissions alleged" and where a "substantial part of the events giving rise to the claim occurred." Local Civ. R. 3.01. As the State Superintendent, Defendant Weaver is responsible for enforcing the Regulation and her own Censorship Memo throughout the state (including in Charleston). ECF 1, ¶ 15. Plaintiff D.R. attends a public high school in Charleston, and that is where his injuries arose and persist. ECF 1, ¶ 13. SCASL has members in every county in South Carolina, ECF 1, ¶ 12, including the six counties comprising the Charleston division. Yes, the case *could* be heard in the Greenville, Columbia, or Charleston divisions, but that is not the question. Because the Complaint alleges facts that easily satisfy the

27

threshold for this Court to exercise jurisdiction, the Court should respect Plaintiffs' choice of venue. [10]

   C.     Plaintiffs are happy to add the State Board as a Defendant.

The District insists that the State Board is a necessary party to this action. ECF 11-1 at *17–19. Rather than quibble about whether that's true, Plaintiffs are willing to amend their complaint to add the State Board as a party and respectfully seek the Court's leave to do so.

That said, the District's arguments provide no grounds for dismissal. Under Rule 19, dismissal is only appropriate if it is not feasible to join a required and indispensable party. Fed. R. Civ. P. 19(b). If the necessary non-party can be joined, then "the court must order that the person be made a party." *Id.* Here, because the State Board can be joined (indeed, the District makes no argument for why it cannot), dismissal is inappropriate.

## CONCLUSION

Plaintiffs have standing to challenge the Regulation's unconstitutional censorship of school library and classroom materials. Their claims are ripe for adjudication, and the District is not shielded by sovereign immunity. Most importantly, Plaintiffs have stated plausible claims that the Regulation violates the First and Fourteenth Amendments. For these reasons, Plaintiffs respectfully request that the Court deny the District's Motion to Dismiss in its entirety.

Dated: January 26, 2026

[*Signature Block on Following Page*]

---

[10] Even if Plaintiffs filed this action in the wrong division, the District is not entitled to dismissal. "Generally, the interest of justice requires transferring [cases filed in an improper venue] to the appropriate judicial district rather than dismissing them." *Blevins v. Pension Plan for Roanoke Plant Hourly Emps. of ITT Indus. Night Vision*, No. 6:10-CV-03261-JMC, 2011 WL 2670590, at *5 (D.S.C. July 8, 2011) (quoting *Gipson v. Wells Fargo & Co.,* 563 F.Supp.2d 149, 153 (D.D.C. 2008)).

Respectfully submitted,


*Allen Chaney*

Allen Chaney
Fed. Bar. No. 13181
Samuel Kennedy*
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org


*Attorneys for Plaintiffs*


\* Admission forthcoming

29