# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **SOUTH CAROLINA ASSOCIATION OF SCHOOL LIBRARIANS**; **D.R.**, by and through his parents, Leah Moore and Charles Rhyne; **H.A.C.**, by and through her parents Susan Cridland-Hughes and Jed Cridland-Hughes; **H.M.C.**, by and through her parents Susan Cridland-Hughes and Jed Cridland-Hughes;<br><br>*Plaintiffs*,<br><br>v.<br><br>**ELLEN WEAVER**, in her official capacity as South Carolina Superintendent of Education; **GREENVILLE COUNTY SCHOOL DISTRICT**;<br><br>*Defendants*. | Case No. 2:25-cv-12857-DCN |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT WEAVER'S MOTION TO DISMISS

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS .........................................................................................1

    I.       The Parties ........................................................................................1

    II.     The Regulation..................................................................................2

           A.     Content Removal ...............................................................2

           B.     Librarian and Teacher Responsibilities .........................3

           C.     Enforcement......................................................................4

           D.     Removed Books .................................................................5

    III.    The Censorship Memo.......................................................................6

LEGAL STANDARD .................................................................................................8

ARGUMENT ...............................................................................................................9

    I.       All Plaintiffs have standing to bring claims against Defendant Weaver. ................9

           A.     Defendant Weaver's primary argument—that there is no right to receive information from the government—goes against the overwhelming consensus that such a right exists. ......................................9

           B.     Student Plaintiffs have plausibly alleged injuries to their First Amendment right to receive information under the Regulation and the Memo. ....................................................11

           C.     SCASL has plausibly alleged injuries from the Regulation and the Memo. ................................................13

           D.     The Plaintiffs' injuries are traceable to Defendant Weaver.......................16

           E.     A favorable decision of this Court would redress Plaintiffs' injuries.........................................17

    II.    Student Plaintiffs assert plausible First Amendment claims against Defendant Weaver. ..........................................18

      A.     Student Plaintiffs assert a plausible First Amendment claim against Defendant Weaver's removal of library materials through the Regulation. ...................................................................................18

      B.     Student Plaintiffs assert a plausible First Amendment claim against Weaver's imposition of ideological discipline through the Memo............23

III.    SCASL asserts plausible vagueness claims against Defendant Weaver.................26

      A.     SCASL asserts a plausible vagueness claim regarding the Regulation. ...............................................................................................26

      B.     SCASL has stated a plausible vagueness claim regarding Defendant Weaver's Memo. ......................................................................28

IV.    Library curation is not government speech............................................................29

CONCLUSION...................................................................................................................31

INTRODUCTION

South Carolina, like Iowa and Florida, enacted a statewide ban on classroom and library materials that describe or depict sexual conduct. *See Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001 (S.D. Iowa 2025); *Penguin Random House LLC v. Gibson*, 796 F. Supp. 3d 1052 (M.D. Fla. 2025). But Defendant Weaver went even further. Through her Censorship Memo, she directed the removal of materials related to race and gender that conflict with her preferred ideologies. The combined effect has been expansive: Classroom libraries have been dismantled, award-winning novels have been pulled from shelves, and students have been told they cannot read certain books even for their own book clubs.

Like the students and educators who successfully sued in *Robbins* and *Gibson*, Plaintiffs have been injured by Regulation 43-170 and the Memo, and they have stated plausible claims for relief under the First and Fourteenth Amendments. Student Plaintiffs have lost access to dozens of books and watched their classroom libraries disappear. Additionally, South Carolina Association of School Librarians' ("SCASL") members face professional consequences if they guess wrong about what the Regulation and the Memo prohibit. These are plain infringements on the Student Plaintiffs' right to receive information and SCASL members' right to fair notice of prohibited conduct. Defendant Weaver's motion to dismiss should be denied.

STATEMENT OF FACTS

I.     The Parties

Plaintiff SCASL is a nonprofit, nonpartisan membership organization representing over 750 school librarians across South Carolina, with members in every school district. ECF 1, ¶ 12. SCASL's mission includes improving school library programs, supporting students' rights to access information, and fostering understanding of the value of librarianship in education. *Id.*

Plaintiffs H.A.C. and H.M.C. are students at Greenville High School in the Greenville County School District. ECF 1, ¶ 14. Plaintiff D.R. is a senior at Academic Magnet High School

1

in the Charleston County School District. ECF 1, ¶ 13. All three Student Plaintiffs are members of DAYLO, a diversity-themed book club. ECF 1, ¶¶ 92, 98.

Defendant Ellen Weaver is the South Carolina Superintendent of Education. ECF 1, ¶ 15. As Superintendent, she heads the Department of Education (the "Department"), serves as the State Board's "secretary and administrative officer," and is responsible for administering "all policies . . . adopted by the State Board." S.C. Code Ann. § 59-3-10.

## II.     The Regulation

The Regulation, which was passed in large part due to the efforts of Defendant Weaver and her counsel, Mr. Coleman, *see* Exhibits A & B[1], imposes a complete ban on any materials that include "descriptions or visual depictions of 'sexual conduct,'" as defined by South Carolina's obscenity statute, from being made available in public schools. ECF 1, ¶ 27. It bans materials regardless of whether they are patently offensive, appeal to the prurient interest, or possess literary, artistic, political, or scientific value. ECF 1, ¶ 29. The prohibition includes school libraries, classrooms, and curriculum. *Id.*

### A.     Content Removal

The Regulation purges sexual content in three ways. First, school districts may vet their existing materials and remove anything that violates the Regulation. ECF 1, ¶¶ 34–39. The Regulation does not mandate that school districts prospectively review their existing materials, but it encourages review by emphasizing that school districts are "ultimately responsible for the selection or continued use of all Instructional Materials." ECF 1, ¶¶ 34–35; ECF 1-1, § II-V. Under the Regulation, school districts may review books however they choose, so long as they account for the material's educational rigor, significance, validity, accuracy, objectivity, currency, appropriateness, and the availability of library shelf space. ECF 1, ¶ 35. The

---

[1] Exhibit A is a request for authorization to employ Mr. Coleman. Exhibit B contains the minutes from the State Board meeting where the Board enacted the Regulation.

2

Regulation also nominally prohibits removing material based on the district's opposition to the viewpoints expressed in the material. ECF 1, ¶ 36.

Second, parents can challenge materials by submitting a form to their school district's board of trustees. ECF 1, ¶ 40. The district's board of trustees must conduct a public meeting to consider the challenge and decide whether to remove or restrict the material based on the Regulation. ECF 1, ¶¶ 41. If the complaining parent disagrees with their district's determination, they may appeal it to the State Board. ECF 1, ¶ 42. Notably, the Regulation only permits the complaining parent to appeal a decision, ECF 1-1, § IV-D; it provides no avenue for parents who disagree with a removal to appeal the decision.

Third, the State Board itself can voluntarily review materials. ECF 1, ¶¶ 44–45. The State Board's decisions—both in appeals and voluntary reviews—bind all public-school districts in South Carolina. ECF 1, ¶¶ 43, 45.

B.     Librarian and Teacher Responsibilities

The Regulation also requires each school district to "maintain at all times on its website a complete, current list or catalog of all books and other materials that are available to students through any of a district's libraries or media centers." ECF 1-1, § II-C. As a result, librarians— including SCASL members—are responsible for cataloging every book in their library. ECF 1, ¶ 54. The Regulation further requires school districts to catalog all materials "used in or available to a student in any given class, course, or program that is offered, supported, or sponsored by a public school, or that are otherwise made available by any public-school employee to a student on school premises." ECF 1-1, § II-D. Thus, teachers are responsible for cataloging their classroom libraries and course materials. ECF 1, ¶ 54. Many school districts ordered their teachers to ensure that no books that violate the Regulation were in their classroom libraries. ECF 1, ¶ 55.

Many educators—including SCASL members—do not know *how* to comply with the Regulation. ECF 1, ¶ 108. The Regulation bans "descriptions" of sexual conduct but provides

3

no guidance on what counts as a description. ECF 1, ¶ 56. Recognizing the problem, the Department of Education issued guidance on February 11, 2025, stating that "descriptions require enough 'explanatory detail' to form a mental image of the conduct occurring." ECF 1, ¶ 57; ECF 1-3. But this so-called "clarification" only created more confusion. After all, different people require differing amounts of detail to form a mental image. ECF 1, ¶¶ 57–58. In other words, different people could reasonably reach different conclusions about whether something describes sexual conduct.

The Department of Education's guidance has not alleviated educators' concerns. Fearful of violating the Regulation, SCASL members have altered their professional practices in significant ways. ECF 1, ¶¶ 115–118. Some librarians have stopped purchasing—or have removed—books designated "mature" by their library management software, even though such designations often reflect factors unrelated to sexual conduct. ECF 1, ¶¶ 115, 117. Others consult crowdsourced reviews to predict which books parents might challenge before making purchase decisions. ECF 1, ¶ 116. And many librarians now maintain extensive records of their selection decisions to defend themselves if challenged. ECF 1, ¶ 118.

Teachers are also wary of violating the Regulation. Many have stopped maintaining classroom libraries because they fear punishment. ECF 1, ¶ 55. This includes many teachers for the Defendant District, including teachers at Greenville High School. ECF 1, ¶¶ 103–104. As a result, Plaintiffs H.A.C. and H.M.C. have both been denied access to materials that were previously available to them in their classrooms. ECF 1, ¶ 103. Moreover, because the plain text of the Regulation forbids teachers from using materials that describe sexual conduct in their classes, many works of classic fiction—including books on the Advanced Placement English Exam—are suddenly unavailable to Plaintiffs. ECF 1, ¶ 107.

C.     Enforcement

Under the Regulation, the State Board may punish school districts or school employees for failing to comply with the Regulation. ECF 1, ¶ 46. For a first violation, the penalty is a

written warning. ECF 1, ¶ 47. For a second violation, the State Board may conduct a hearing and subject the violator to any penalty that it finds appropriate if it finds that the violator intentionally, knowingly, or recklessly disregarded the Regulation. ECF 1, ¶ 48. Because South Carolina requires its teachers to be credentialed by the State Board, ECF 1, ¶ 51, losing an educator's State Board credentials could effectively end their career.

The Board has delegated a substantial portion of its enforcement authority to the Department, which is currently headed by Defendant Weaver. Ex. C (Procedure for Educator Certification Hearings). Under its rules of governance, the Department initiates and investigates allegations of misconduct, holds a hearing to determine whether misconduct occurred, and then submits its findings and recommended disposition to the State Board for approval. Thus, while the Board can decide to remove books, Defendant Weaver ensures that the books are removed.

D.    Removed Books

Since enacting the Regulation, the State Board has banned 21 books from all public-school libraries and classrooms. ECF 1, ¶ 66. Plaintiffs H.A.C. and H.M.C., who attend Greenville High School, have been unable to check out specific books from their school library, including *The Perks of Being a Wallflower* by Stephen Chbosky, *Identical* by Ellen Hopkins, and *Kingdom of Ash* by Sarah Maas. ECF 1, ¶ 102. H.A.C. and H.M.C. are also both members of the Greenville DAYLO chapter. ECF 1, ¶ 98. When the Greenville DAYLO chapter expressed interest in reading *The Perks of Being a Wallflower*, school officials told them that they could not because it would violate the Regulation. ECF 1, ¶¶ 99–100. Most teachers at Greenville High have stopped maintaining classroom libraries. ECF 1, ¶ 104.

Similarly, Plaintiff D.R., who attends the Academic Magnet High School in Charleston County, has been unable to access at least 11 books from his school's library. ECF 1, ¶¶ 13, 95. Like H.A.C. and H.M.C., D.R.'s DAYLO chapter was prohibited from reading its book of choice (for D.R., *Last Night at the Telegraph Club*). ECF 1, ¶ 97. Teachers at D.R.'s school have also stopped maintaining classroom libraries. ECF 1, ¶ 94.

5

The Regulation denies Student Plaintiffs access to age-appropriate classroom and library materials and denies any opportunity to engage with such materials under the guidance of teachers who can provide context, guide classroom discussions, and connect works to broader literary and historical understanding.

## III.     The Censorship Memo

On March 14, 2025, Defendant Weaver issued a memorandum to Department staff titled "Guidance Regarding Terminology and Data Collection Practices" (the "Memo"). ECF 1-2. The Memo states that it provides "clarity and consistency in how [the Department] implement[s] federal and state policies." *Id.*

The Memo directs that all Department "policies, instructional resources, technical assistance, and professional development" must "comply with applicable state and federal laws" and "must not promote ideologies that are inconsistent with these mandates." ECF 1-2. It further requires Department offices to "review existing resources, including third-party materials, to ensure compliance." *Id.*

The Memo specifically prohibits two categories of content: "discriminatory equity ideology" and "gender ideology." ECF 1-2.[2] To define these terms, it borrows language from three Executive Orders and a Dear Colleague letter. The Memo defines "discriminatory equity ideology" as "an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals." ECF 1-2. The definition includes the view that "the United States is fundamentally racist, sexist, or otherwise discriminatory." *Id.* It defines "gender ideology" as anything inconsistent with the notion that there are only two sexes, male and female, and asserts

---

[2] Exec. Order No. 14190, 90 FR 8853 ("Ending Radical Indoctrination in K-12 Schooling"); Exec. Order No. 14168, 90 FR 8615 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government"); Exec. Order No. 14151, 90 FR 8339 ("Ending Radical And Wasteful Government DEI Programs And Preferencing").

that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.*

The Memo also provides a list of terms that "may not be used" in Department materials. ECF 1-2. The list includes: Action Civics; Antiracism; Cisgender, Heteronormative, and other Gender Binary/Spectrum-related terms; Collective Guilt/Responsibility; Critical Pedagogy/Consciousness; Critical Theory (Postcolonial, Queer, Race, or any other kind of Postmodern Theory); Culturally Responsive/Relevant Teaching; Disparate Impact Theory; Diversity, Equity, and Inclusion; Implicit/Unconscious Bias; Intersectionality; Restorative Justice/Practices; Social Justice; and Social-Emotional Learning. *Id.* The Memo states that this list is "not exhaustive but rather illustrative of buzzwords, concepts, and practices common in K-12 and/or postsecondary education that could jeopardize federal funding." *Id.*

While the Memo is addressed to Department staff, the Department plays a significant role in shaping classroom instruction throughout the State. As mentioned above, the State Board has delegated enforcement authority over educator credentials to the Department. Grounds for investigation include incompetence, willful neglect of duty, willful violation of State Board rules, unprofessional conduct, immorality, and evident unfitness. S.C. Code Regs. 43-58. Promotion of "discriminatory equity ideology" or "gender ideology" could fit into any of these categories.

Following the Memo's issuance, some school districts directed librarians to remove texts related to sexuality and social justice from their shelves. ECF 1, ¶ 120. Some districts ordered librarians to take down themed book displays related to Black history and the LGBTQ+ community. *Id.* SCASL members remain uncertain about what activities and materials fall within the Memo's scope, particularly given that the list of prohibited terms is expressly non-exhaustive. ECF 1, ¶ 119.

The Memo does not define what it means to "promote" a prohibited ideology, leaving educators to determine whether the prohibition extends to active advocacy, neutral explanation,

7

or mere mention of the listed concepts. ECF 1, ¶ 88. Nor does the Memo specify what additional terms beyond the fourteen listed might "jeopardize federal funding." ECF 1-2.

## LEGAL STANDARD

When a defendant's motion to dismiss argues that the complaint does not allege sufficient facts to support subject-matter jurisdiction, a court must apply the 12(b)(6) standard, and assume the truth of the complaint's allegations. *Kerns v. United States*, 585 F.3d 187, 192–193 (4th Cir. 2009). In contrast, when a defendant brings a motion to dismiss where they challenge subject-matter jurisdiction on the grounds that the jurisdictional allegations in the complaint are not true, the court may "go beyond the allegations of the complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional allegations." *Id.* at 192 (cleaned up) (emphasis in original). But when the jurisdictional facts are intertwined with the facts central to the merits, "dismissal under Rule 12(b)(1) is inappropriate, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." *Id.* at 196. When the facts are not unsubstantial or frivolous, the court "should afford the plaintiff the procedural safeguards—such as discovery—that would apply were the plaintiff facing a direct attack on the merits." *Id.* at 193.

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts must accept as true all material allegations of the complaint, draw all reasonable inferences from those facts in the plaintiff's favor, and construe them in the light most favorable to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court may dismiss the case only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (citations omitted). If a complaint contains facts sufficient to state a claim for relief that is plausible on its face, the court must deny the motion. *Iqbal*, 556 U.S. at 678.

**ARGUMENT**

**I.     All Plaintiffs have standing to bring claims against Defendant Weaver.**

To have standing, a plaintiff must demonstrate that (1) they have suffered injury in fact, (2) a causal connection between the harm alleged and the action of the defendant, and (3) that their harms are redressable by a decision of the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Requirements for standing are "relaxed" in First Amendment cases. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)).

At each stage of litigation, the elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* Thus, for purposes of Defendant Weaver's motion, the court must accept as true "allegations for which there is sufficient factual matter to render them plausible on their face." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018) (cleaned up).

A.     <u>Defendant Weaver's primary argument—that there is no right to receive information from the government—goes against the overwhelming consensus that such a right exists.</u>

In 1982, the Supreme Court recognized a First Amendment right to receive information from the government in the school library context. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). Granted, *Pico* was a fractured decision. But to assert, as Defendant Weaver does, that *Pico* stands for the proposition that there is no right to receive information from the government *at all*, ECF 18, at 15, is to badly misread that case. In *Pico*, students sued their school district over its removal of books for being "anti-American, anti-Christian, anti-Semitic, and just plain filthy." *Id.* at 857 (cleaned up). Ultimately, the Supreme Court remanded the case to the district court to determine whether the defendants violated the

plaintiffs' right to receive information. *Pico*, 457 U.S. at 875. That disposition would be impossible without there being a right to receive information from the government.

Since *Pico*, virtually every court to consider the issue has found that library book removals implicate the right to receive information. *Gibson*, 796 F. Supp. 3d 1052 (holding law removing books from school libraries violated First Amendment); *Robbins*, 774 F. Supp. 3d 1001 (same)[3]; *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, No. 1:25-CV-637 (PTG/IDD), 2025 WL 2969560 (E.D. Va. Oct. 20, 2025) (same); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160 (D. Colo. 2025) (same); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) (same);  *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024) (county library violated First Amendment by removing books). Even when courts found that the plaintiffs lacked standing, it was not because there was no right at issue. *E.g., Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (plaintiffs lacked standing to challenge some book removals, but *not others*).

Despite all that, Defendant Weaver argues that Student Plaintiffs lack standing because their First Amendment right to receive information "doesn't exist." ECF 18 at 13–20. As grounds, she urges the Court to depart sharply from the overwhelming consensus and follow the Fifth Circuit's decision in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025). In that case, a majority of the en banc Fifth Circuit held that plaintiffs could not challenge a county library's book-removal decisions "by invoking a right to receive information." *Id.* at 850–51. But, as the dissent pointed out, this decision "forsakes core First Amendment principles"; "not only reaches a result directly contrary to *Pico*, but also casts aside the reasoning of a supermajority of the Court in the process"; and "overturns decades of settled First Amendment law." *Id.* at 869–89

---

[3] Defendant Weaver does not cite either of the *Penguin Random House* cases, even though they consider a nearly identical restriction which prohibits schools from carrying materials that describe sexual conduct.

(Higginson, J., dissenting). The *Llano* decision contains no limiting principle, and would allow the State to engage in conduct that even the *Pico* dissent "cheerfully" agreed was unlawful: the wholesale suppression of disfavored speech for "narrowly partisan or political" reasons. *Pico*, 457 U.S. at 907. This Court should not follow in the Fifth Circuit's footsteps.

      B.      <u>Student Plaintiffs have plausibly alleged injuries to their First Amendment right to receive information under the Regulation and the Memo.</u>

      *1.      The Regulation*

To start, Student Plaintiffs have suffered many injuries in fact that are traceable to the Regulation. The State Board banned 21 books under the Regulation. As a result, none of Student Plaintiffs can access any of those books. ECF 1, ¶ 3. D.R.'s school removed at least 11 books. ECF 1, ¶ 95. Meanwhile, H.A.C.'s and H.M.C.'s school removed at least three books. ECF 1, ¶ 102. Most egregiously, school officials at *both* high schools directed DAYLO chapters not to read books that the State Board had banned. ECF 1, ¶¶ 96–101. Thus, D.R. could not read *Last Night at the Telegraph Club* with his DAYLO chapter, and H.A.C. and H.M.C. could not read *The Perks of Being a Wallflower* with theirs. ECF 1, ¶¶ 96–101.

But the effects of the Regulation extend beyond these named titles. Student Plaintiffs' injuries also include the loss of classroom libraries, the elimination of literature from school curriculum, and the materials taken off the shelves by librarians who fear violating the Regulation. ECF 1, ¶¶ 91–107, 117.

Other courts have found these injuries sufficient to establish standing in virtually identical circumstances. *Robbins*, 774 F. Supp. 3d at 1009 (enjoining law that banned from schools "any material with descriptions . . . of a sex act"); *Gibson*, 796 F. Supp. 3d at 1061 (enjoining law that banned from schools material that "describes sexual conduct."). The *Robbins* court held that a student suffered an injury in fact where the law directly limited the materials that she could access from the school library. *Robbins*, 774 F. Supp. 3d at 1014. This limitation injured the *Robbins* plaintiff by limiting her "access to new ideas and viewpoints, as well as

information about history, politics, and science." *Id.* The same is true here, thus the Regulation has injured the Student Plaintiffs.

>    2.     *The Memo*

The Memo's impact is no less insidious. The Memo requires all the Department's communications and resources to omit any concepts deemed verboten by Defendant Weaver. ECF 1-2. Although the Memo is only addressed to Department staff, it nonetheless sets the Department's interpretation of what is required to comply with state and federal law. This interpretation binds all public-school educators in South Carolina. Since the Memo's release, districts have pressured educators to remove potentially controversial texts from their schools. ECF 1, ¶¶ 120–123. This includes books related to Black history and the LGBTQ+ community that are prohibited under the Memo. ECF 1, ¶ 120.

The Memo harms the Student Plaintiffs in the same way the Regulation does, by restricting their "access to new ideas and viewpoints." *Robbins*, 774 F. Supp. 3d at 1014. The difference between the harms is not one of kind, but of content: the Regulation bans sex, while the Memo bans ideologies with which Weaver disagrees.

True, unlike with the Regulation, there are no public orders declaring what must be removed. But "general factual allegations of injury" are sufficient at the pleading stage. *Lujan*, 504 U.S. at 561. And courts "must be careful . . . not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard," because "[w]hen a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). At the summary judgment stage, more will be required. But at that point, Plaintiffs will have had the benefit of discovery to narrow down the scope of their injuries.

Student Plaintiffs have plausibly alleged injuries in fact stemming from Defendant Weaver's enforcement of the Regulation and the Memo. At the pleading stage, that is all that is

required. Considering the relaxed standing requirements in First Amendment cases, Student Plaintiffs have met their burden. *Cooksey*, 721 F.3d at 235.

      C.      <u>SCASL has plausibly alleged injuries from the Regulation and the Memo.</u>

      *1.      The Regulation*

The Regulation injures SCASL members by forcing them to choose between risking professional liability and violating students' First Amendment right of access—all while guessing at what counts as a "description" of sexual conduct. That is a textbook vagueness problem, and one that SCASL members have standing to challenge. *See GLBT Youth v. Reynolds*, 709 F. Supp. 3d 664, 683–84, 702 (S.D. Iowa 2023) ("*GLBT Youth I*") (holding that because SB 496 "places . . . Educator Plaintiffs in the untenable position of having to decide whether to remove [a book] from the school library—thereby interfering with the First Amendment rights of students—or leaving it on the shelves and facing potential discipline, up to and including termination," it "likely violates the due process clause"), *rev'd on other grounds by GLBT Youth v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) ("*GLBT Youth II*").

Defendant Weaver argues that SCASL lacks standing to challenge the Regulation because there has been no credible threat of prosecution against its members. But courts have found that similarly situated librarians had standing to challenge virtually identical laws. For example, like the educator and librarian plaintiffs in *Robbins*, SCASL members have "been required to remove books from their respective libraries and are subject to sanctions in the form of termination and/or revocation of licensure." *Robbins*, 774 F. Supp. 3d at 1013; ECF 1, ¶¶ 137–141; *see also GLBT Youth I*, 709 F. Supp. 3d at 682–83.

True, the Department issued a memorandum stating that the Regulation "puts responsibility for compliance squarely on the shoulders of local boards, not individual educators." Ex. D (Memo to Superintendents Re: Enforcement). But the Department's interpretation of the Regulation contradicts its text. The Enforcement Section specifically states that school district employees who violate the Regulation are subject to discipline:

A.  For a first violation or failure, the State Board shall issue a written warning to the district board or *to the employee*, as applicable.

B.  For a second or subsequent violation or failure, if the State Board determines that the violation or failure was knowing or intentional or willful or recklessly disregarded the district's or the employee's actual or constructive knowledge of the criteria and requirements in this regulation, the . . . *relevant employee . . .* may be subject to a hearing conducted by the State Board, and any response that the Board, in its discretion, deems appropriate.

ECF 1-1, § VII (emphasis added). The Department's interpretation of the Regulation is little more than a promise not to enforce the Regulation as written. As the court found in *GLBT Youth I*, that does not deprive federal courts of jurisdiction. 709 F. Supp. 3d at 684; *cf. City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[V]oluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.").

2.      *The Memo*

The Memo has caused similar injuries. In essence, the Memo advises that ensuring "alignment with state and federal law" requires staff to conform Department materials (including curricular materials) to Defendant Weaver's own partisan ideology. ECF 1-2. And because the Department has authority to initiate disciplinary investigations, *see infra* Part I-D, failure to conform could expose educators to professional sanctions. S.C. Code Regs. 43-58; Ex. C. The problem is that the Memo's prohibitions are so vague that educators cannot know what compliance requires.

The Memo directs educators not to "promote ideologies" related to "gender" and "discriminatory equity." "Gender ideology" ostensibly means anything inconsistent with the idea that there are only two genders. *Id.* "Discriminatory equity ideology" encompasses anything that generalizes about race, or that suggests that the United States is "fundamentally racist, sexist, or otherwise discriminatory." *Id.* But what does it mean to "promote" an ideology? Does providing books with transgender characters promote gender ideology? What about books that discuss slavery? SCASL members don't know. Worse still, the Memo includes a *non-*

14

*exhaustive* list of "buzzwords, concepts, and practices" that may not be used.[4] *Id.* Thus, SCASL members cannot know whether promoting any concept—or even using any particular word— would give Weaver grounds to investigate them.

As a result of the Memo's open-ended prohibitions, SCASL members have removed potentially controversial texts from their shelves, particularly those related to sexuality and social justice issues. ECF 1, ¶ 120. Several school districts have ordered their librarians to take down displays related to Black history and the LGBTQ+ community. *Id.* The Memo has put SCASL members in the same untenable position as the Regulation does: "having to decide whether to remove [a book] from the school library—thereby interfering with the First Amendment rights of students—or leaving it on the shelves and facing potential discipline, up to and including termination." *GLBT Youth I*, 709 F. Supp. 3d at 683–84, 702. The only difference is that the Memo targets content related to race and gender as opposed to sex.

With respect to both the Regulation and the Memo, Defendant Weaver argues that SCASL lacks standing because there is no credible threat of enforcement. ECF 18, at 25, 27. But Defendant Weaver's history with SCASL suggests otherwise. In 2023, Defendant Weaver severed the Department's ties with SCASL because of SCASL's opposition to censorship in school libraries. ECF 1, ¶ 110. In doing so, Defendant Weaver escalated tensions while simultaneously accusing SCASL of creating a "hostile environment." *Id.*; *see also* Maura Turcotte, *SC Education Supt. Ellen Weaver cuts ties with SC school librarians group*, Post & Courier (Sept. 1, 2023), https://tinyurl.com/5c38hbua. Weaver refused to resume the Department's relationship with SCASL, even after SCASL wrote a letter asking to meet to address her concerns. Given this history, SCASL members have good reason to believe that

---

[4] The list includes action civics, antiracism, gender binary/spectrum-related terms, collective guilt/responsibility, critical pedagogy/consciousness, critical theory, culturally responsive/relevant teaching, disparate impact theory, DEI, implicit/unconscious bias, intersectionality, restorative justice/practices, social justice, and social-emotional learning.

Defendant Weaver will use the enforcement mechanisms at her disposal against librarians who fail to comply with her directives.

D.    The Plaintiffs' injuries are traceable to Defendant Weaver.[5]

To satisfy the traceability prong of standing, a plaintiff must show that the injury is "fairly traceable" to the defendant. *Cooksey v. Futrell*, 721 F.3d 226, 238 (4th Cir. 2013). Here, Defendant Weaver—the State official responsible for enforcing the regulation—has caused Plaintiffs' injuries.

Defendant Weaver asserts that the Regulation itself does not give her authority to enforce the Regulation. But under South Carolina law, the Superintendent of Education is responsible for administering "*all policies* . . . adopted by the State Board." S.C. Code Ann. § 59-3-10 (emphasis added). So, while the State Board determines policy, it is the Superintendent's job to execute it. *Id.*; S.C. Code Ann. § 59-5-65. That is no less true of the Regulation. For example, Defendant Weaver is responsible for promulgating the form used to challenge books at the local level. ECF 1, § IV.A. In the similar *Gibson* case, the court found the plaintiffs' injuries could be "readily traced" to the Florida state board of education because it prescribed such a form, just as Defendant Weaver does here. *Gibson*, 796 F. Supp. 3d at 1064. Additionally, Defendant Weaver's filings reveal that the Department has actively enforced the Board's removal decisions by issuing "weekly memos" and providing tools to school districts "to communicate any restrictions or removal decisions by the State Board." ECF 18-4.

Moreover, as the State Board's secretary and administrative officer, Defendant Weaver is responsible for communicating the State Board's decisions to the public, and issuing warnings for initial violations. ECF 1-1, §§ VI.A & VII.A. With respect to disciplinary actions, the State Board's rules of governance give the Department responsibility for investigating misconduct

---

[5] Defendant Weaver (rightly) does not argue that injuries caused by her Memo are not traceable to her.

allegations and providing a recommendation to the State Board. Ex. C. This is nothing if not enforcement.

And, contrary to Defendant Weaver's assertion, the Department (under her leadership) does interpret the Regulation. In fact, it did so in the same memorandum that Defendant Weaver now cites to show that there is no genuine threat of enforcement. ECF 18, at 25. That memorandum interpreted the Regulation as not changing "the scope, definitions, or processes associated with disciplinary action," and as putting "responsibility for compliance squarely on the shoulders of local boards." Ex. D. Defendant Weaver's Department interpreted the Regulation again in a February 2025 memorandum, in which it explained that the word "description" means to provide "enough 'explanatory detail' to form a mental image of the conduct occurring." ECF 1, ¶ 57. Defendant Weaver's own submissions to this Court show that her Department's definition of "description" was then decisively applied by the Board in many removal actions. *See, e.g.*, ECF 18-6 at 70 (*1984*), 91 (*Crank*), 106 (*Bronx Masquerade*), 129 (*The House on Mango Street*), 382 (*Half of a Yellow Sun*).

     E.     <u>A favorable decision of this Court would redress Plaintiffs' injuries.</u>

A plaintiff's burden to show redressability is small. A plaintiff must show only that they "personally would benefit in a tangible way from the court's intervention." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (internal citations omitted). Thus, "the removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Id.* at 190 (cleaned up).

An injunction prohibiting Defendant Weaver from enforcing the Regulation would redress Plaintiffs' injuries. At minimum, it would stop her from promulgating the necessary form to challenge materials. *Gibson*, 796 F. Supp. 3d at 1064 (requiring defendants to revise their unconstitutional book-challenge form would remedy plaintiffs' injuries). This would remove the primary mechanism through which the Regulation bans materials, protecting Student Plaintiffs' right to access information. ECF 1, ¶¶ 40–45. An injunction would similarly prevent Defendant

17

Weaver or the Department from initiating any investigations against SCASL members who allegedly fail to comply with the Regulation.

Enjoining Defendant Weaver from enforcing her Memo would likewise relieve pressure on educators to remove from the classroom ideas she disagrees with, preventing further infringement of Student Plaintiffs' right of access to information. It would also prevent her from enforcing her own open-ended interpretation of what the law prohibits against SCASL members, allowing them to continue shelving books about race and gender without fear of retaliation.

## II.     Student Plaintiffs assert plausible First Amendment claims against Defendant Weaver.

"Generally speaking, a First Amendment challenge proceeds in three steps." *Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 197–98 (D. Me. 2014). First, plaintiffs bear an initial burden to "demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 n.5 (1984). Second, the court must consider the nature and circumstances of the claim and "determine[] the applicable level of scrutiny." *Billups v. Cty. of Charleston, S.C.*, 961 F.3d 673, 684 (4th Cir. 2020). Third, the court must determine "whether the government's justifications for restricting the conduct or speech satisfy the applicable standard or standards." *Pollack*, 12 F. Supp. 3d at 198; *see Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) ("After the plaintiff makes his initial showing, the burden then falls on the government to prove the constitutionality of the speech restriction.").

### A.     Student Plaintiffs assert a plausible First Amendment claim against Defendant Weaver's removal of library materials through the Regulation.

#### 1.     The Regulation burdens Plaintiffs' First Amendment rights.

The Constitution protects the right to receive information. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). And students do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The Constitution protects students' right to receive information in both libraries and classrooms. *Bd. of Educ.,*

18

*Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) (libraries); *Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015) (classrooms). Courts generally agree that the First Amendment is implicated by classroom and library restrictions, but they have not yet coalesced around the appropriate standard of scrutiny. *Compare Robbins*, 774 F. Supp. 3d at 1021 ("The state must establish a substantial and reasonable governmental interest that justifies the school library restrictions.") *with Gibson*, 796 F. Supp. 3d at 1073–74 (discussing *Tinker* but then applying nonpublic forum analysis and holding that the state "must not unreasonably restrict the [school] library's purpose of providing students information on a broad range of subjects and viewpoints."); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013) (explaining that *Tinker*'s substantial-disruption test applies by default to all school censorship claims, except those discussed in *Fraser*, *Kuhlmeier*, and *Morse*).

Here, Defendant Weaver's enforcement of the Regulation has denied Student Plaintiffs access to library and curricular materials. Because these restrictions do not satisfy any level of scrutiny and are attributable to an overbroad regulation, Plaintiffs have stated a cognizable First Amendment claim against Defendant Weaver.

   2.  *The Regulation is substantially overbroad.*

To resolve a facial overbreadth challenge, "a court must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718 (2024). The "first step" in determining whether a law "is overbroad is to assess the law's scope" *Id.* at 724. Once the scope is determined, the next step is "to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id*. at 725. If "a substantial number of the law's unconstitutional applications are substantial compared to its constitutional ones," the law is unconstitutionally overbroad. *Id*. at 718. Under any standard of scrutiny, the Regulation is substantially overbroad.

19

i.    The Regulation's scope is vast.

The Regulation does not make a particularized inquiry into the pedagogical value or age appropriateness of any specific library or curricular material. Rather, it categorically requires the removal of all "materials used in a South Carolina K-12 public school classroom, made available in a public school library/media center, or included on a public school's reading list . . . [that] include[] descriptions or visual depictions of 'sexual conduct,' as that term is defined by Section 16-15-305(C)(1)." S.C. Code Ann. Regs. 43-170; S.C. Code Ann. § 16-15-305(C)(1). So far, the Regulation has prompted the statewide removal of 21 books, ECF 1, ¶ 66, the wholesale removal of classroom libraries, *id.* ¶¶ 3, 55, 94, & 103, and the termination of online research resources, *id.*, ¶¶ 70–82.

ii.    The Regulation has no constitutional applications.

When state action implicates the First Amendment, it carries the burden of demonstrating that its conduct satisfies constitutional scrutiny. *Reynolds*, 779 F.3d at 226. Here, Defendant Weaver cannot justify *any* of the book removals under Regulation 43-170.

As federal courts in Iowa and Florida concluded, the best framework for assessing laws like the Regulation stems from the Supreme Court's obscenity jurisprudence. *See Robbins*, 774 F. Supp. 3d at 1010 (enjoining law that prohibited schools from containing "material with descriptions or visual depictions of a sex act"); *Gibson*, 796 F. Supp. 3d at 1061 (enjoining law that allowed parents to challenge material that "[d]epicts or describes sexual conduct"). The obscenity standard for minors was established in *Ginsberg v. State of New York*, 390 U.S. 629 (1968), where the Supreme Court held that the State may only restrict minors from accessing material that:

1. Taken as a whole, and under contemporary community standards, appeal to the prurient interest of minors;

2. Depict or describe specifically defined conduct in a way that is patently offensive for minors; and

20

3. Taken as a whole, lack serious literary, artistic, political, or scientific value for minors.

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025). Both the *Robbins* and *Gibson* courts found this standard to be the best fit for dealing with laws like the Regulation. As the *Robbins* court put it, this standard, which applies to laws "with sweeping implications on the ability of minors to access books or other materials," fits because the law at issue was "just such a law." *Robbins*, 774 F. Supp. 3d at 1024. Accordingly, this Court should apply the *Ginsberg* standard. Like the law at issue in *Robbins*, the Regulation "imposes across-the-board, statewide restrictions" on the content that students may access. *Id.* Moreover, applying the *Ginsberg* standard to the Regulation's applications is straightforward.

Under *Ginsberg*, there are no constitutional applications of the Regulation. Every removed book was in a school because an educational professional determined that it had literary, artistic, political, or scientific value for minors. ECF 1, ¶ 128. In fact, before enacting the Regulation, South Carolina had already criminalized the distribution of obscene materials to minors under the *Ginsberg* standard. S.C. Code Ann. § 16-15-305. In other words, there were never any obscene materials in schools for the Regulation to target. Thus, as in *Robbins* and *Gibson*, the Regulation has no constitutionally permissible applications and is facially overbroad.

But the Regulation does not only fail the *Ginsberg* standard, it fails *every* standard.

*Tinker.* Fourth Circuit precedent directs that *Tinker*'s "substantial-disruption test" should apply to all school-based First Amendment claims except for those carved out by the Supreme Court in *Fraser* (prohibiting students from using "vulgar and offensive terms"), *Hazelwood* (restricting student speech that "bear[s] the imprimatur of the school"), or *Morse* (student speech promoting illegal drug use). *Hardwick*, 711 F.3d at 435; *see also Gibson*, 796 F. Supp. 3d at 1073–1074 (applying nonpublic forum analysis but agreeing that "the *Tinker* standard might be warranted."). A book that is not obscene under *Ginsberg* might nonetheless be subject to removal if there is evidence that its availability or usage has caused (or reasonably will cause)

21

a substantial disruption. But here, Defendant has cited no such evidence. Thus, all the book removals violate *Tinker*.

Nonpublic forum. Even applying the nonpublic forum standard, as the *Gibson* court did, Defendants lose. Under that standard, "the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). The reasonableness of the restriction is judged "in light of the purpose served by the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

The school library is the "principal locus" of students' freedom "to inquire, to study, and to evaluate, to gain new maturity and understanding." *Pico*, 457 U.S. at 868. Its purpose is "to provide information on a broad range of subjects and viewpoints." *E.K.*, 2025 WL 2969560, at *12 (quoting *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024)). Given that, it is unreasonable to remove all books that contain descriptions of sexual conduct. "[V]ast swaths of literature" contain such content. *Gibson*, 796 F. Supp. 3d at 1074; *Couch v. Jabe*, 737 F. Supp. 2d 561, 567–69 & n.4–14 (W.D. Va. 2010) (listing "dozens of the highly regarded works of literature which include an explicit description of a sexual act or intercourse"); *Cline v. Fox*, 319 F. Supp. 2d 685, 692–93 (N.D. W. Va. 2004) (observing that *1984*, *The Canterbury Tales*, *Ulysses*, and the Bible all contain sexually explicit passages). Indeed, the *Robbins* court took judicial notice of that fact when striking down an identical law in Iowa. 774 F. Supp. 3d at 1027.

Defendant Weaver has claimed no reasonable interest in banning every book that describes sexual content. Nor is any such interest obvious, given that many such titles frequently appear on the Advanced Placement Literature and Composition Exam. ECF 1, ¶ 132. Because the Regulation *undermines* the purpose of the school library, it cannot satisfy scrutiny under the nonpublic forum analysis.

22

B.     Student Plaintiffs assert a plausible First Amendment claim against Weaver's imposition of ideological discipline through the Memo.

Like the Regulation, the Memo burdens Student Plaintiffs' right to receive information in their school libraries and classrooms. Specifically, the Memo impedes Student Plaintiffs' ability to access materials related to "gender" and "discriminatory equity" ideologies. ECF 1, ¶¶ 86–87.

According to the Memo, prohibited gender ideology is anything that contradicts the notion that there are only two genders, male and female. *Id.* Thus, anything that acknowledges the existence of non-binary or transgender individuals is forbidden. This prohibition partially overlaps with the Regulation. For example, *All Boys Aren't Blue* by George M. Johnson was banned by the Regulation for describing sexual content, but it equally violates the Memo.

The Memo puts many things in the category of "discriminatory equity ideology." Most notably, anything that suggests that the United States is "fundamentally racist, sexist, or otherwise discriminatory." ECF 1, ¶ 87. Critically, this suppresses an entire side of an ongoing public debate about the role racism plays in society—the side Defendant Weaver disagrees with. But this mandate is not just blatant viewpoint discrimination, it's impossible to follow. History teachers cannot teach about slavery, the Civil War, or the Civil Rights Movement. Ironically, the Memo would ban even the *I Have a Dream* speech from which it cherry-picks. ECF 1-2. Defendant Weaver quotes the following portion:

> When the architects of our republic wrote the magnificent words of the Constitution and the Declaration of Independence, they were signing a promissory note to which every American was to fall heir. This note was the promise that all men [ . . . ][6] would be guaranteed the unalienable rights of life, liberty, and the pursuit of happiness. ECF 1-2 (*quoting* Dr. Martin Luther King, Jr., *I Have a Dream*, 1963).

But in the next paragraph, Dr. King accuses the United States of racism:

---

[6] Here, Weaver omits the clause "yes, even black men" from her quotation in her Memo.

23

> It is obvious today that America has defaulted on this promissory note in so far as her citizens of color are concerned. Instead of honoring this sacred obligation, America has given the Negro people a bad check. Dr. Martin Luther King, Jr., *I Have a Dream*, 1963.

The Memo makes it clear: Defendant Weaver believes the law does not permit discussions about LGBTQ+ people or racism in America. It is hard to see how any teacher or librarian would look at the Memo and conclude otherwise.

### 1.     The Memo in the Library

The Memo violates Student Plaintiffs' rights in the library context for the same reasons the Regulation does; it is unconstitutionally overbroad.

Like the Regulation, its scope is vast. It categorically declares that anything that promotes "discriminatory equity" or "gender" ideologies does not align with state and federal law. It applies to materials that cover America's history of racism, the Civil Rights Movement, and the history of LGBTQ+ rights.

Like the Regulation, the Memo lacks any constitutional application. It does not satisfy the *Ginsberg* standard because it bans materials even if they do not contain sexual content. Nor does it satisfy the *Tinker* standard because there is no evidence that any such materials have caused a substantial disruption in any school. And it does not satisfy the nonpublic forum standard because it does exactly what is not permitted: It "suppress[es] expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.

### 2.     The Memo in Classrooms

When it comes to curriculum, the result is the same. The State has more leeway to determine curriculum, *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968), but "the government's control over education is not limitless; it must be 'reasonable.'" *E.K.*, 2025 WL 2969560 at *18. Here, Plaintiffs agree with Defendant Weaver that the proper standard is the one stated in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). ECF 18, at 28. Under the *Hazelwood* standard, school officials may exercise control over activities that "bear the

24

imprimatur of the school," if "their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 271–73. Of course, *Hazelwood* dealt with student speech that the school sponsored, not other curricular materials. *Id.* at 262. Nonetheless, many courts have read *Hazelwood* as establishing the standard for curricular decisions generally. *E.g., Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015). This includes another district court within the Fourth Circuit, the Eastern District of Virginia.

The Eastern District of Virginia recently decided a similar case: *E.K. v. Department of Defense Education Activity*, 2025 WL 2969560. There, the court considered curricular changes made by the Department of Defense Education Activity schools (DoDEA) in response to the same Executive Orders that the Memo parrots. *Id.* at *1–2. Like the Memo, those Executive Orders prohibited materials that supported "gender ideology and discriminatory equity ideology." *Id.* at *2; Exec. Order No. 14,190, 90 Fed. Reg. 8853, Ending Radical Indoctrination in K-12 Schooling (Jan. 29, 2025). Ultimately, the district court preliminarily enjoined DoDEA from removing curricular content under the Executive Orders. *Id.* at *21.

Applying *Hazelwood*, the *E.K.* court found no evidence that there was a legitimate pedagogical interest in removing curricula related to gender ideology or discriminatory equity ideology. *Id.* at 19. In particular, the court noted that the directives lacked "any reference to specific pedagogical interests" or "a detailed pedagogical review process." *Id.* The same is true here. The Memo *does* reference legitimate pedagogical interests, such as presenting a "full historical picture" of American history. ECF 1-2. But removing curricula related to the United States' history of racism *contravenes*, rather than supports, that goal. A full historical picture cannot leave out slavery, the Civil War, segregation, Jim Crow, redlining, and the Civil Rights Movement.

### III.    SCASL asserts plausible vagueness claims against Defendant Weaver.

#### A.    SCASL asserts a plausible vagueness claim regarding the Regulation.

A law is unconstitutionally vague if ordinary individuals "must necessarily guess at its meaning and differ as to its application." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984). The problem with such laws is two-fold. First, they fail to provide actual notice to citizens. Second, and more importantly, they permit arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). The Regulation triggers both concerns.

Because the Regulation does not say what it means to "describe" sexual conduct, SCASL members, school boards, and even the State Board have struggled to apply it. The *Robbins* court found an identical law vague for exactly this reason. *GLBT Youth*, 709 F. Supp. 3d 664. As that court explained:

> According to Merriam-Webster, the word "description" means "an act of describing," "discourse intended to give a mental image of something experienced," or "a statement or account giving the characteristics of someone or something: a descriptive statement or account." Description, Merriam-Webster Online Dictionary. In the context of Senate File 496, this definition is elastic enough to leave considerable uncertainty about what crosses the line. In the Court's view, for example, a statement that two characters "made passionate love," "had sex on the bed," or even just "had sex" is a "description" of a "sex act," albeit not a terribly detailed one. Accordingly, reasonable school districts could decide to remove books with such language. Reasonable school districts also could decide not to do so, however, concluding that such language does not contain sufficient visual imagery to constitute a "description."

*Id.* In other words, individuals must guess at its meaning and differ in its application. The facts alleged in the Complaint bear this out. ECF 1, ¶¶ 56–65, 70–82, 108–121. Berkeley County School District banned students from using DISCUS—a powerful online resource operated by the State Library. ECF 1, ¶¶ 72–78. No other school district has done so. Fort Mills

26

School District has cut off its students' ability to access the county library's eBook collection. ECF 1, ¶¶ 79–82. Other districts have not.[7]

The Department's attempt to rectify the issue was to only count descriptions that provide "enough explanatory detail" to generate a "mental image" of the conduct occurring. ECF 1-3. But this is no clarification at all. Different people require different amounts of explanatory detail to form a mental picture. And educators do not know whose perspective matters. Should they consider books from the perspective of kindergarteners, high school seniors, or someone in between? SCASL members do not know.

Worse still, the State Board has arbitrarily enforced the Regulation. The text of the Regulation requires removal of any material that contains a description of sexual conduct, as that term is defined by Section 16-15-305(C)(1) of the South Carolina State Code. This includes depictions of "simulated touching, caressing, or fondling of . . . the covered or exposed genitals, pubic or anal regions, or female breast nipple . . . in an act of actual or apparent sexual stimulation or gratification." S.C. Code Ann. § 16-15-305(C)(1)(d). And yet, the State Board voted to retain *1984*, which contains the following description of the main character feeling the breast of his lover:

> "Don't you like *this*?" She twisted herself round and pressed her bosom against him. He could feel her breasts, ripe yet firm, through her overalls. Her body seemed to be pouring some of its youth and vigor into his. "Yes, I like that," he said.

George Orwell, *1984* 215 (2003). According to the State Board, this passage is "brief and lack[s] the necessary explanatory detail to qualify as a description." ECF 1, ¶ 62. But this scene is far more descriptive than the examples given by the *Robbins* court: "made passionate love,"

---

[7] In a footnote, Defendant Weaver asks the Court to strike the allegations related to school districts in Beaufort, Berkeley, and Fort Mill. But Defendant Weaver's claim that such allegations are "irrelevant" because "[n]one of the Plaintiffs have been affected by that conduct" is wrong. SCASL has been affected by that conduct, because it has members in those districts. ECF 1, ¶ 12. But even if that were not true, that many school districts have applied the Regulation in different ways is relevant to SCASL's vagueness claims.

"had sex on the bed," and "had sex." Notably, school districts in Iowa, applying the *same rule*, did remove *1984. GLBT Youth I*, 709 F. Supp. 3d at 700.

Fortunately, the Board did not ban *1984*. Nonetheless, Plaintiffs are puzzled at how this passage could be anything other than a description of a man experiencing sexual gratification from his lover pushing her breasts into him. Regardless, it illustrates the issue. Anyone applying the Regulation can stretch it to cover—or not cover—whatever they want.[8]

The Regulation's vagueness poses serious problems for SCASL members. If they fail to apply it in a way Defendant Weaver deems correct, she can initiate an investigation that could lead to the loss of their librarian credentials. ECF 1, ¶ 51. Thus, SCASL members are afraid that their failure to comply could cost them their entire careers. ECF 1, ¶ 114.

The Regulation is unconstitutionally vague. SCASL has stated a plausible claim for relief.

> B.    <u>SCASL has stated a plausible vagueness claim regarding Defendant Weaver's Memo.</u>

To reiterate, a law is unconstitutionally vague if ordinary individuals "must necessarily guess at its meaning and differ as to its application." *Jaycees*, 468 U.S. at 629. Such laws are problematic because they fail to give notice of what the law requires, and they permit arbitrary enforcement. *Kolender*, 461 U.S. at 357–58. Like the Regulation, the Memo is problematic for both reasons.

First, the categories of "gender" and "discriminatory equity" ideologies are both broad and open ended. ECF 1, ¶ 150; ECF 1-2. In the Memo, Defendant Weaver provides a list that is "not exhaustive but rather illustrative of buzzwords, concepts, and practices common in K-12

---

[8] Rather than responding to these vagueness concerns, Defendant Weaver badly mischaracterizes SCASL's claim. *See* ECF 18, at 31. Defendant Weaver's straw man argument notwithstanding, SCASL does not argue that the South Carolina obscenity statute is vague because it, unlike the Regulation, incorporates the *whole* obscenity standard from *Miller v. California*, 413 U.S. 15 (1973). *See supra* Part II-A-1.

and/or postsecondary education that could jeopardize federal funding and may not be used." *Id.* Even the terms that are expressly listed are poorly defined. For example, SCASL members must guess at the scope of "social justice." ECF 1, ¶ 151. This could apply to anything that argues that one version of society is more just than another, including John Locke's social contract theory, Montesquieu's philosophy regarding the separation of powers, or even the *Federalist Papers*. Given the vagueness of the listed terms and the open-ended nature of the list, SCASL members cannot know if any given idea would constitute impermissible gender or discriminatory ideologies.

Second, the open-ended nature of the list makes it easy for Defendant Weaver to add to it on a whim. This makes it easy for Defendant Weaver to arbitrarily enforce the Memo. And, as explained in Part I-D, *supra*, Weaver can enforce the Memo against SCASL members by initiating an investigation under the delegated authority of the State Board.

SCASL members are right to be worried, not only because they have been ordered to remove controversial texts from their libraries, but because Defendant Weaver has a history of retaliating against SCASL because of its resistance to censorship in school libraries. ECF 1, ¶ 110. Librarians are understandably concerned that the Department will investigate them if they fail to adhere to the Memo's undefined scope. SCASL has stated a plausible claim that the Memo is unconstitutionally vague.

## IV.   Library curation is not government speech.

Defendant Weaver argues that library curation is government speech, and thus is not bound by the First Amendment. But no court has ever held that the curation of library materials is government speech. On the contrary, courts have been nearly unanimous in holding the opposite. *See, e.g.*, *GLBT Youth II*, 114 F.4th at 667–68 (rejecting the idea that "placement and removal of books in school libraries" is government speech); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) (same); *PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 (same); *Virden*, 2024 WL 4360495 at *5 (same); *Fayetteville Pub. Libr*

*v. Crawford County, Arkansas*, 760 F. Supp. 3d 811, 834 (same). True, the Fifth Circuit *almost* went that way in *Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025). But even there, only seven of seventeen judges would have held that library curation constitutes government speech. *Id.* The Supreme Court's analysis in *Shurtleff v. City of Boston*, shows why few judges agree with *Llano County*'s plurality. 596 U.S. 243, 252 (2022).

To determine whether a government's editorial decisions constitute government speech, courts conduct a holistic inquiry examining (1) "the history of the expression at issue"; (2) "the public's likely perception as to who is speaking"; and (3) the extent to which the government has shaped or controlled the expression." *Id.*

First, there is no history showing that school library collections are government speech. Unlike the monuments at issue in *Pleasant Grove City v. Summum*, which Defendant Weaver cites, school libraries have not historically been used to speak to the public. *GLBT Youth II,* 114 F.4th at 668–69 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)).

Second, no one considers library collections to be an expression of the state's views. *Id.* When a student checks a book out of the library, they are not looking to read what the State has to say; they are looking to read what the book's *author* has to say. Moreover, libraries usually contain texts that contradict one another. If all library books are government speech, the government is "babbling prodigiously and incoherently." *Matal v. Tam*, 582 U.S. 218, 236 (2017).

Finally, until Defendant Weaver began pushing the State Board to adopt the Regulation in 2023, there was no history of South Carolina asserting control over local school libraries. *See GLBT Youth II,* 114 F.4th at 668–69. Indeed, Defendant Weaver concedes as much in her motion, stating that before the Regulation, decisions about what materials were suitable for students were made by a "patchwork quilt of local policies, practices, and procedures that varied from one school district to the next." ECF 18, at 4. None of the considerations in *Shurtleff* support Defendant Weaver's argument here.

CONCLUSION

Plaintiffs have standing to challenge Defendant Weaver's enforcement of the Regulation and the Memo. Student Plaintiffs have lost access to books in their libraries and classrooms. SCASL members face the untenable choice between risking professional discipline and violating students' First Amendment rights. These injuries are traceable to Defendant Weaver and redressable by this Court.

On the merits, Plaintiffs have stated plausible claims. The Regulation and the Memo are facially overbroad under any standard of scrutiny, and neither gives notice of what they prohibit to SCASL members. For these reasons, Plaintiffs respectfully request that the Court deny Defendant Weaver's Motion to Dismiss.

**Dated: February 9, 2026**

Respectfully submitted,

*Allen Chaney*
Allen Chaney
Samuel Kennedy*
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

Attorneys for Plaintiffs

* Licensed in California and Illinois, admission to South Carolina Bar pending