Exhibit B

# MINUTES
State Board of Education Meeting

**Date**
February 13, 2024

**Time**
1:00 p.m.

**Location**
Rutledge Conference Center
1429 Senate Street
Columbia, SC 29201


Dr. David O'Shields, Chair
Ms. Rita Allison, Chair-Elect
Ellen E. Weaver, State Superintendent of Education,
Secretary and Administrative Officer to the Board


**Visitor Information**

If you require Section 504 or Americans with Disabilities Act (ADA) accommodations to attend or participate in this public meeting, please contact Tracy Moore.

Due to allergies of staff and visitors, we ask that visitors refrain from wearing scented products when attending the State Board of Education (SBE) meetings in South Carolina Department of Education facilities.

**State Board of Education Mission**

The State Board of Education's mission is to provide a leadership role in helping South Carolina set policy and direction to transform teaching and learning so that students are prepared with the necessary knowledge and skills, including innovation, to compete globally and live a productive life.

The following State Board of Education (SBE) members physically attended: Chair David O'Shields, Eighth Judicial Circuit; Chair-Elect Rita Allison, Governor's Appointee; Maya Slaughter, First Judicial Circuit; Jacqueline "Jackie" Lynn, Fourth Judicial Circuit; Beverly Frierson, Fifth Judicial Circuit; Joyce Crimminger, Sixth Judicial Circuit; Dr. Joette Johnson, Seventh Judicial Circuit; Dr. Christian T. Hanley, Jr., Ninth Judicial Circuit; Sallie Lee, Tenth Judicial Circuit; Tammie Shore, Eleventh Judicial Circuit; Richard Harrington, Twelfth Judicial Circuit; Cheryl Collier, Thirteenth Judicial Circuit; Alan Walters, Fifteenth Judicial Circuit; and Jackie Terribile, Sixteenth Judicial Circuit. Crystal Stapleton, Ed.D., Second Judicial Circuit; Delaney Frierson, Third Judicial Circuit; Mary Cordray, Fourteenth Judicial Circuit was absent.

The following South Carolina Department of Education (SCDE) staff attended: John Tyler, Deputy Superintendent, Parliamentarian, General Counsel, Division of Legal Affairs; Barbara Drayton, Deputy General Counsel, Office of General Counsel, Division of Legal Affairs; Henry

State Board of Education Minutes
February 13, 2024
Page 2 of 14


Exhibit B

Gunter, Deputy General Counsel, Office of General Counsel, Division of Legal Affairs; Tracy Moore, SBE Executive Liaison, Office of General Counsel, Division of Legal Affairs; Cricket Katsos, Administrative Coordinator, Office of General Counsel, Division of Legal Affairs; Travis Huggins, Information Technology Manager I, Chief Information Office, Division of Data, Technology and Agency Operations; Rashard Huntley, IT Specialist III, Chief Information Office, Division of Data, Technology and Agency Operations; Brando Butler, IT Specialist III, Chief Information Office, Division of Data, Technology and Agency Operations; Raymond Dues, IT Specialist II, Chief Information Office, Division of Data, Technology and Agency Operations; Jonathan Glover, IT Specialist III, Chief Information Office, Division of Data, Technology and Agency Operations.

## I. WELCOME/PLEDGE OF ALLEGIANCE

The SBE meeting convened at 1:09 p.m. Chair O'Shields called the meeting to order and welcomed everyone who attended.

Chair-Elect Allison led everyone in the Pledge of Allegiance.

## II. APPROVAL OF STATE BOARD OF EDUCATION MINUTES FOR JANUARY 9, 2024

Chair O'Shields asked if there were any objections to approving the minutes as presented for the SBE meeting on January 9, 2024. Hearing no objections, the minutes were approved.

## III. APPROVAL OF STATE BOARD OF EDUCATION AGENDA FOR FEBRUARY 13, 2024

Chair O'Shields asked if there were any objections to approving the agenda as presented for the February 13, 2024, SBE meeting. Hearing no objections, the minutes were approved.

## IV. RECOGNITION OF VISITORS AND NEWS MEDIA

Chair O'Shields welcomed any media and asked if any visitors had signed in. Acknowledged media include: Spencer, Khalil, Gracie, Eric, and Ryan with Nickelodeon; Henry Schuster with CBS News; Jeniffer and Tom, Wigan, Dorian, Delvao, Corey Connor, Doug, Tutoria, Ali Redmond, and Daniel Dumas with Band Together Documentary; Becky Budds with WLTX. Chair O'Shields acknowledged a large visitor turnout and thanked those visitors.

## V. STATE BOARD CHAIR REPORT

Chair O'Shields reported, "I want to thank you again for coming. As you know, tomorrow is Valentine's Day, red coat, red, pink, all the different colors that are associated with that. I remember very clearly being young, one time ago, in early elementary school where we gave each other Valentines.

State Board of Education Minutes
February 13, 2024
Page 3 of 14


Exhibit B

The origin of Valentine's Day comes from a Saint Valentine of Rome, a priest who was martyred in the year 269 AD. According to church history, Saint Valentine displayed love and tenderness, even to those who most opposed him. Especially the emperor, who actually tried to convince him to convert from Christianity. He corresponded with the Jailer's Daughter before his execution, signing letters to her as, "Your Valentine". No month is more overtly about love than February. I wonder if there is an unintentional correlation between February being the shortest month in our ability to give, or more likely withhold love. But for those of us in this room, public education is something we all care deeply about. And in this whole room, I mean that. And dare I say, we love it. Although love is often professed, sometimes it's much less likely displayed. Today, however we stand, as evidenced by this crowd here today, love needs to be maintained as a focus. Love for teaching, love for learning, love for those whom we find unlovable, and most of all, for the students who are our future.

I close with last night's devotional. With the American Civil War spawning many bitter feelings, Abraham Lincoln saw fit to speak a kind word about the South. A shocked bystander asked, how could he do that? He replied, madam, you want to destroy my enemies when I make them my friends.

## VI. STATE SUPERINTENDENT OF EDUCATION REPORT

Chair O'Shields recognized Superintendent Weaver. Superintendent Weaver reported, "As you may or may not know, this week is actually School Bus Driver Appreciation week. There are few people who need more appreciation or who we should more appreciate than our school bus drivers. I'd like to share for a minute just a few statistics about school bus drivers here in the state of South Carolina. We currently have about 4,500 currently employed, and about 950 assistants on top of that for about 5,500 total drivers and assistants. 340,000 students are transported to school each day on a school bus. The average service time of our bus drivers in South Carolina is just over 17 years, but we do have one veteran in Horry County who has been serving for 52 years as a school bus driver. The average statewide pay is $19.25 an hour, and collectively our state drivers drive Approximately 78 million miles each year. It's an amazing statistic. Many of these routes begin at 5:15 in the morning, and of course, that doesn't count the pre-inspection that they do on their buses before they even ever leave that bus depot.

These are dedicated, incredibly dedicated people working often until 6:30 at night, long routes, especially with the shortage that we have. As part of my budget presentation to the House last week, I encourage them to strongly consider a $2,500 retention bonus to our bus drivers who stay with us through the 24-25 school year. Because we have a lot of important experience that they represent, and we need to make sure that we maintain them and pay them well. This statistic for those of you who are teachers will certainly give you pause. You can have up to 77 students at one time on a bus. That's a lot of children to be maintained over at any given time. Our bus drivers are incredibly vital to the functioning of our public education system and to ensuring equality of access to students in every part of our state. With that in mind, our intrepid Derek Phillips, Communications Director, got up very, very early, a couple of weeks

State Board of Education Minutes
February 13, 2024
Page 4 of 14



ago, and actually went and shadowed a bus driver in Richland One, and so I'd like to bring you that video today. (A video was shared highlighting a day in the life of a bus driver)

If you have an opportunity this week, I encourage you to say a special thank you to our bus drivers all over the state for everything that they do.

Just a quick update from a report that I gave you, I believe at the last board meeting about something that we're calling Project Raise Your Hand, which is a volunteer partner initiative between the Department of Education and our neighborhood district of Richland One. We now have 10 schools that have raised their hand to ask for volunteer support from employees here at the department, and we have over 70 folks here at the department who have raised their hand to support and serve in those local schools. We're very excited. This is a pilot program that we will be running from next week when they first go to their first school to the end of May. We'll look forward to reporting back to you on this service initiative, with the hopes that we can continue to grow it. I'd love to see it across the entire state by the time we finish. So very excited about that but wanted to give you that quick update.

The final thing on my superintendent's report today, obviously there is a reason why we have a lot of folks here today. I just wanted to do, from my perspective, a quick review of how we got here and really what the conversation that we're going to engage in today is all about. This process for the state library reg has been very deliberate and thoughtful. When we first responded to requests, both members of this Board, members of the General Assembly, and feedback that we received from the public further revealed the need for this type of regulation. We said the first thing that we want to do is make sure that anything that is put in front of this board is carefully crafted and legally defensible. You all heard last time from a nationally known First Amendment attorney who is from here in South Carolina, who you will hear, again, from today just outlining some of the technicalities of this process. As we said at the very first reading of that draft regulation, that's a starting point. There is much conversation and feedback that needs to be heard and received in order to make this regulation the best that it can possibly be. As you all are well aware, we've had an extended public comment period, longer actually, than most public comment periods typically are. That has given us the ability to thoughtfully hear and sift through a lot of the feedback that we have received. I know you all personally have sat down one on one and in group scenarios with different constituents in your own areas. I, for my part, have spoken with school board members. I have spoken with superintendents, teachers, as well as parents, and just members of the broad community to solicit feedback. I think that what was brought forward earlier this morning in subcommittee really addressed much of the substantive feedback that we received in order to strengthen the regulation. Because as we have stated from the outset, the goal of this regulation is really to help create uniformity and clarity across the state because there are so many different competing narratives and standards that have been out there across the district. Our goal is to remove uncertainty and fear from the backs of our teachers who are often the ones who are caught in the crosshairs of these ongoing controversies. I'm sorry to say that this fear has been

State Board of Education Minutes
February 13, 2024
Page 5 of 14



fomented in many cases I've seen even throughout this process by national organizations who are coming into South Carolina trying to impose their pre-written narrative of what this regulation does and doesn't do onto the hard work of this board and the community feedback that we have received and incorporated here.

I'd like to say to our students who are here today that it is unfortunate, in my opinion, that there are adults and narratives who have actively misled you about what this regulation does and doesn't do. I want to be entirely clear with you that this regulation in no way silences your viewpoint or your voice. This is simply to describe in a succinct way something that is or is not age-appropriate and aligned with South Carolina's instructional standard. And in fact, the regulation goes on to say numerous times that this should in no way be used to discriminate against anyone's viewpoint. I just want to be clear about that up front.

To the teachers who also have been told that this is something that they should be afraid of. I want to say that, we, as your Department of Education, should this regulation move forward, are here to work with you, to provide clarity and resources for you as you navigate the use of this regulation. This is not in any way intended to be a "got you" game, we are here simply to create clarity and transparency around the materials that are introduced into South Carolina classrooms and libraries at taxpayer expense. As an example of what I'm talking about, I would point to one of the provisions that were included in the board amendment that I understand was passed in subcommittee earlier today. That was the dropping of the use of FCC definitions. That's something that, I think, if you were to talk to the average person on the street, is pretty intuitive, right? They say, well, if it can't be on local TV, then why would we want it in a South Carolina school? While that sounds like very much common sense, in some ways, we received feedback that that creates more uncertainty. Again, since our job and our goal here was not to create more uncertainty, I think the board and its prudential judgment made a decision that we're going to eliminate that from the regulatory framework. I think that that was probably the right thing to do in terms of providing something to teachers that is truly useful and clear and understandable.

In addition to just thanking the board for their work on this, for the time that they have taken to really thoughtfully receive and process all of the feedback that we've received; the final thing that I'll say today along those lines is, again, to just call people's attention to the very clear definition that this regulation now provides about what is or is not considered age-appropriate in a South Carolina school. And I think there might have been copies distributed of this, but this is straight out of the South Carolina Code of Laws, § 1615305C1. These are the definitions that are incorporated into this regulation. What I would challenge folks here to speak against this regulation to do is to look at this list carefully and to discern and describe, if you will, what provisions of these definitions you believe taxpayer resources should be used to introduce into South Carolina schools. Because at the end of the day, that is what this regulation does, it prohibits things that are defined on this piece of paper from being purchased at taxpayer expense and put in front of students.

State Board of Education Minutes
February 13, 2024
Page 6 of 14



This concluded the Superintendent's report.

## VII. PARLIAMENTARIAN COMMENT

Parliamentarian, John Tyler, General Counsel, Deputy Superintendent, Division of Legal Affairs, reported, "Thank you, Mr. Chairman, and good afternoon honorable members of the State Board of Education. Our parliamentarian comment today, tis the season, it's almost March and your statement of economic interest is due. You can go to ethics.sc.gov, seek additional information from my office on how to make those filings. The due date is March 30th. I'm told it does not take long and it doesn't hurt much. So please make your filing. If you have basic high-level questions, please reach out to my office. If you have more in-depth questions, you can reach out directly to the ethics commission. And once again, March 30th is your deadline, please get those filings in. Thank you."

## VIII. PUBLIC COMMENT

Chair O'Shields welcomed those signed up for public comment. He then suggested that because of the large number of participants, the board take a vote on amending the procedures to allow for 10 speakers with a time limit of 3 minutes instead of the standard 6 speakers with a time limit of 5 minutes in order to allow as many comments as possible within the 30 minutes allotted for public comment. Ms. Frierson made the motion. Dr. Hanley seconded the motion. Chair O'Shields called for a vote. The motion passed. He then announced that public comments are taken as information and the board would not respond.

Public comments, alternating in favor of and in opposition to were heard from: Pastor Tommy Quick, Kate Selvitelli, Breanna Benton, Dylan Rhyne, Joshua Quick, Mickey Thompson, Susana Saravia, Patrick Good, Angelina Davenport, Mary Ruff, Josh Malkim, Elana Lewis, Melissa Goforth, Katherine Freligh, Linda Fisher, Natalia Chailds, and Diana Simone.

## IX. STATE BOARD ITEMS

### POLICY AND LEGISLATIVE (PL) — COMMITTEE REPORT

Dr. O'Shields reported, "The Policy and Legislative Subcommittee met earlier today and approved to present before the full Board, Regulation 43-170 with revisions. We also received one item for information from Basil Harris regarding waivers from the SDE. That concludes the report from the Policy and Legislative Committee."

FOR APPROVAL
1. Second Reading: Proposed State Board of Education (SBE) Regulation S.C. Code Ann. Regs 43-170 (R.43-170), Uniform Procedure for Selection or Reconsideration of Instructional Material

FOR INFORMATION

State Board of Education Minutes
February 13, 2024
Page 7 of 14



2. Waivers Approved by the SCDE

**EDUCATOR PROFESSIONS (EP) — COMMITTEE REPORT**

Chair O'Shields recognized Dr. Johnson, Chair, who reported that the sub-committee met and heard three action item(s) and no item(s) for information. The action items were placed on the Consent Agenda.

This concluded Dr. Johnson's report.

FOR APPROVAL

3. Identification of Critical Need Subject Areas for 2024–25
4. Identification of Critical Need Geographic Areas (Schools) for 2024–25
5. New Educator Preparation Program Approval Recommendation: Teach Right USA (TRUSA)

FOR INFORMATION
No items.

**STANDARDS, LEARNING AND ACCOUNTABILITY (SLA) — COMMITTEE REPORT**

Did not meet.

**EDUCATOR LICENSURE (ELC) — COMMITTEE REPORT**

Chair O'Shields recognized Ms. Crimminger who reported the sub-committee met and took action upon the following 15 cases; one public reprimand, ten suspensions, one approval for initial certification, and two denials for initial certification. Ms. Crimminger further reported that these matters were ratified during the Full Board ELC meeting.

**FULL BOARD EDUCATOR LICENSURE (FB-ELC) — COMMITTEE REPORT**

Chair O'Shields reported that the FB ELC met and took action upon the following case; a suspension. Chair O'Shields confirmed the ratification of the matters and thanked the Office of General Counsel and the board members.

## X. CONSENT AGENDA

All Committee Items presented to the State Board for approval make up the Consent Agenda.

Chair O'Shields called for a vote. Ms. Crimminger made the motion. Mr. Walters seconded the motion. The motion passed.

State Board of Education Minutes
February 13, 2024
Page 8 of 14


Exhibit B

## X. SOUTH CAROLINA BOARD OF EDUCATION REPORT

FOR APPROVAL

Chair O'Shields recognized Miles Coleman, Esq., of Nelson Mullins Riley & Scarborough. Mr. Coleman reported, "Good afternoon, thank you, Mr. Chairman. If I may be permitted a point of personal privilege. Can I start by saying that this meeting thus far has given me such hope for the future of our state and for the future of public education. The active public participation from members; young and old, black and white, pro and con. To have young people, 16, 17 years old, displaying the enormous courage to stand in front of a powerful board at a state agency and speak their views, whether we may agree with them or not, is encouraging to me and I hope it has been to you as well.

I'd like to divide my comments into four sections. First will be a few introductory remarks. Second, we can go through, change by change, and briefly touch on the points in the red line, or the proposed revised version of the regulation you have before you. Third, I'll respond briefly to a few of the comments and questions that we've already heard during the public comment period. And fourth, I'd, of course, be happy to answer any questions that you all may have. But first, as to the brief introductory matter, I won't give you all the full introduction that I shared last time. My name is Miles Coleman, I'm a First Amendment lawyer. I work at Nelson Mullins Riley & Scarborough, and a significant portion of my practice is devoted to First Amendment law.

Two months ago, the department asked me to review and opine on the legality and enforceability of this, which I did. I understand that department leadership and staff have met with a wide range of interested stakeholders, including students, parents, teachers, librarians, agencies, boards, and associations. As part of the deliberative process of implementing, revising, and promulgating this regulation, those comments and feedback have been taken into account and been considered.

At a high level, broad themes, as I read these revisions, they do a couple of things. One, they, in some ways, make this version slightly narrower than the version we looked at two months ago. That's by removing both the FCC regulatory standard, which Superintendent mentioned briefly earlier, and by changing the ability from any person in the district to file a challenge to being a person with a student in the district. It is slightly narrow in that sense. Secondly, these amendments, as I see them, in some ways make the administrative and logistical process clearer and easier, both on this board and on the district boards that will be implementing it.

Let's move on to the second section of my comments, which is to go through and talk briefly about the changes. I believe each of you has a copy, probably the same one that I've got here, showing the red lines. We'll start on the first page. There are a few changes in section 1a that are non-substantive, but to clarify that the schools we're talking about are in fact South Carolina K-12 public schools, think that's unremarkable. Subsection C of Roman numeral one, you'll see we've already spoken briefly about the fact that it struck out or proposes to remove

State Board of Education Minutes
February 13, 2024
Page 9 of 14



the reliance on, or incorporation by reference of, FCC regulatory guidance. From an implementation standpoint, doing that makes the process simpler. If you're a lawyer, particularly if you're a lawyer who practices in this area, you're very comfortable reading precedent, discerning nuance differences and distinctions between cases. But frankly, that's not practicable for a district board, who has many things to do, to do. By removing reference to FCC regulation, it makes the standard that applies simpler, cleaner, clearer, and easier to apply. Toward the bottom of that page, under Roman numeral 2a, you'll see that previously, it referred to school sponsored extracurricular activity. That's been changed to say school controlled extracurricular activity, which I don't believe has a material or substantive change but makes it a little bit cleaner and clearer for schools to implement.

Top of the next page, you'll see there's a new subsection D that, as I understand it, was inadvertently omitted from the prior version. It has two things going on in it. First, you'll see the District Board of Trustees is ultimately responsible for the selection for continued use of all instructional materials. That's a fairly unremarkable proposition of law because a school district's board of trustees is already ultimately responsible for everything that happens in that district. In the same way that a corporation's board of trustees is ultimately responsible for everything that occurs in or through the corporation. The second section, if you go about four lines down, you'll see after the parenthetical word, instructional materials. A district's board may, but is not required to, prospectively review, and assess its existing instructional materials for compliance with this regulation. One of the comments we heard in the public comment period at the last hearing, and I think we even heard overtones of this morning, was the view that this regulation would impose an onerous and untenable burden on school district boards, on school administrators, and on teachers to affirmatively and prospectively go and review tens of thousands of books and other materials already in the district to ensure they're compliant. The regulation never required that, and now it's made clearer by expressly saying it doesn't require that. There's no need for anyone to go and spend the summer trying to read 17,000 books in the library just to make sure they all comply. A district board may simply review and assess materials on a case-by-case basis when they get challenged. And frankly, that's realistically the more likely way that materials will be reviewed, is they'll be challenged and then reviewed. Keep moving down, excuse me, down that page.

You'll see in subsection D, about halfway down the page, this is referring to a list of instructional materials. At the end of that, you'll see that previously it allowed for "any person residing in the district to request a list". That's been changed now to say that a parent or legal guardian of a student in the district can request that list. We'll see a change similar to that in a couple of other spots. You can flip to the next page, it's the page at the bottom, says page two, about one-third of the way down the page, Roman numeral four. This has to do with the complaint process, which now applies to a parent or legal guardian of a student in the district. One thing that's added in that introductory paragraph to section four is that "a complainant before submitting the complaint form that's been promulgated by the Department of Education

State Board of Education Minutes
February 13, 2024
Page 10 of 14



Exhibit B

will have to have made a good faith effort to address their concern regarding non-compliance with this regulation with the school level or district level staff". We heard comments again at the last public hearing and today about that, so that's been added in in response to the feedback that's been received.

Subsection A, about halfway way down the page, you'll see this refers to the complaint form. The department will issue a complaint form that everyone will use to file their complaint. Bottom of this page, subsection B, there are six or seven underlined lines indicating new material. Those underlined lines do two things. The first part of the sentence allows the district board to do something similar to what this board did about 75 minutes ago, which is to understand that in the interest of time it may be necessary to reasonably and evenhandedly limit the number and extent, the time limit, on public comments. District boards already have that authority to do that, but we wanted to make it clear. The key thing I'd point out there is that it needs to be both reasonable and even-handed, and you all understand what that means, we've just seen it demonstrated here today. The second thing that that new language does, toward the bottom of that, beginning with a district board may in its discretion….. It allows a district board, it specifically contemplates a district board doing, again, what this board often does, which is to form a committee formed of board members, fewer than the whole board. But a committee formed of board members who can take the initial review and assessment and then come to the full board with a recommendation. The full district board is still responsible for reaching a decision, but in the interest of efficiency they can authorize a committee of board members to take the first pass and then provide a report and recommendation.

You'll see about a third of the way down the next page in subsection D. This is intended to aid efficiency. This authorizes districts to stay their proceeding, which is legalese for pause, to suspend it temporarily to await the decision from the state Board of Education.

Next page, halfway down, there's the page at the bottom, it says page four, halfway down, subsection C. This is a procedural mechanism. Typically, you file a lawsuit in what we call circuit court. After that court decides the case, whether by jury or bench trial or dispositive motion, a party may then appeal it to our court of appeals, that's our intermediate court of appeals. It's then briefed, argued, and decided, and only then can one of the parties make an appeal to the state Supreme Court. But there are certain situations in which when a party has initially filed their appeal as they're supposed to at the court of appeals, they can ask the Supreme Court. Or the Supreme Court can actually do that on its own initiative, it can reach down and take a case up. What this new subsection C does is effectively allow that same type of mechanism to be employed in the book review process. It says that a district board that's received a complaint may by written request, ask the state Board of Education to take jurisdiction, to take the first crack at reviewing and bring a decision on the book. The decision of whether or not to grant that request is in the discretion of this board. It is in your discretion whether or not to grant such a request, or if you think is best, to decline it and allow the district board to have the first level of review and decision on it.

State Board of Education Minutes
February 13, 2024
Page 11 of 14



Exhibit B

Last page, you'll see there's a new subsection D that essentially acknowledges that already existing in statutory law, case law, and South Carolina precedent, is the right of a parent to opt their child out of certain instructional material. And like the other subsections in this final section of the reg, this is acknowledging that nothing in this regulation alters or changes that ability. That allows parents to have certain opt-out rights.

Section three, I want to respond briefly to a few of the comments that we heard this morning. We've heard reference to the demonization of teachers and librarians. I haven't heard any of that from this board. I share a checking account and a mortgage with a public-school teacher, and I certainly have only seen, in my experience, good faith actors with the best interests of our children at heart. Nothing in this regulation threatens them, penalizes them, or will be used as some sort of a "gotcha tool" and it's not something they ought to be afraid of. I certainly don't believe that any of us here today have or would seek to demonize or cast ill motives upon them. One other thing that was mentioned was reference to South Carolina Code Section 16-15-305. On page one or page two, early in the regulation, it incorporates by reference a statutory definition of sexual conduct. Consideration is a whole artistic merit. It becomes more difficult to apply and introduces more variability in the outcomes.

A few more comments. One would be, we heard a rhetorical question asked, why could a student go home and experience something that they cannot read at school? I think the reference was, right, once you're over the age of 16 in South Carolina, that's the age of consent, and that a student of that age can legally consent to engage in sexual activity. Why can't they then read about people engaging in sexual activity at school? Well, for a whole lot of reasons. There are all kinds of things that a person can do legally that they can't do at school. A person of 16 or 18 years old is allowed to own a gun. They're allowed to shoot guns and buy guns. But we don't do it at school. There are people, there are each of us of whatever age have a constitutional right to exercise certain rules religious beliefs and activities, but that doesn't mean the school itself has to fund them, right? That's a key distinction. We're not talking about the school accommodating student expression, right? Let's use the same analogy. A student of faith, whatever it may be, has a free exercise right to exercise his or her faith, including at school, but that doesn't mean that the school has to fund it. In fact, that's a critical distinction of what's known as release time Bible education. It accommodates a student's free exercise right but clearly says the school doesn't fund it and it doesn't occur on school grounds. Let's bring it back to this context. A student may have the ability to do something or to read something, but it doesn't mean that the school has to buy it, provide it, house it, and teach it, right? This isn't student-speech we're talking about. These are books bought by government employees using government money put into government buildings as part of a government program. It's government-speech. Those are different rules than private speech or expression.

I think the last thing I'll mention is that one of the comments noted the need for appropriate and suitable health education or sex education and training on other matters related thereto. The only response to that is, on the final page of the regulation, you'll see it specifically says that nothing in this regulation does or frankly could, as a matter of legal authority, supersede

State Board of Education Minutes
February 13, 2024
Page 12 of 14


Exhibit B

South Carolina's comprehensive health education law, Gavin's law, Aaron's law. So that's already been factored in and taken care of.

The last thing I'll say, and I'll wrap up this section and be happy to answer any questions is that this regulation doesn't censor anyone. It refers to the government selection of government materials in a government program with government funds. Students are still free to speak and act and read as they wish, but on their own time and on their own dime, not at the expense of the government as part of a public-school education." This concluded Mr. Coleman's report.

The Chair asked for any questions of the presenter. Ms. Collier asked if there could be clarifying language for good faith effort. Mr. Coleman explained that the definition intentionally left room for interpretation and would be hard to either proscriptively or prescriptively define. He further opined that when the first complaint is filed, we'll have a sense of what we think good faith means.

Mr. Walters commented, "Can I offer a point here real quick as well? In the legislation that is currently in conference in the General Assembly, this is a framework that they use. And so I believe that pulling from that example, we've tried to keep it as consistent as possible with what you're doing so to your point, this is something that is used in other contexts as well."

Ms. Slaughter asked, "Relating to section four, I'd just like for you to clarify in case maybe it doesn't relate only to section four currently as written, a valid complaint would be allowed to come before to file a complaint and that ability is unlimited?" Mr. Coleman responded that in the current version there were no limits to how many complaints can be filed.

Ms. Allison asked for clarification, stating, "First of all, we know that our school boards and our districts are elected by the people and basically, they set policy in hiring the superintendent. With that said, if a school board already has a policy in place concerning this matter that we're taking up today. And by the way, thank you for all that you've given us in this. If they have a policy of their own and it's actually stronger than the policy that we possibly would pass today, that go forward as the district policy, they can carry out that policy." Mr. Coleman responded, "The language states that "this regulation shall, upon its effective date, preempt, supersede, and replace any district, and I'm leaving out some more, any district policy, to the extent such policy or program is inconsistent with this regulation". Hypothetically, if a district had a requirement that was done different from, but not inconsistent with, this regulation, then it could continue." Ms. Allison further clarified her example, "There are policies already set in some districts that allow parents to sit on those boards or a teacher to sit on the board or, diversity on the board. If that policy is stronger in that amount, how does it affect us here with this amendment?" Mr. Coleman responded that the regulation authorizes the use of a committee composed of board members, and only consisting of board members. So, that would be inconsistent with the regulation. However, he clarified that he did not think that it would be impermissible or inconsistent for there to be observers or even commenters as long as the people voting in the committee are board members. Ms. Allison then asked, "we call on

State Board of Education Minutes
February 13, 2024
Page 13 of 14



Exhibit B

parents or guardians to be able to bring the complaint on the book but that does not keep someone petitioning the board to go before the board to speak against something. Nothing or does it, or that they could send petitions or anything like that. They just can't in this case, they can't ignore an administrative procedure." Mr. Coleman responded, "The public comment hearing that the district board holds, there's nothing in the proposed regulation that says that only parents and legal guardians of students may appear to offer comments. All it says is parents and legal guardians are the ones who can initiate the process. As to the second piece of your question. There's nothing that this regulation does, or frankly, can do, to limit existing First Amendment right of petition and grievance that any person can file a complaint with their representatives. Now, they can file a complaint. It doesn't initiate this process. It may initiate a different process, but they're certainly free to do that."

Dr. Hanley asked, "Since the process would be different for someone who does not have a child in the district, does that in some way violate their 14th amendment protections of equal protection?" Mr. Coleman responded, "Equal protection or due process, and the answer is no. Equal protection and due process require, and I'm speaking very high level broadly, requires similarly situated people to be treated the same. And in this instance, you've got a material distinction between the one and the other, and therefore, they'd be able to be treated differently." Dr. Hanley responded, "I still have concerns about removing the other folks in the district that you know the idea of taxpayer standing still is very important for me." Mr. Coleman responded, "Standing itself is both a Constitutional Article 3 requirement, and a series of prudential requirements that have been created by the Article 3 federal courts, and it's generally mirrored in the state court systems, but it's courts we're talking about. That's separate from what we talked about a minute ago, and you mentioned this morning in the committee meeting sort of the rights of petition and grievance and redress, right? Those are not limited to the court system, right? Those exist to go directly to the representatives of the people, the legislature, so that's one distinction. Secondly, even within the judicial system, whether it's federal Article 3 or at a state level, taxpayer standing, while it does exist, is an anomaly, it's the exception. The general baseline rule that applies to 98% of cases is that the only person who has standing to bring a case is one who is personally, or in the case of a corporation collectively, harmed, right, or injured by the action."

Ms. Allison asked, "Section 16-15-305(c)(1), which is in our South Carolina Court of Laws, this is already in statute, what sexual conduct means. I heard a lot today and I've heard a lot of input, but the misinterpretation of what is trying to be considered here as age-appropriate and that type of thing. When we speak to sexual conduct, this means that is already in statute, am I correct?" Mr. Coleman responded, "That's right, there's already a definition in statute that has been incorporated by reference."

Mr. Walters asked, "My question is procedural in nature. If we choose to pass a regulation in some form today, then it goes to the legislature, they in turn can take it as written, or they can take stuff out and put stuff in as well, is that correct?" Mr. Coleman responded, "Yes." Mr. Walters continued, "So, if something were to pass today, it's not necessarily the final form of

State Board of Education Minutes
February 13, 2024
Page 14 of 14



Exhibit B

what it will look like if it becomes qualified. Mr. Coleman responded, "It goes to the general assembly where there'll be another layer of review, comment, discussion, and approval." A Board Member asked, "Am I correct, and I'm on page one, C four and five in particular. I'm correct in saying that this regulation, as written, does allow for consideration of literary or educational merit, but only in the context of library shelf space, like physical space, or kind of the divvying up of instructional time?" Mr. Coleman explained that it provides guidelines on thinking through placement of books, considering what you already have, what to replace, and what is instructional."

There being no further questions of the presenter, Chair O'Shields called for a motion to approve the proposed regulation, with amendments as presented to the Board. Ms. Slaughter called for an amendment to the motion to be called and offered that, "In regard to Section 4A, I would offer that we consider adding after the second sentence, that no complainant shall file more than five petitions, in any given calendar month. The most appropriate place to insert it would be subsection for A, it would be the second sentence of A." Mr. Harrington seconded the motion. Chair O'Shields opened the floor for discussion. After clarifying the language to be inserted (quoted above), the Chair called for a vote to approve the proposed regulation as presented and as amended. The motion carried.

1. **Second Reading: Proposed State Board of Education (SBE) Regulation S.C. Code Ann. Regs 43-170 (R.43-170), Uniform Procedure for Selection or Reconsideration of Instructional Materials**— Matthew Ferguson, Deputy Superintendent, Division of College, and Career Readiness

FOR INFORMATION
No items.

## XI. OTHER BUSINESS

Chair O'Shields thanked everyone involved in the promulgation process for this regulation. He then thanked Mr. Ferguson for deferring his normal reporting time to allow for extra time in consideration of this regulation. Chair O'Shields also informed the Board Members to turn in their travel forms prior to their departure.

## XII. ADJOURNMENT

There being no further business, the SBE adjourned at 3:12 p.m.