| | | |
|---|---|---|
| South Carolina Association of School Librarians; D.R., by and through his parents, Lean Moore and Charels Rhyne; H.A.C., by and through her parents Susan Cridland-Hughes and Jed Cridland-Hughes; H.M.C., by and through her parents Susan Cridland-Hughes and Jed Cridland-Hughes, | ) ) ) ) ) ) ) ) | C.A. No. 3:26-cv-12857-SAL **Greenville County School District's Memorandum of Law in Support of Its Motion to Dismiss Amended Complaint** |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| Ellen Weaver, in her official capacity as South Carolina Superintendent of Education; et al., | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## I.     <u>INTRODUCTION AND BACKGROUND</u>

Defendant Greenville County School District ("District") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' claims against it pursuant to Rules 12(b)(1) and (6), Fed. R. Civ. P. The Plaintiffs relevant to the asserted claims against the District appear to be the South Carolina Association of School Librarians, and H.A.C. and H.M.C., by and through their parents Susan Cridland-Hughes and Jed Cridland-Hughes. Both H.A.C. and H.M.C. are alleged to be students enrolled in the District, but Plaintiff D.R. is alleged to be a student in the Charleston County School District, and the District does not understand the amended complaint to include claims by D.R. against the Greenville County School District. In a similar vein, the District does not understand the allegations in the amended complaint concerning the

State Superintendent of Education's memorandum issued to State Department of Education staff to apply to the District. This memorandum was not conduct or action by the District, and therefore, any aspect of the amended complaint pertaining to the memorandum is not directed at or viable against the District.

According to the amended complaint, the Plaintiffs appear to seek to challenge the constitutionality of the South Carolina State Board of Education's ("State Board") regulation R 43-170, S. C. Code of Regulations, R 43-170, "that bans all classroom, library, and curricular materials that contain "descriptions or visual depictions of 'sexual conduct, … .'"" (Docket Entry No. ("EN") 36, Amended Complaint, p. 2.) This Regulation was authorized and is implemented by the State Board, and any sanctions imposed under this regulation are imposed by the State Board- not the District or South Carolina Department of Education. The amended complaint alleges that the regulation facially violates the First Amendment because it is a content-based regulation that is substantially overbroad and is unconstitutionally vague because its text fails to provide librarians and other educators with sufficient certainty about what materials do and do not amount to a "description or depiction" of "sexual conduct." (*Id*., p. 3.) However, as also alleged in the amended complaint, any sanctions set forth in the Regulation only apply after the State Board first issues a warning, at which point any material not compliant with the Regulation would be explicitly identified, and a sanction may only be imposed by the State Board for a "knowing or intentional or willful or reckless disregard[]" of the Regulation's criteria and requirements. (*Id*., p. 10, para. 49.) Further, as recognized in the amended complaint, the State Board continues to be in the process of interpreting R 43-170 and clarifying and narrowing its application. (*Id*., p.12, para. 58; EN 36-3, Memo re: R 43-170, dated February 11, 2025.)

Only a handful of allegations in the amended complaint relate to the District, specifically

2

paragraphs 102 through 108. (*Id.*, pp. 20-21.) These allegations state:

"102. H.A.C. is 16 years old and is a junior at Greenville High School, which is part of the Greenville County School District. She founded the Greenville DAYLO chapter and is currently its president. H.M.C. is 14 years old and is a freshman at Greenville High School. H.M.C. joined DAYLO at the start of her freshman year. The Greenville DAYLO chapter meets on campus.

103. At the beginning of the 2025 school year, the Greenville DAYLO chapter expressed interest in reading *The Perks of Being a Wallflower*. School officials informed DAYLO that it was not permitted to read *The Perks of Being a Wallflower* because it was one of the 21 books banned under Regulation 43-170.

104. The Greenville DAYLO chapter does not rely on Greenville High School to provide its books. Ordinarily, its members purchase their own copies or rely on the public library. In some circumstances, the larger DAYLO organization will provide the books.

105. Even though Greenville High School would not provide DAYLO's reading material, it still forbade DAYLO from reading any of the books banned by Regulation 43-170.

106. After starting high school, H.M.C. attempted to locate and check out *The Perks of Being a Wallflower* by Stephen Chbosky, *Identical* by Ellen Hopkins, and *Kingdom of Ash* by Sarah Maas from the Greenville High School's library. None of the books were in the library, although other books from the same series by Sarah Maas were present.

107. Shortly after the Regulation went into effect, both H.A.C. and H.M.C. (who was then in middle school) asked their English teachers if they could borrow a book from their classroom libraries. Both of their teachers told them that they could not borrow a book because the teachers still needed to catalog their classroom

3

libraries.

108. Since the Regulation went into effect, H.A.C. has noticed that most of their teachers at Greenville High School have stopped maintaining in-classroom libraries."

(*Id.*, pp.20-21.)

Contrary to the above-allegations, however, the District made clear to H.A.C. and H.M.C., that the DAYLO student club faculty advisors (who are not "school officials") mistakenly, but in good faith, advised the DAYLO club that it could not read and discuss *The Perks of Being a Wallflower* as a club activity. The District wrote to Plaintiffs' counsel clarifying that "Greenville County Schools wishes to be clear that its policy and practice does not bar the Greenville High School DAYLO student club from reading or discussing *The Perks of Being a Wallflower* as a student club activity." (EN 11-1, Exhibit A, November 13, 2025, correspondence to Allen Cheney, Esq.) Accordingly, since the allegations concerning the DAYLO student club at Greenville High School are moot, the meat of Plaintiffs' remaining allegations against the District is that two students have not been able to borrow three books from the Greenville High School library and that some of their teachers no longer maintain classroom libraries. Allegedly, this state of affairs arises from R 43-170, but no District librarian or teacher is alleged to have had their First Amendment rights chilled or otherwise to have been threatened with a sanction as a result of non-compliance with R 43-170.

In its motion to dismiss, the District contends that: (1) Plaintiffs claims are not ripe for adjudication; (2) Plaintiffs lack standing to assert their claims, and accordingly, the Court lacks subject matter jurisdiction; (3) the District is immune from suit in this Court under the 11th Amendment to the United States Constitution and principles of sovereign immunity; (4) the Court should otherwise abstain from exercising jurisdiction under the *Pullman* abstention doctrine; and

(5) the Plaintiffs allegations fail to state a cause of action upon which relief can be granted.

## II.  <u>STANDARD OF REVIEW</u>

With respect to the District's motion to dismiss the amended complaint pursuant to Rule 12(b)(1), F. R. C. P., the Plaintiffs bear the burden of showing that this court has subject matter jurisdiction over their alleged claims, including Plaintiffs' standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992); *Williams v. United States of America*, 50 F.3d 299 (4th Cir. 1995).  Further, in ruling on a Rule 12(b)(1) motion, the court may consider exhibits outside the pleadings and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  *Id*., at 304.  On the other hand, the District bears the burden of showing Plaintiffs have failed to state a claim for relief that is plausible on its face. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 440 (4th Cir. 2011); *American Gen. Life & Accident Ins. v. Wood*, 429 F. 3d 83, 92 (4th Cir. 2005).

## III.  <u>ARGUMENT</u>

### a.  <u>Plaintiffs' Claims are not Ripe for Adjudication</u>

Fundamentally, Plaintiffs seek a declaratory judgment that R 43-170's prohibition of materials that describe sexual conduct violates the First and Fourteenth Amendments.  Such an adjudication and declaratory relief, at this time, would be premature.  The doctrine of ripeness is designed to limit courts from entangling themselves in abstract disputes by way of premature adjudication.  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-581 (1985).  An unripe claim must be dismissed. *Cause of Action Inst. V. Dep't of Just.*, 999 F.3d 696, 704 (D.C. Cir. 2021).

The determination of whether a dispute is ripe for adjudication involves evaluating the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial consideration. *National Park Hospital Association v. Department of the Interior*, 538 U.S. 803, 808 (2003). Where a complaint is riddled with contingencies and speculation that impede judicial review, it does not state claims fit for adjudication. *Texas v. United States*, 523 U.S. 296 (1998); *Saline Parents v. Garland*, 88 F. 4th 298, 306-307 (D.C.Cir. 2023). Here, the District has not sought to sanction in any manner any school librarian or teacher with respect to instructional materials under R 43-170, and there is no allegation that it has done so or has any intention of doing so. Likewise, even under R 43-170, section VII, any allegation of enforcement action by the State Board is wholly contingent and speculative. First, the State Board would need to determine through an administrative process that specific instructional material violates the criteria of the Regulation. Then, a school district employee would need to disregard the State Board's specific determination. Again, the State Board would need to review the alleged violation through an administrative process and, if a violation is found, issue a warning. Then, again, a school district employee would need to intentionally or recklessly disregard the State Board's warning, and only then would a violation of R 43-170 come back before the State Board for further adjudication entailing a *possible* sanction against a teacher or school librarian. Notably, neither the District, nor the State Superintendent of Education have any role in the State Board's enforcement process under section VII of the Regulation. To date, a proceeding involving even simply a warning has not been brought before the State Board, and there is no allegation of any adverse action taken by the District, much less the State Board, against any school librarian.

Similarly, the claims of H.A.C. and H.M.C. are not ripe for adjudication. Even assuming the allegations to be true that they have not been able to obtain from a school library three books

6

and that some teachers no longer maintain a classroom library, the District, of course, can add or remove books from its libraries, even if R 43-170 is declared to violate the First and Fourteenth Amendments. Regulation 43-170 is not the sole or exclusive font of the District's or its teachers' authority to maintain school and classroom libraries, and it is an entirely speculative and contingent issue whether, in the absence of R 43-170, H.A.C. and H.M.C. would have access to the three books sought or additional classroom libraries and what books they might contain.

This speculative and contingent chain of possible future events is simply too attenuated to be fit for judicial resolution. As noted in *Saline Parents,* "Appellants invite this court to give credence to their surmise that the Government will not only decide to take enforcement action at some point, but that it will take action against Appellants in particular. We decline the invitation because this would be anathema to the judicial function." *Saline Parents*, 88 F. 4th at 307. Accordingly, Plaintiffs' broad and unspecified constitutional claims attacking R 43-170 are too contingent and speculative to be fit for adjudication. Rather, "judicial appraisal is likely to stand on a much surer footing in the context of a specific application of [R 43-170 by the State Board] than could be the case in the framework of [a] generalized challenge." *Am. Tort Reform Ass'n v. OSHA*, 738 F. 3d 387, 396 (D.C. Cir. 2013). Plaintiffs' claims against the District should, therefore, be dismissed.

### b.    <u>Plaintiffs Lack Standing</u>

A plaintiff seeking to invoke the jurisdiction of the federal court bears the burden of showing standing under Article III of the United States Constitution. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). To establish Article III standing, Plaintiff must show: (1) a concrete and particularized invasion of a protected interest, i.e., an injury-in-fact; (2) a causal connection between the injury-in-fact and the challenged

conduct of the District; and (3) it is not speculative, but likely, that the injury-in-fact will be redressed by a favorable decision by this Court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Here, neither H.A.C., H.M.C., nor the South Carolina Association of School Librarians ("SCASL") have plead, much less demonstrated, an injury-in-fact causally connected or fairly traceable to action by the District.

In the school library book removal context, "the injury-in-fact inquiry appears satisfied only where the plaintiff(s) (1) took concrete steps to access the restricted material in the past and/or (2) articulated a concrete plan or desire to access the restricted material in the future." *Pickens County Branch of the NAACP v. School District of Pickens County*, No. 8:23-cv-01736-JDA, 2025 WL 2844248, *8 (D.S.C. 2025). Furthermore, for purposes of standing, Plaintiffs must have had access to a restricted book at the time of its removal. See *Case v. Unified School District No. 233, 908 F. Supp. 864, 873-74* (D. Kan.1995) (finding student did not have injury-in-fact because she did not have access to the book at the time of its removal). Here, H.A.C., who was a junior at Greenville High School, has alleged no concrete step or plan in the future to access any restricted material, and as set forth in the District's correspondence to Allen Chaney (EN 11-1, Exhibit A), the District has not restricted the Greenville High School DAYLO student club from reading and discussing allegedly restricted material. Only H.M.C., who was a freshman at Greenville High School, allegedly has attempted in the Fall of 2025 to locate and check out *The Perks of Being a Wallflower*, *Identical*, and *Kingdom of Ash* from Greenville High School's library. (EN 36, pp. 21, para.106.) However, each of these three books was restricted by the State Board during the 2024-2025 school year. (EN 11-2, Exhibit B, collected book removal orders of the State Board.) Accordingly, at the time the books were removed, H.M.C. was in the eighth grade and not a student at Greenville High School. H.A.C. and H.M.C. have not established an injury-in-fact fairly

traceable to the District and, therefore, have not established the required Article III standing to invoke this Court's jurisdiction.

Likewise, SCASL has not established standing. First, SCASL does not allege organizational standing. In other words, SCASL does not allege or seek redress for any alleged injury to itself as an organization. Rather, the amended complaint appears to allege associational standing, whereby SCASL seeks redress against the District for the alleged chilling of its member school librarians' protected speech due to R 43-170. See *White Tail Park, Inc. v. Stroube*, 413 F. 3d 451, 458 (4th Cir. 2005). To establish associational standing, SCASL must show its members would otherwise have standing to sue as individuals, the interests at stake are relevant to the organization's purpose, and neither the claim made, nor the relief requested requires the participation of individual members in the civil action. *Hunt v. Washington State Apple Advert. Commission*, 432 U.S. 333, 343 (1977). With respect to the District, however, there is no allegation supporting the standing of any of its members in District, including that a District school librarian has had their First Amendment rights chilled in any respect by an action of the District. *Saline Parents v. Garland*, 88 F. 4th at 304 (cognizable chilling injury cannot arise merely from individual's knowledge that a governmental agency was engaged in investigative and data-gathering activities or that the agency might in the future take some action detrimental to that individual). The only allegations regarding a school librarian relate to the Fort Mill School District and the actions of the State Board. Further, the actions of school librarians under R 43-170 are as District employees, and as such they do not involve protected First Amendment speech or activities. See *Savage v. Gee*, 716 F. Supp. 2d 709 (S.D. Ohio 2010) (Librarian's recommendation of book while serving on university committee was not protected by First Amendment); *Boring v. Buncombe County Board of Education*, 136 F. 3d 364 (4th Cir. 1998) (Teacher's dispute over

9

curricular issues is an ordinary employment dispute and does not constitute protected speech). SCASL has not alleged that a warning has even been issued against a school librarian by the State Board, much less the District, and, although the District greatly appreciates the perspective and services of its school librarians and understands the complexities of their jobs, SCASL has made no showing that the protected First Amendment activities of any school librarian in the District has been chilled or infringed. Consequently, it has not been shown that a SCASL member in the District has suffered or is presently exposed to suffering an injury necessary to support SCASL's associational standing to prosecute its claim against the District.

### c. <u>Sovereign Immunity</u>

The District is entitled to immunity from suit under the Eleventh Amendment to the United States Constitution. The District is an "arm of the state" and consequently this Court lacks jurisdiction over the Plaintiffs' alleged claims against it. Under the Eleventh Amendment, a state is immune from suits brought in federal courts by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 17 (1890). This sovereign immunity protects from suit not only the "state" itself, but its agencies, divisions, departments, officials and other arms of the state. *Will v. Michigan Department or State Police*, 491 U.S. 58, 70-71 (1989). The specific issue of whether the District is an arm of the state entitled to sovereign immunity was directly addressed in *Smith v. School District of Greenville County*, 324 F. Supp. 2d 786 (D.S.C. 2004). In a detailed decision, then District Court Judge Floyd reviewed scores of statutory and regulatory provisions establishing and reflecting the state's pervasive control over the District and unequivocally held "the Court is of the firm opinion that the relationship between the Defendant school districts and the state is so close and the laws of this state are such as to render the Defendant school districts arms of the state for purposes of Eleventh Amendment sovereign immunity. *Id*. at 796; see also, *Eldeco, Inc. v.*

*Skanska USA Building, Inc.,* 447 F. Supp. 2d 521 (D.S.C. 2006); *cf. Anderson v. Dorchester County*, No. 2:20-cv-2084, 2021 WL 1186637, *8-9 (D.S.C. 2021) (denying motion to dismiss on grounds of sovereign immunity and discussing differing decisions regarding applicability of sovereign immunity to school districts in South Carolina). Here, not only does Judge Floyd's decision in *Smith* specifically and exhaustively outline the state's pervasive control over the District, but R 43-170 further highlights this control by exemplifying the state's pervasive control over the District through the State Board's imposition of specific criteria and procedures relating to the District's instructional materials. Accordingly, this Court, in line with the holding in *Smith,* should affirm the District's sovereign immunity and dismiss the Plaintiffs' claims against the District for lack of jurisdiction.

### d. *Pullman* Doctrine Abstention

This Court should abstain from exercising jurisdiction over Plaintiffs' claims against the District pursuant to the *Pullman* abstention doctrine. *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941). *Pullman* abstention applies in cases presenting federal constitutional issues which might be clarified, presented in a different posture, or mooted by a state court determination of pertinent law. *Pullman* abstention is particularly appropriate, as here, where an unconstrued state statute is susceptible of a construction by state courts which would materially change the nature, avoid, or minimize the need for federal adjudication. *Meredith v. Talbot County, Maryland*, 828 F. 2d 228, 231 (4th Cir. 1987); *National Capital Naturists, Inc. v. Board of Supervisors of Accomack County, Virginia*, 878 F. 2d 128, 131 (4th Cir. 1989) (where the validity of an ordinance and the sweep of its prohibitions were in question, abstention was appropriate). Further, for *Pullman* abstention to apply, there need not be any current state civil action pending regarding the claims. See *National Capital Naturists*, 878 F. 2d at 132.

Here, the gravamen of Plaintiffs' claims against the District is that R 43-170 is vague and overly broad. However, it is admitted in the amended complaint that the State Department of Education and State Board have and are seeking to clarify the criteria and review standards respecting affected instructional materials under R 43-170. (See EN 36-3.) Furthermore, under R 43-170, each challenged book or instructional material is subject to formal administrative review by the State Board, which in turn is subject to administrative and judicial review. (See, e.g., EN 11-2, Exhibit B, State Board orders; S.C. Code of Laws, Ann., section 1-23-600(E) (Administrative Law Court appeal) and section 15-53-10, et seq. (Declaratory Judgments Act).) Accordingly, through available state administrative and judicial procedures, any alleged vagueness, ambiguity, over breath, or improper decision by the State Board regarding instructional materials may be reasonably and adequately addressed. *South Carolina State Conference of NAACP v. Wilson*, No. 2:23-cv-01121-DCN, 2023 WL 5207978, at *8 (D.S.C. 2023) (court abstained under *Pullman*, noting "plaintiffs have provided no reason to suggest that exercising jurisdiction prior to a State Supreme Court ruling would be anything but a needless federal intervention into local affairs. [internal quotation and citation omitted]"); *Sea Cabin on the Ocean IV Homeowners Association v. City of North Myrtle Beach*, 828 F. Supp. 1241, 1249-50 (D.S.C. 1993) ("*Pullman* abstention is certainly appropriate here and prevents this Court from addressing the merits of Plaintiff's taking claim."). Unquestionably, either the State Board, Administrative Law Court, or South Carolina Judicial Branch through available process could well further clarify and narrow the application of R 43-170, especially with respect to the criteria concerning descriptions of sexual conduct and any available sanctions the State Board might have authority to impose on individual school librarians. Indeed, Exhibit C to the amended complaint clearly shows that this state-level and state-initiated clarification process is available and has begun. (EN

36-3.)

### e.  **Plaintiffs Fail to State a Claim**

Plaintiffs' amended complaint must plausibly allege a claim for relief.  Under Rule 12 (b)(6), F.R.C.P., a claim should be dismissed if it fails to plausibly state a claim upon which relief can be granted.  To have plausibility, the allegations must assert factual content that allows the Court to draw reasonable inferences that the Plaintiffs are entitled to relief or the District is liable for the alleged constitutional violations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs' allegations against the District do not meet this standard; neither the SCASL, H.A.C., nor H.M.C. have alleged as a matter of law a plausible constitutional violation against the District.

As discussed above, SCASL has alleged its members' free speech under the First Amendment is chilled, and H.A.C. and H.M.C. have alleged their free access to information under the First Amendment has been denied by R 43-170.  However, R 43-170, as a State Board regulation, is clear that it establishes criteria for school district instructional materials and a procedure for removing instructional materials that do not meet its criteria.  Instructional materials fall squarely within the bounds of a school district's curriculum.  The Fourth Circuit has emphasized the contours of school curriculum are broad and include school expressive activities from notices posted on teachers' doors to theatrical productions and school sponsored publications. See *Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir. 1998); *Newton v. Slye*, 116 F. Supp. 2d 677 (W.D. Vir. 2000); *Penguin Random House, LLC v. Robbins*, 172 F. 4th 581, 585 (8th Cir. 2026) (school library is fairly characterized as part of school curriculum).  Clearly, here too, instructional materials as defined by the State Board constitute part of the District's curriculum.  (See R 43-170, definitions of "Instructional Program" and "Instructional Materials.")

The Fourth Circuit made clear in *Boring* that school boards' curricular decisions do not

generally implicate the First Amendment, and that a school employee has no constitutional right to define, even in part, the public-school curriculum. The District seeks respectful input and seriously considers the views of faculty in making curricular decisions; however, SCASL members do not have a protected First Amendment right to pick and choose to add or remove from the District's school libraries' reading and other instructional materials, which the District decides to make available to its students.

For a similar reason, H.A.C. and H.M.C. cannot state a claim. Certainly, if District employees such as teachers and librarians do not have a protected First Amendment right to determine the District's curriculum, students do not have that authority under the guise of a right to access information. Although students may have a right to access information, this right does not reach so far into to the public schools as to empower students to dictate, even partially, school instructional materials or programs. "[I]t is within the power of the school board to determine what shall be taught and how it will be taught." *Newton*, 116 F. Supp. 2d at 686, citing *Boring*, 136 F. 3d at 370; see also, *Penguin Random House, LLC v. Robbins*, 172 F. 4th at 587. Recently, courts have addressed this issue under the framework of Government speech arriving at differing conclusions. See, e.g., *Parnell v. School Board of Escambia County, Florida*, 802 F. Supp. 3rd 1361, 1366-67 (N.D. Fla. 2025); *Little v. Llano County*, 138 F. 4th 834 (5th Cir. 2025)(en banc) (both finding libraries to be government speech and/or not public fora entailing right of access to information); *cf. GLBT Youth in Iowa School Task Force v. Reynolds*, 114 F. 4th 660 (8th Cir. 2024); *Penguin Random House, LLC v. Gibson*, 796 F. Supp. 3d 1052 (M.D. Fla. 2025) (finding no government speech). Here, in light of the clear precedent under *Boring* and the clear and succinct analysis in *Robbins*, the distinctions and disagreements involving what constitutes government speech need not be reached. Instructional program materials, as identified in R 43-

170, encompass school libraries and constitute District curricular materials subject to the exclusive control of the District. Under *Boring*, decisions by the District excluding or including curricular or instructional materials do not implicate the First Amendment rights of H.A.C. or H.M.C. "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion … section 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of the discretion which do not rise to the level of violations of specific constitutional guarantees." *Newton*, 116 F. Supp. 2d at 687 (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975). Accordingly, as a matter of law, Plaintiffs' amended complaint fails to state a claim for relief against the District.

## IV. CONCLUSION

For the foregoing reasons, the District respectfully asks this Court to dismiss the Plaintiffs' amended complaint against it.

Respectfully submitted,

HALLIGAN MAHONEY WILLIAMS SMITH FAWLEY & REAGLE, PA

By: s/ John M. Reagle
    John M. Reagle, Fed. I.D. No. 7723
    jreagle@hmwlegal.com

    Thomas K. Barlow, Fed. I.D. No. 7483
    tbarlow@hmwlegal.com

    P.O. Box 11367
    Columbia, South Carolina 29211
    (803) 254-4035

    **Attorneys for Greenville County School District**

June 16, 2026

Columbia, South Carolina